1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**INSTITUTE FOR JUSTICE**
Joshua House                     Robert Johnson*
(CA Bar No. 284856)        (OH Bar No. 0098498)
Jared McClain*                 16781 Chagrin Blvd.,
(DC Bar No. 1720062)       Suite 256
901 N. Glebe Rd,             Shaker Heights, OH 44120
Suite 900                         T: (703) 682-9320
Arlington, VA 22203         rjohnson@ij.org
T: (703) 682-9320
jhouse@ij.org                   *Application for admission
jmcclain@ij.org               pro hac vice forthcoming

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
derek.mayor@pillsburylaw.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### EUREKA DIVISION

| | |
|---|---|
| CORRINE MORGAN THOMAS and DOUG THOMAS, a married couple; BLU GRAHAM; and RHONDA OLSON, on behalf of themselves and all others similarly situated, | Case No. 1:22-cv-5725 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| COUNTY OF HUMBOLDT, CALIFORNIA; HUMBOLDT COUNTY BOARD OF SUPERVISORS; HUMBOLDT COUNTY PLANNING AND BUILDING DEPARTMENT; VIRGINIA BASS, MIKE WILSON, REX BOHN, MICHELLE BUSHNELL, and STEVE MADRONE, in their official capacity as Supervisors of Humboldt County; and JOHN H. FORD in his official capacity as Planning and Building Director, | |
| Defendants. | |

Complaint – Case No. 1:22-cv-5725

1

United States District Court
Northern District of California

**INTRODUCTION**

1.      Humboldt County fines landowners hundreds of thousands of dollars for things they never did because it doesn't investigate the charges it files.  The accused then rarely ever get the chance to defend themselves because the County withholds hearings from those who fight the baseless charges against them.

2.      While the County makes accused landowners wait indefinitely for an administrative hearing, fines continue to accumulate and the County denies them permits to develop their property. The only way out is to pay the County, one way or another.

3.      The County's code enforcement policy is designed to squeeze every dollar it can from legalized marijuana, often at the expense of innocent people.

4.      After California legalized recreational marijuana, Humboldt County created an "abatement" program, under which it alleges that landowners have committed traditional nuisances and permitting violations in order to cultivate marijuana without a permit.

5.      By alleging that code violations relate to illegal cannabis cultivation, the County exponentially increases the fines for those violations, regardless of whether the violation poses any harm to the community.  Minor violations like building a temporary greenhouse without a permit suddenly carry a daily fine between $6,000 and $10,000.

6.      Relying on crude aerial images that show harmless things like greenhouses on a property, the County will allege, without probable cause, that the greenhouse's presence means the landowner must be growing marijuana illegally.  Based solely on that image, the County will issue a $10,000 fine for the greenhouse, plus another $10,000 fine for unpermitted cultivation because the County will allege—again, without any proof or investigation—that the greenhouse must have illegal marijuana inside.  The County will often tack on another $10,000 daily fine by alleging that the owner couldn't have built a greenhouse without also grading their land without a permit.

7.      The County's dragnet approach to code enforcement catches plenty of harmless conduct and innocent landowners, including people growing their own food and people who just purchased their property and have done nothing wrong.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

8.    Even when the alleged code violations simply reflect the failure to obtain a permit before developing property, the County will not issue the landowner the permit that would cure the violation.  Nor will it drop its fines when an accused offers proof that there is no marijuana growing on their property.

9.    The County makes accused landowners wait *years* and pay up to $4,500 for a hearing at which they can finally defend themselves against the County's accusations.  As the County delays the hearing, it refuses to issue other permits for the property and pressures the landowner to settle.

10.    In the rare instance that the County ever does schedule an administrative hearing, the County does not let a jury decide whether the landowner violated the code in order to cultivate cannabis—a factual determination that can multiply the landowner's penalty by 10 times or more. Instead, a law firm hired by the County decides the facts of the case.

11.    Humboldt County's abatement program violates due process, imposes unconstitutional conditions and unconstitutionally excessive fines and fees, and deprives accused landowners of their right to a jury.

12.    Accordingly, the named Plaintiffs, on behalf of themselves and a putative class of similarly situated landowners, seek to enjoin the County's unconstitutional implementation and enforcement of its abatement program.

## JURISDICTION AND VENUE

13.    Plaintiffs bring this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, for violations of rights, privileges, or immunities secured by the U.S. Constitution.

14.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343 (civil-rights jurisdiction).

15.    Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**PARTIES**

16.     Plaintiffs Corrine Morgan Thomas and Doug Thomas are adult citizens of the United States and residents of Humboldt County, California.  The Thomases face $1,080,000 in fines, the ordered destruction of their three-story workshop (an additional cost of $180,000), plus thousands in fees to the County because someone else grew marijuana at their property over two years before they bought it.

17.     Plaintiff Blu Graham is an adult citizen of the United States and a resident of Humboldt County, California.  He faced $900,000 in fines based on unfounded and uninvestigated allegations that he was growing marijuana in greenhouses that the County saw in satellite images of his property.  Really, he was growing vegetables for his restaurant.  He waited 4.5 years for a hearing to contest the baseless charges that he was growing marijuana, during which the County withheld a permit he needed for his house.  As Blu was preparing the filing of this lawsuit, the County suddenly scheduled his hearing and agreed to drop its claims against him (and issue a permit that it had been wrongfully denying since 2018) if he waived his right to a hearing and paid back the $3,747 in fees that accumulated as the County dragged out his case for 4.5 years.

18.     Plaintiff Rhonda Olson is an adult citizen of the United States and a resident of Humboldt County, California.  She faces over $7 million in fines because someone else grew marijuana on her property before she purchased it.  The County has also prohibited her from developing her property—the very reason she bought it—while her case is pending.  She's been waiting over two years for a hearing.

19.     Defendant County of Humboldt is a general-law county within California.

20.     At all times relevant to the facts of this case, Humboldt County and its officials, agents, and employees have acted under color of law.  The actions that give rise to Plaintiffs' claims are, unless otherwise indicated, taken pursuant to the policies, practices, and customs of the County, at the direction of, with the knowledge of, and through the actions of its former and current policymakers, including its Board of Supervisors and its Planning and Building Department.

21.     Defendant Humboldt County Board of Supervisors is the legislative and executive body of the County's government.  The Board of Supervisors passed the ordinances at issue in this case, and it controls, directs, and funds the County's Planning and Building Department and its subsidiary Code Enforcement Unit.

22.     Defendant Humboldt County Planning and Building Department is a division of the Humboldt County government tasked with enforcing laws, ordinances, and policies regarding planning and building, including code violations.  Humboldt's Code Enforcement Unit is part of the Planning and Building Department.

23.     Defendant Virginia Bass is Chair of the Board of Supervisors.

24.     Defendant Mike Wilson is Vice Chair of the Board of Supervisors.

25.     Defendant Rex Bohn is a member of the Board of Supervisors.

26.     Defendant Michelle Bushnell is a member of the Board of Supervisors.

27.     Defendant Steve Madrone is a member of the Board of Supervisors.

28.     Defendant John H. Ford is the Director of the Humboldt County Planning and Building Department.  The Director supervises the Planning and Building Department, and he exercises the Department's statutory power, including that of the Department's Code Enforcement Unit.

**STATEMENT OF FACTS**

29.     Humboldt County is a mostly rural community of about 54,000 households spread across 4,052 square miles, 80% of which is forestlands, protected redwoods, and recreation areas.

30.     About half of Humboldt residents live in unincorporated and isolated parts of the County.

31.     The County is economically depressed.  Humboldt residents earn an average yearly income of roughly $29,500, well below the national average, and about 16% of residents live in poverty.

32.     For decades, the County has attracted off-the-grid homesteaders, hippies, and other counterculture and anti-government types.

United States District Court
Northern District of California

33. As a likely result of the County's geographic, economic, and political makeup, Humboldt has scarcely enforced its building code as thousands of its residents built homes and accessory structures and graded land without first obtaining a permit from the County.

34. The County allowed this culture of unpermitted development to grow unabated.

35. After Californians voted to legalize the recreational use of marijuana, however, Humboldt County gained a newfound rigor for enforcing the permitting requirements and nuisance laws that it had overlooked or left unenforced for decades.

36. The County amended its code to authorize the Planning and Building Department to police cannabis cultivation along with public nuisances and permitting requirements.

37. The Planning and Building Department then began an "abatement" program, under which it charges residents with code violations and alleges that those violations must be connected to illegal marijuana growth.

38. Faced with the same constraints that made code enforcement difficult historically in Humboldt, the Planning and Building Department devised a strategy to supercharge its abatement regime: *ticket everyone* and force the accused to prove their innocence.

39. The County imposes tens of thousands of dollars in daily fines on landowners without evidence or an investigation to determine whether they grew marijuana illegally.

40. The County's policy and practice is to accuse landowners of code violations relating to marijuana without regard for probable cause that a landowner grew marijuana illegally.

41. The County then imposes ruinous daily fines for things like the failure to get a permit before building a greenhouse if the County thinks a landowner might be growing marijuana.

42. Even when a code violation is just the failure to obtain a permit, the County doesn't allow the landowner to abate the "nuisance" by obtaining the permit in question. Indeed, the County won't issue *any* permits to properties under abatement orders.

43. Instead, the County orders landowners to destroy unpermitted structures within 10 days or the daily fines kick in—simply because the County alleges that the structures once had something to do with marijuana.

Complaint – Case No. 1:22-cv-5725

44. Photographic proof that there is no marijuana growing on their property is not enough to get the County to stop the fines.

45. Landowners who weren't growing marijuana illegally and who don't want to destroy their property must appeal the charges to an administrative "court" run by Code Enforcement.

46. The County waits *years* before scheduling administrative hearings.

47. The fines continue to accumulate and the County refuses to issue other necessary permits unless the landowner pays money to settle their case.

48. Landowners who agree to apply for permits to grow cannabis commercially, however, can get their fines reduced or dismissed.

49. The County's enforcement regime is designed to maximize squeeze every dollar the County can out of its residents as it tries to maximize its proceeds of legalized marijuana.

50. Landowners fined without probable cause cannot escape the process without paying the County—either in the form of fines, a settlement, administrative fees, or the licensing fees and taxes that the County charges to allow them to grow commercially in exchange for dismissing the code violations.

51. The County's unconstitutional implementation and enforcement of this abatement program gives rise to the facts in this Complaint.

**A. Humboldt County Began Aggressively Prosecuting Building Code Violations Following Marijuana Legalization**

52. California voters passed Prop 64 in November 2016 to legalize marijuana use for adults over 21 years old as of January 1, 2018.

53. In response to legalization, Humboldt began amending its tax system and civil code throughout 2017.

54. Under the County's tax and fee schemes for marijuana, a commercial permit costs up to $86,560 in application and licensing fees, plus thousands of dollars in additional fees to cover the time that County staff has taken to work on an application. Commercial growers must also pay

annual taxes up to $3 per square foot of a cultivation area, which the County charged regardless of whether marijuana is actually grown on such property.

55.     These laws created a massive financial incentive for the County to push landowners into commercial growth.

56.     In 2018 alone, the County took in about $5 million in permits and fees.

57.     The Board of Supervisors also passed several other ordinances in 2017 to impose massive fines and fees on anyone who grows marijuana in Humboldt without obtaining a permit from the County.

58.     Growing cannabis without a permit now qualifies as a "Category 4 violation" of the county code—the code's most severe offense, which carries a daily fine of $6,000 to $10,000.

59.     But the County did not stop at punishing illegal growth: The Board of Supervisors also amended the county code to increase the penalties for *all* code violations that the County alleges "exist[] as a result of or to facilitate the illegal cultivation of cannabis."

60.     As a result of these changes, minor code violations like the failure to obtain a building permit now also become Category 4 violations subject to $10,000 in daily fines automatically whenever the County alleges that a landowner violated the code in order to facilitate the unpermitted growth of marijuana.

61.     Violations that would typically carry fines between $1 to $1,000 multiply by a factor of 10 or more based solely on an alleged nexus between the alleged violation and marijuana.

62.     To increase the County's capacity to enforce its new cannabis-related regulations, the Board of Supervisors more than doubled the number of full-time Code Enforcement officers.

63.     The 2017 code changes also replaced the County's complaint-based enforcement system and authorized the Code Enforcement Unit to proactively enforce state and local laws regarding marijuana cultivation.

64.     The County's proactive, cannabis-focused enforcement mandate extended the purview of the Planning and Building Department and its Code Enforcement Unit beyond the

traditional role of processing permit applications and abating nuisances that pose a danger to the public welfare.

65.     The Board of Supervisors directed the Planning and Building Department to implement all these changes by January 1, 2018, when legalization would take full effect in California.

66.     As a result, once marijuana became legal, a newly constituted Code Enforcement Unit was in place to aggressively enforce code violations in Humboldt County.

67.     Coming as they did after legalization, the County's code and enforcement policy changes appear calculated to boost county revenue by extracting fines and fees from residents who don't pay for costly commercial permits and increased property taxes for commercial growth.

**B.  Humboldt County Imposes Ruinous Fines Without Regard for Probable Cause**

68.     The Planning and Building Department has run wild with its new fine-driven mandate and adopted a policy and practice of charging cannabis-related code violations without proof or process.

69.     By indiscriminately charging cannabis-related code violations, the County's policy has punished innocent people throughout the County.

70.     In 2018, the Department's first year prosecuting cannabis-adjacent building and permitting issues, the County increased code enforcement by about 700 percent, resulting in the County's assessment of $3 million in fines that year.

71.     To increase enforcement so rapidly, the County adopted a policy and practice of charging Category 4 violations without regard for probable cause.

72.     Category 4 violations, which carry fines of $10,000 per day, are those that are "committed intentionally or through inexcusable neglect and have a significant and/or substantial impact on the health, safety, comfort, and/or general welfare of the public."

73.     The County's policy and practice, however, is to charge cannabis-related Category 4 violations without any proof that landowners violated the county code intentionally or through

1    inexcusable neglect to grow cannabis illegally and without regard for whether a cannabis-related

2    code violation has a significant or substantial impact on health, safety, comfort, or general welfare.

3    74.    The County administers its blanket enforcement by using a satellite-imaging program

4    that provides the County with aerial images of property in the County.

5    75.    Using satellite imaging, County officials identify properties that may have a

6    greenhouse, building, a graded flat of land, an access road, or trees removed without a permit on

7    record.

8    76.    Prior to the County's access to satellite imagery and data, it issued far less than 100

9    citations per year.

10    77.    In the roughly four years since the County began using satellite imagery and data, it

11    has issued cannabis-related citations to over 1,200 properties.

12    78.    The crude satellite images that the County relies on reveal plenty of activity wholly

13    unrelated to cannabis growth—let alone *illegal* growth in a state that allows residents to grow

14    cannabis for medical and recreational use.

15    79.    Many people in rural Humboldt grow their own food, often out of necessity.

16    80.    The crude satellite images that the County relies on cannot distinguish between a

17    greenhouse growing food and one growing cannabis commercially.

18    81.    Indeed, the images do not reveal anything about the contents of a greenhouse or other

19    structure.

20    82.    The County's policy and practice is to charge a landowner with unpermitted

21    commercial cannabis cultivation based merely on a satellite image that shows a hoop house (a

22    temporary greenhouse built from PVC pipes and a plastic covering), a larger greenhouse, or some

23    other accessory structure.

24    83.    A greenhouse in a crude satellite image is not probable cause that a landowner is

25    growing marijuana in the greenhouse.

26    84.    Many people in Humboldt live on property once owned by logging companies that

27    graded the land to help clear timber up through the 1980s.

28

United States District Court
Northern District of California

85.    The crude satellite images that the County relies on are unable to reveal the origins or purpose of a grade.

86.    Nor can the crude satellite images show whether the amount of soil graded exceeded the threshold that requires a permit.

87.    Indeed, the flat images often can't show whether there is a grade at all.

88.    But the County still treats a greenhouse as proof that there must be grading.

89.    A greenhouse in a crude satellite image is not probable cause that a landowner graded land without a permit.

90.    More importantly, the County cannot determine from a crude satellite image alone that a landowner built a greenhouse or graded their land *for the purpose of* cultivating cannabis.

91.    The County charges a range of cannabis-related Category 4 violations based solely on satellite images that show greenhouses, gardens, graded flats of land, and rainwater-catchment units.

92.    The County elevates these charges to Category 4 violations without evidence of cannabis cultivation—let alone evidence amounting to probable cause that the landowner violated the code to facilitate illegal growth.

93.    On information and belief, the County takes no investigative steps to confirm the presence of *any* cannabis in the greenhouse or on the graded flat found in a satellite image—let alone whether the cultivation is illegal.

94.    The County's enforcement-by-satellite practice is so crude and indiscriminate that it has led the County to accuse the nuns at the Redwoods Abbey of running an illegal cannabis operation based on their vegetable garden.

95.    The County has similarly accused vegetable and lavender farmers of having cannabis in their greenhouses when it was just vegetables and lavender.

96.    The County also has a policy and practice of imposing fines on new purchasers or inheritors of land in Humboldt despite lacking any probable cause that these new owners committed Category 4 violations.

97.     Indeed, the county code includes a *mens rea* requirement for Category 4 violations, limiting the most severe punishments to those committed intentionally or with inexcusable neglect.

98.     But the County charges cannabis-related Category 4 violations without regard for intent or culpability.

99.     When someone purchases or inherits a parcel, the County's policy and practice is to wait until a new owner records their title and then fine them for violations relating to a prior owner's alleged cannabis growth—even when the County knows that the new owner has not grown cannabis or committed the cannabis-related violations it charges.

100.     The County does not record cannabis-related code violations, so they do not appear in a title search.

101.     The County will insist, under threat of tens of thousands of dollars in daily fines, that the new owner must return their new property to its "pre-cannabis state," a murky concept that requires the owner to destroy any structures and re-grade land that the County alleges once had a nexus to cannabis.

102.     In many cases, returning a property to its pre-cannabis state is more hazardous to the environment than leaving structures or grading as they are.

103.     The County imposes these penalties and fees regardless of the cost to the current owner and regardless of whether there was cannabis cultivated in a structure or on a flat of land after the current owner's purchase of the property.

**C.  The County's Abatement Program Is Designed to Force Owners into Settlements**

104.     The County designed its cannabis-related code and enforcement regime to inflict so much pressure on accused landowners that they feel compelled to settle the County's claims.

105.     The County creates settlement pressure from the very day it issues a Notice of Violation and Proposed Administrative Civil Penalty and Notice of Abatement (together as "NOV").

106.     Service is considered effected under the county code when the County sends notice by certified mail and posts a copy on the subject property.

107.    The 10-day clock, therefore, begins to run before a landowner receives actual notice of an alleged violation in the mail.

108.    The County often obscures when the clock starts by dating notices before the date it actually effects service.

109.    The County also typically posts the notice on a Friday to create the false impression that four of the 10 days fall on a weekend, leaving landowners with the mistaken belief that they have just one full week to weigh the risks of costs of incurring fines, fees, and the other costs associated with abating or opposing any alleged cannabis-related violations.

110.    Additionally, the County posts notice in the newspaper to publicly accuse landowners of growing cannabis illegally.

111.    The County makes these public accusations against landowners regardless of whether it has probable cause that they have grown marijuana illegally.

112.    Once served with an abatement order, the accused faces immense pressure to settle due to the County's issuance of ruinous fines unsupported by any legitimate governmental interest, its refusal to drop baseless charges, its delay in providing hearings, its denial of permits while abatements are pending, and the cost the County imposes to prove one's innocence.

**1.    Humboldt County Issues Ruinous Fines and Fees Unsupported by Any Governmental Interest**

113.    The County imposes cannabis-related Category 4 penalties without any regard for whether the penalty amount serves a valid governmental interest.

114.    Indeed, when assessing fines for cannabis-related code violations, the County's policy and practice is to ignore the county code's mitigating factors such as the owner's culpability, history of similar offenses, and the severity of the impact on public health and safety.

115.    The County's policy and practice is to issue the maximum $10,000 daily fines regardless of whether there aren't any health and safety concerns, complaints, prior violations, or culpability, and regardless of whether the County's entire investigation consisted of viewing a satellite image.

116.    Indeed, County officials have insisted that a violation does not need to cause *any* actual harm to justify a maximum daily fine of $10,000.

117.    While one daily fine of $10,000 would be unconstitutionally excessive for the innocent and harmless conduct and paperwork violations for which the County imposes Category 4 violations, the County multiplies pressure on landowners exponentially through a policy and practice of charging duplicative violations.

118.    On average, the County charges about three Category 4 violations per property.  For instance, an unpermitted hoop house could result in three separate violations: (1) building a hoop house without a permit; (2) grading the land without a permit to build the hoophouse; and (3) growing marijuana illegally in the hoophouse.

119.    Taken together, Code Enforcement will impose up to $30,000 in *daily* fines for building a temporary hoop house without a permit by alleging—without further investigation or evidence—that a hoop house itself is proof that a landowner also graded their land and grew cannabis without a permit.

120.    A single day's worth of $30,000 daily fines already exceeds the average yearly income for Humboldt residents.

121.    The daily fines accumulate for 90 days—quickly exceeding one million dollars in many cases—unless the landowner "abates" the alleged nuisance within 10 days.

122.    If the condition still exists after the 90 days of fines, the County can re-notice the violation and impose another set of daily fines for 90 more days.

### 2.  Innocent Landowners Cannot Escape an Abatement Order Without Paying

123.    Other than immediately paying to settle an abatement order, there is rarely a way for innocent landowners to quickly resolve their case.

124.    Even though the County often charges Category 4 violations for things like the failure to obtain a permit (which can cost just $6 for every $1,000 in construction value), the County does not allow an accused landowner to obtain the permit that would resolve the abatement order.

125.    Without regard for public safety, the environmental impact, or the cost to the owner, an abatement notice will order landowners to destroy unpermitted structures and re-grade land solely because there was marijuana grown on the property at one point.

126.    The County requires landowners to demolish structures that would qualify for permits if it alleges the structure has a nexus to illegal cultivation.

127.    For those structures not currently up to code, it is often still cheaper for the landowner to bring the structure into compliance than to demolish it.

128.    But the County will rarely allow landowners to bring a structure up to code because its policy and practice of ordering the destruction of buildings with an alleged nexus to cannabis is a major part of the leverage it creates for its fine-driven enforcement scheme.

129.    Some structures under abatement orders are large, permanent structures that require an engineer, demolition permits, high labor costs, and even an environmental impact study before the owner can tear down the structure.

130.    As a result, an abatement order can cost a landowner over $100,000 to demolish harmless and stable structures and land simply because cannabis may have once been cultivated on the land—even when the guilty party is a prior owner or trespasser.

131.    Even if a landowner destroys a structure within 10 days, it's often still not enough to get the County to dismiss a violation.

132.    Dozens of landowners in Humboldt have sent the County pictures during the 10-day abatement period to show that they destroyed an unpermitted hoop house and there is no cannabis, and the County still refused to drop the charges.

133.    Neither proof of innocence nor proof that the alleged nuisance is abated is enough to escape.

134.    The County's policy and practice is to keep landowners trapped in its abatement process until they pay the County.

United States District Court
Northern District of California

3.   **The County Refuses to Provide Timely Administrative Hearings While It Pressures Accused Landowners to Settle**

135.   Another way the County pressures landowners to settle is by delaying administrative hearings indefinitely.

136.   An NOV includes an "Attachment C," which an accused landowner can file to seek an administrative hearing.

137.   Once an accused landowner files their Attachment C, the county code permits Code Enforcement to schedule an administrative hearing "no *sooner*" than 15 days after the notice of appeal.

138.    The code does not impose a maximum time limit on how long the County can take to schedule an administrative hearing.

139.   The County does not stay the accrual of fines upon the filing of an Attachment C to request an administrative hearing nor during settlement negotiations.

140.   The County's policy and practice is to wait years before scheduling an administrative hearing.

141.   Even if the County scheduled a hearing within 15 days, the soonest the code allows, a landowner must incur *at least* five days of daily fines before they are even allowed to receive their hearing.

142.   But the County's policy and practice is to ensure that the full 90 days of fines run against anyone who seeks an administrative hearing.

143.   Consequently, people who seek an administrative hearing must incur hundreds of thousands—if not *millions*—in fines just to defend themselves.

144.   The fines that accrue while an owner waits for a hearing increase the risk and cost of demanding a hearing—even when the County cannot ultimately prove the presence of cannabis.

145.   If a landowner requests a hearing because they were falsely accused of violating the code *for the purpose* of growing cannabis, and then successfully shows they did not grow cannabis,

the County can still "prevail" at the hearing by proving that the accused committed the underlying code violation.

146.    In other words, by delaying hearings and refusing to stay the accrual of fines, the County ensures that a landowner subjects themselves to 90 days' worth of *some* fines—even when the County can't prove the alleged nexus to cannabis that led the landowner to appeal.

147.    So, when the County can't prove its allegations of cannabis cultivation, it can still demand that landowners pay $90,000 per violation—instead of $900,000—for exercising their right to a hearing instead of "abating" the issue within 10 days.

148.    Often, the County wouldn't have issued the permit needed to abate those violations before the landowner incurs daily fines because of the baseless accusation of cannabis cultivation.

149.    The County's refusal to schedule a timely administrative hearing forces an accused landowner to endure years under the threat of fines, fees, and abatement costs, and leaves the landowner unable to develop their land with no guarantee that the County will ever schedule their hearing.

150.    Fully aware of the financial and psychological costs brought to bear by its abatement regime, the County routinely checks in with landowners to pressure them into waiving their right to a hearing and settling their case instead.

151.    In more than one instance, Code Enforcement officials warned landowners that an appeal is not in their personal interest because the County does not lose before its own hearing officer.

152.    Code Enforcement officials will even contact landowners without their lawyers to pressure them to settle, even when they know that landowner has retained counsel to challenge the abatement order.

153.    The County's threats appear to be correct: Whenever the County does schedule a hearing before the law firm it hired to decide cannabis-related cases, the County wins.

**4.  The County Illegally Prohibits Landowners from Developing Their Property While an Abatement Is Pending**

154.    The County also increases settlement pressure by making permits costly or completely unavailable to landowners facing abatement orders.

155.    The County has a policy and practice of denying all permits for landowners with pending cannabis-related abatement orders, even if the permits are wholly unrelated to the abatement.

156.    The County denies landowners the very permits that the County is fining them for not having.

157.    The County will also deny unrelated permits to landowners who are awaiting a hearing on an abatement order, including permits under the County's "Safe Home Program."

158.    The County created its Safe Home Program at the same time it adopted its cannabis-driven code enforcement.  The program gives landowners from October 2017 through the end of 2022 to come forward and apply for as-built permits for their property without facing penalties.

159.    So, while the County dangled the carrot of amnesty for building-code violations, its Code Enforcement unit began blindly swinging the stick of ruinous fines at any violation with a perceived nexus to cannabis.

160.    The County will refuse to issue Safe Home permits—or any other permits—unless a landowner will enter a settlement agreement or apply for a commercial permit.

161.    The County adopted this blanket-denial policy despite a county ordinance that limits its authority to deny permits to only those *projects* that are subject to unpaid administrative civil penalties.

162.    The County's denial of permits leaves an accused landowner unable to develop or maintain their property for years as they challenge a cannabis-related abatement order.

163.    The County's illegal denial of permits imposes undue pressure on landowners to settle by denying their right to develop their property and by putting them at risk of additional permitting violations unless they give up their right to appeal any abatement orders.

1

United States District Court
Northern District of California

**5.    Challenging an Abatement Order Comes at a Great Cost**

164.    If the County does ever finally provide an accused an administrative hearing, the hearing can be extremely costly for the landowner.

165.    Administrative hearings take place before a hearing officer for Code Enforcement.

166.    Despite the massive fines that the County levies "to minimize the expense and delay associated with pursuing alternative remedies through the … criminal justice system," the County does not afford an accused the right to a jury.

167.    The hearing is conducted before a contractor from a private law firm that the County hires to serve as the hearing officer.

168.    Under the County's agreement with this private firm, the County pays hearing officers $240 per hour for their work plus $120 per hour for their travel time.

169.    The County passes on the cost of the hearing officer to the accused in the form of an administrative fee.

170.    The County charges up to $4,500 in administrative fees to landowners who request an administrative hearing.

171.    These fees the County charges for exercising one's right to an initial hearing are in addition to the daily fines that a landowner necessarily accrued waiting for the County to schedule the hearing.

172.    The county code permits the hearing officer to reduce the penalty below the amount that Code Enforcement assessed in the NOV *only* if the landowner immediately remedied a violation that did not impact the health, safety or general welfare of the public.

173.    Put differently: Exercising one's right to an initial hearing guarantees increased fines and fees, which the hearing official cannot reduce because the landowner chose to contest an abatement order rather than caving to the demands of a NOV within 10 days.

174.    The County reminds landowners of all the associated risks—and the fact that all landowners are sure to lose their administrative appeal—as it pressures landowners to settle their case and waive their right to contest an abatement order.

175.    The County's system for adjudicating cannabis-related code violations is designed to pressure landowners into settlements.

176.    If the hearing does go forward, any party aggrieved by a hearing officer's decision may then file a request for judicial review in the county superior court within 20 days.

177.    The appeal to the superior court is a limited civil case for which the record from the administrative hearing is admitted as prima face evidence of the County's claims.

178.    The County can enforce its administrative order and collect any penalties before a landowner appeals the hearing officer's decision and receives a hearing in superior court.

179.    As a result, the County can collect the ruinous fines it brought without probable cause before an accused landowner can ever step foot in a real court.

**6.    The Pressure Is the Point**

180.    The pressure campaign described throughout this section—with the ruinous fines, time pressure, the inability to obtain permits, the lack of a timely hearing, and the County's refusal to dismiss baseless charges—is all designed to generate revenue for the County.

181.    Once a landowner receives an NOV, they are trapped unless they pay the County to let them out.

182.    When a landowner appeals an NOV, the County typically responds by immediately offering a compliance agreement under which the landowner agrees to pay one day's worth of the daily fines plus administrative fees up to $4,500.

183.    The administrative fees include things like the time that County employees have spent answering a landowner's phone calls or responding to emails about the case, down to the 15-minute increment.

184.    The fees also include the cost of the County publishing its accusations against the landowner in the newspaper.

185.    Paying fines and fees as part of a settlement agreement isn't the only way a landowner can pay their way out of an abatement order.

United States District Court
Northern District of California

186.    The County has offered to drop cannabis-related abatement orders for landowners who have agreed to enter the costly process to grow commercially.

187.    The County has even offered to dismiss a cannabis-related abatement order in exchange for a landowner transferring to the County the title to the very unpermitted building at issue.

188.    Those landowners who don't respond to an NOV get a $900,000 lien put on their property.

189.    As of August 2022, the County had placed a $900,000 lien on 24 properties, plus a $150,000 lien on a 25th.

190.    For those who resist the County's settlement offers and insist on an appeal, the financial and psychological pressures remain unabated indefinitely, until the County eventually agrees to schedule an administrative hearing.

191.    Once the County does schedule a hearing, it can increase the pressure to settle yet again by finally dropping any pretext of its baseless cannabis allegations and instead seeking 90 days' worth of fines for the underlying code violations that the landowner might not have ever contested if not for the cannabis charges, plus $4,500 in administrative fees.

192.    For many landowners, the cheapest way out of a cannabis-related abatement order— whether brought based on probable cause or not—is to settle before the fines and fees accumulate.

193.    About one-third of landowners facing abatement orders have agreed to settle their case and waive their right to a hearing, generating millions in fines and fees for the County.

**D.  The County's Violation of the Individual Plaintiffs' Constitutional Rights**

**1.  Corrine Morgan Thomas & Doug Thomas**

194.    Corrine and Doug Thomas live in Miranda, California.

195.    The Thomases are both disabled and on a fixed income.

196.    They are retired aside from their work for a non-profit they run called the Miracle Run Foundation for Autism.

197.    The Miracle Run Foundation is named after a book Corrine wrote and the movie based on that book, which depicts their twin autistic sons' perseverance through school.

198.    Through their foundation, the Thomases raise awareness and money to support families with autism.

199.    The Thomases lived in Los Angeles County with their twin sons until the Woolsey Fire destroyed their home in November 2018.

200.    Using the insurance money from the fire, the Thomases decided to purchase their "forever home" in the middle of a redwood forest in Humboldt, where they always dreamt of living.

201.    The Thomases closed on a home in Miranda on August 20, 2021.

202.    The home sits on top of a ridge above the Avenue of the Giants.

203.    Behind the home, there is a detached garage alongside a three-story building.

204.    When the Thomases purchased the property, the building was empty and the electrical wiring inside had all been cut.

205.    Six days after the Thomases closed on their new home, on August 26, they received an NOV addressed to Summerville Creek LLC, the property's prior owner.

206.    The notice listed two violations: (1) violation of the commercial cannabis land use ordinance; (2)(a) construction of building/structure in violation of building, plumbing and/or electrical codes; and (b) facilities/activities in violation of the commercial cannabis land use ordinance.

207.    The paperwork described the conditions causing a nuisance as "[u]npermitted commercial cannabis operation with approximately 2,500 square fee of cultivation" and a "[s]tructure facilitating commercial cannabis activity and constructed contrary to the provisions of Humboldt County Code."

208.    The notice said the owner faced a daily administrative penalty of $12,000 for 90 days unless they (1) ceased all commercial cannabis cultivation operations and removed all cannabis and infrastructure supporting commercial cannabis including water infrastructure and power sources; and (2) removed all structures with a nexus to cannabis cultivation and constructed in violation of

the Humboldt County Code, including applying for and obtaining a demolition permit when applicable.

209.    The Thomases filled out the Attachment C to their NOV and submitted their request for a hearing on September 2, 2021, stating that they were the landowners as of 12 days prior and that there was no cannabis operation on the property.

210.    The Thomases have never grown cannabis.

211.    The Thomases certainly did not set up an illegal grow operation in Humboldt within days of moving into their new home.

212.    It should have come as no surprise to the County that there was no cannabis operation on the Thomases' property given that the County had raided the property and shut down the cannabis operation at issue in 2019, over two years before the Thomases bought the property.

213.    During a 2019 raid, the County had already cleared out all the remnants of the prior owner's growing operation and cut the electric to the three-story workshop, leaving no illegal cannabis growth for the Thomases to abate.

214.    The County would have also known that the property changed hands before it issued the NOV, as the Thomases had already recorded their deed with the County.

215.    Despite having raided the property over two years prior, the County waited until after the Thomases purchased the property to serve the Thomases with a NOV for the prior owner's wrongdoing.

216.    After receiving the NOV, the Thomases informed the County of their new ownership of the property, but that did not deter the County for pursuing its abatement order against them.

217.    Despite the fact that the Thomases did nothing wrong, the County still insisted that they must destroy the three-story building solely because the prior owners used it to cultivate cannabis.

218.    The three-story building that the County wants to demolish is situated behind the family's home, surrounded by old-growth trees.

United States District Court
Northern District of California

1   219.    The Thomases hired an engineer in response to the abatement order.  He estimated

2   that the cost to remove the building with minimal environmental impact was about $180,000 plus

3   the cost of the necessary demolition permits.

4   220.    The Thomases do not want to destroy the three-story building, which Doug planned

5   to use as a workshop for projects related to his renovations to their home.

6   221.    Nor do the Thomases want to remove old-growth trees from their scenic yard,

7   considering the trees were the main appeal to the Thomases living in a redwood forest.

8   222.    The Thomases also cannot afford the cost of removing the building.

9   223.    After losing everything in the Woolsey Fire, the Thomases invested their insurance

10  money into their new home.

11  224.    They cannot afford nearly $200,000 in abatement costs designed to punish someone

12  else's wrongdoing.

13  225.    The threat of over a million dollars in fines, plus nearly $200,000 in abatement costs

14  has caused the Thomases an incredible amount of emotional distress.

15  226.    On October 7, 2021, the County offered the Thomases a settlement agreement under

16  which they would be required to admit to the County's cannabis-related accusations, remove the

17  unpermitted structure from their property, and pay administrative fees.

18  227.    The settlement offer stated that Code Enforcement opened the case against the

19  Thomases on July 12, 2019, more than two years before they purchased the property.

20  228.    By October 7, 2021, the Thomases had already accrued $468,000 in fines for the

21  outstanding abatement order.

22  229.    The Thomases decided not to destroy their building and instead wait for their

23  administrative hearing.

24  230.    On August 16, 2022, the County offered the Thomases a new settlement agreement.

25  231.    Like the prior year's offer, the August 2022 agreement acknowledged that the

26  abatement case pre-dated the Thomases' ownership but still required them to falsely admit that they

27  committed the prior owner's cannabis-related offenses.

28  Complaint – Case No. 1:22-cv-5725

24

232.    The August 2022 agreement also required the Thomases to pay administrative fees that the County incurred bringing a case against them for someone else's wrongdoing.

233.    The August 2022 agreement, however, allowed the Thomases to keep the three-story building if, within eight weeks, they submitted a restoration plan and permit application.

234.    The County told the Thomases' attorney that they would have to pay triple the permit price to obtain any permits they needed, again as punishment for someone else's wrongdoing.

235.    If, upon reviewing the Thomases' permit application, the County determined that it could not permit the structure, the Thomases would then have three months from the County's denial of the permit to obtain demolition permits and demolish the structure.

236.    Once the Thomases either obtained a permit for the structure or demolished the structure, the County would then dismiss the code-enforcement case against them.

237.    The Thomases remain intent on obtaining the permits necessary to keep the three-story accessory structure they purchased with their property but are not willing to pay penalties for the prior owner's wrongdoing.

238.    The Thomases also do not want to admit guilt or otherwise agree to waive their right to be heard.

239.    To date, the Thomases have still not received an administrative hearing since filing their notice of appeal on September 2, 2021.

### 2. Blu Graham

240.    Blu Graham has lived in and around southern Humboldt County for most of his life.

241.    Blu owns a hiking company called Lost Coast Adventure Tours and, along with his wife, owns a restaurant called Mi Mochima near their home in Shelter Cove.  Blu also works as a contractor for a national outdoor-recreation retailer, serving as a guide on hiking tours in Humboldt.

242.    Blu was the chief of the Whale Gulch Volunteer Fire Company for about five years and remains a captain for the company.

243.    Back in December 2012, Blu purchased an 80% interest in a parcel of land in Whitethorn, and he has been slowly developing a homestead there ever since.

United States District Court
Northern District of California

244.    Blu constructed greenhouses on his property to grow fresh produce for his family's restaurant.

245.    Blu's property also contains a fire road and rainwater-catchment pond for fire control.

246.    Back in May 2018, Blu was in the second group of Humboldt residents to receive an NOV from the County.

247.    The notice alleged three violations: (1) violation of the commercial cannabis ordinance; (2) construction of building/structure in violation of building, plumbing, and/or electrical codes; and (3) grading land to install a rainwater-catchment pond without permits.

248.    The notice informed Blu that he'd face $10,000 in fines per day for a period of 90 days unless he completely abated the nuisances within 10 days.

249.    To abate the issues, the notice required Blu to implement a restoration plan for all three violations, cease all cannabis cultivation, and remove all supporting infrastructure.

250.    Blu was not cultivating cannabis on his property and no infrastructure on his property supported cannabis cultivation.

251.    Along with the NOV, the County included a cover letter, also dated May 10.  The letter informed Blu that Code Enforcement "recently inspected" his property and "observed violations of County Code."  It warned that "these recorded Notices may hinder the landowner's ability to sell or refinance the property."

252.    On or about May 12, 2018, the County published in a local newspaper that Blu's property was under an abatement order relating to illegal cultivation.

253.    The publication of allegations that Blu was growing marijuana illegally caused him stress and embarrassment, as he had recently opened Mi Mochima and was trying to get the business off the ground with his wife.  He had to explain his innocence to inquiring customers.

254.    Blu went to Eureka on or around May 14, 2018, to speak with Code Enforcement about his NOV.

United States District Court
Northern District of California

1    255.    Code Enforcement officers Brian Bowes and John Moredo assured Blu that everyone

2    in Humboldt would get an NOV eventually.

3    256.    They told him he had three options: settle, appeal, or lose his land.  They tried to

4    persuade Blu to take the first option—enter a settlement agreement under which he'd admit guilt

5    and pay a $30,000 fine to the County.

6    257.    Blu told Code Enforcement officers that he knew they did not have proof of cannabis

7    because there was none on his property.  Code Enforcement officers responded, "Well, you're not

8    just growing asparagus in there."

9    258.    Blu was, in fact, just growing vegetables in his greenhouses.

10    259.    The officers provided Blu with four aerial pictures of his property from 2012, 2014,

11    2015, and 2017.

12    260.    None of the images on which the County relied showed the property at the time of

13    the alleged violation in 2018, when its cannabis-related code provisions became law.

14    261.    It is impossible to detect marijuana cultivation from these crude images.

15    262.    It is impossible to detect *anything* inside Blu's greenhouses from these crude images.

16    263.    There was no marijuana cultivation on the property.

17    264.    The rainwater-catchment pond that the County alleged that Blu dug to cultivate

18    cannabis is situated about 1,000 feet up a ridge from Blu's house and greenhouses.  The pond exists

19    solely for fire prevention; it is designed so a firefighting helicopter can drop down and scoop up

20    water to fight a nearby fire.

21    265.    There are no pipes or irrigation leading from the pond to Blu's greenhouses below.

22    266.    Blu was not using his pond to grow marijuana illegally.

23    267.    Blu retained an attorney and timely filed his notice to request a hearing on the

24    abatement order, asserting that there was no marijuana on his property.

25    268.    On May 22, 2018, Blu's attorney sent a letter to the County inviting Code

26    Enforcement to come inspect the property.  The letter also explained that Blu wanted to keep and

27    permit his greenhouses because he uses them to grow fresh produce for his wife's restaurant.

269.    Along with the letter, Blu's attorney included pictures to show that there was no illegal cultivation on Blu's property.

270.    The County made clear in response that they had no intention of visiting Blu's property and refused to issue a permit for his greenhouses.  The County insisted that its cannabis allegations pre-dated 2018.

271.    Unable to obtain a permit from the County, Blu removed his greenhouses to comply with the abatement order despite his hopes to retain them to continue growing vegetables.

272.    Blu's attorney sent a second letter on June 25, 2018, this time to Director John Ford. He expressed concern and confusion over the County's refusal to inspect the property and dismay at the fact that the County was charging Blu based on crude aerial photos that do not show any marijuana.

273.    The June 25 letter conceded that Blu dug the rainwater-catchment pond in 2015 to aid the local fire company.  He sought a retroactive permit for the grading rather than filling it in, as the fire company inspects the pond annually and has expressed its pleasure with it.

274.    On July 5, 2018, Deputy Director Bob Russell responded by letter.  He acknowledged that the pond may be for fire prevention but claimed that the County also had evidence that Blu's grading was done with the intent to support cannabis infrastructure (which, again, was not true).

275.    Mr. Russell said that the NOV against Blu would stand and offered Blu a reduced penalty to $20,000 plus administrative fees if he signed a settlement agreement.  If he elected instead to move forward with his administrative hearing, the County warned that a settlement "may no longer be an option."

276.    Mr. Russell did not respond directly to Blu's request to permit his pond.  Instead, he said that the County may "eventually" allow Blu to permit existing "empty" structures on his property through the Safe Home Program.

277.    The 90 days of fines for Blu ran through August 18, 2018, at which point Blu accumulated $900,000 in fines for his unresolved abatement order, despite his filing a timely request for an initial hearing that he never received.

United States District Court
Northern District of California

278.    In September 2018, the County offered to settle Blu's case for $10,000 if Blu signed a settlement agreement pursuant to which he admitted that he graded land without a permit for the purpose of cultivating cannabis.

279.    Blu once again rejected the offer because the development of his property had nothing to do with marijuana.

280.    The County still refused to provide Blu an administrative hearing.

281.    Blu hired a register engineer to inspect the grade of his pond.

282.    On January 15, 2019, the engineer sent a letter to Bob Russell advising him that he did not observe any commercial-cannabis activity on Blu's property and that "[t]he property [was] developed for use as a rural homestead with site grading activities and building development occurring a little at a time over the past 40 years."

283.    The letter concluded that the grading did not create a geologic or erosion hazard and that the rainwater-catchment pond is stable and does not require corrective action to protect against erosion and sediment runoff.

284.    On February 6, 2019, the County offered another compliance agreement that would have required Blu to pay $20,000 (an increase from the $10,000 it offered the year before).  Blu again refused to pay the County's settlement demand and wrongfully admit that he was growing cannabis on his property.

285.    In a conversation with Code Enforcement officer Warren Black, Blu objected to the County's issuance of Category 4 violations without any evidence that a greenhouse contains cannabis.  Mr. Black responded that the prevalence of cannabis throughout Humboldt justifies the County's policy and practice of levying fines without individualized suspicion—just as police would be right to suspect that any shed contains methamphetamine in a region that has problems with that drug.

286.    The County offered Blu another settlement agreement on August 5, 2021.  He again refused to sign because the offer required him to accept responsibility for the County's baseless claim that he was cultivating cannabis.

287.    With his abatement case still unresolved, Blu went to the Planning Department to try to obtain a permit for his home through the Safe Home Program.  He paid $799 for the initial startup fee.

288.    Code Enforcement, however, learned that Blu was trying to participate in the Safe Home Program and put a hold on his application after he already began the process, paid the County fees, and hired and paid for contractors.

289.    Even though Code Enforcement knew that Blu had retained counsel for his abatement case who had already participated in settlement negotiations, County officials contacted Blu directly to pressure him into signing a settlement agreement in exchange for his Safe Home permit.

290.    Warren Black told Blu that it was in Blu's best interest to drop his appeal and sign a settlement agreement because Blu would not receive a permit for his house while his abatement order was outstanding and because no one can win their administrative hearing before the County's hand-picked hearing officer.

291.    Mr. Black encouraged Blu to submit public-records requests to see the County's perfect win-rate in administrative hearings.

292.    Mr. Black followed up by email later the same day and gave Blu instructions on how to submit an information request for the results of all the administrative hearings held on cannabis-related charges.

293.    Blu interpreted this email as telling him he should settle his case because Code Enforcement does not lose at its administrative hearings.

294.    Mr. Black emailed Blu again on August 4, 2022, and confirmed that he would only "release the hold on [Blu's] safe homes project" if Blu signed the County's settlement offer in his unrelated abatement case.

295.    In September 2022, over four years after Blu requested his hearing but only a few weeks after he retained undersigned counsel to challenge the County's code-enforcement system, Code Enforcement suddenly sent Blu a notice of administrative hearing, scheduled for October 14.

1    296.    Shortly after the County served the notice of administrative hearing, Mr. Black once

2    again contacted Blu directly to pressure him to settle.

3    297.    The County was no longer pursuing cannabis-related claims, and instead offered to

4    settle Blu's case if he would admit to grading land for the pond without a permit, pay up to $4,500

5    in fees, and waive his right to an administrative hearing.

6    298.    Instead of signing the settlement agreement, Blu contacted the County and requested

7    a meeting with Director John Ford.

8    299.    Blu met with Director Ford and other County officials on September 26, 2022.

9    300.    At the meeting, Director Ford confirmed the County's policy of refusing to issue any

10    permits for a property under an abatement order.

11    301.    Director Ford agreed to drop Blu's case and to issue a permit for Blu's pond (which

12    Blu had been requesting—without success—since 2018) without a signed settlement agreement if

13    Blu paid over $3,700 in administrative fees that accumulated while Blu was waiting for a hearing.

14    302.    Director Ford confirmed that the engineering report Blu's attorney submitted back in

15    January 2019 was sufficient to support a grading permit for the pond.

16    303.    Deputy Director Bob Russell told Blu that settling his case would have been a lot

17    cheaper if Blu had not hired an attorney and defended himself against the County's claims for all

18    these years.

19    304.    That same day, Blu gave the County a cashier's check for $3,747.29 to pay the

20    administrative fees associated with his case.

21    305.    These fees included $207 to post notice of his alleged cannabis-related violations in

22    the newspaper and $3,474.10 in general staffing costs.

23    306.    In exchange for Blu paying the administrative fees, the County agreed to expedite

24    the permit for his pond that it had denied him for over four years.

25    307.    Director Ford followed up by email and confirmed that it would resolve the violations

26    on Blu's property if he paid his administrative fees and paid for the grading permit.

27

28

308.    The County sent Blu a letter dated September 28, 2022, stating that it was processing a refund for him to return $2,951.18 he paid in administrative fees as a reduction for costs associated with preparing for his administrative hearing.

309.    Blu completed the permitting process for his pond on Monday, October 3, 2022, and the County closed its abatement case against him.

### 3.    Rhonda Olson

310.    Rhonda Olson is a longtime resident of Orleans, California, an unincorporated area of Humboldt County more than two hours northeast of the county seat in Eureka.

311.    On September 10, 2020, Rhonda closed escrow on the purchase of three adjacent parcels of land near her house in Orleans for $60,000.

312.    She planned to use the property to provide housing for her family and close friends in the properties' existing homes and to build affordable housing that she could sell on the undeveloped parcel.

313.    The property came with scattered junk and needed renovations that Rhonda planned to undertake to improve the property.

314.    The first parcel is on the top of a large hill.  It has a modular home and the remnants of several hoop houses; it also has an industrial garage and a logging flat atop a steep driveway, all of which dates back to a logging operation on the property until the 1980s.

315.    The second parcel is below the first and leads to the street; it has a home and a spacious yard.

316.    The third parcel is a naturally sloped field across the street; it is empty aside from some grapevines and the remnants of a hoop house.

317.    At the time of purchase, Rhonda knew that the prior owners had been raided by law enforcement and that law enforcement had cleared an illegal growing operation from the property.

318.    Because she was aware of the raid, she conditioned her purchase on the property having a clean title.

319.    The title search showed no outstanding violations or liens on the property.

United States District Court
Northern District of California

1    320.    It wasn't long after Rhonda's purchase, however, before the County brought

2    Rhonda's development plans to an abrupt halt.

3    321.    On October 1, 2020, Rhonda received an NOV for each of the three parcels, each

4    dated September 11—just one day after she closed escrow on the property.  The NOVs were all

5    addressed to the prior owner, a corporation based out of Santa Rosa.

6    322.    The first NOV, for the vacant parcel across the street, cited four nuisances: (1)

7    unpermitted commercial cannabis cultivation; (2) two hoop-house structures facilitating commercial

8    cannabis activity; (3) grading without permit to facilitate commercial cannabis cultivation; and (4)

9    multiple piles of junk.

10    323.    The first NOV assessed daily fines of $31,000: a $10,000 fine for each of the

11    cannabis-related violations and $1,000 for the junk.

12    324.    There was no cannabis on the property at the time of the NOV, and an engineer would

13    later confirm that there no grading was done on the parcel.

14    325.    The second NOV, for the parcel with the house, also cited four nuisances: (1)

15    unpermitted commercial cannabis operation; (2) structures facilitating commercial cannabis activity

16    and constructed contrary to the county code; (3) grading to facilitate commercial cannabis

17    cultivation activity; and (4) piles of junk.

18    326.    The second NOV also assessed daily fines of $31,000: a $10,000 fine for each of the

19    cannabis violations and $1,000 for the junk.

20    327.    There was no cannabis on the second parcel at the time of the NOV, and a simple

21    check of the tax records or historical satellite imaging would have confirmed for the County that the

22    structure at issue was constructed decades ago—not as part of the prior owner's cannabis operation.

23    328.    The third NOV, for the parcel up the hill with the modular home, cited six violations:

24    (1) unpermitted commercial cannabis cultivation; (2) four structures facilitating commercial

25    cannabis activity and constructed contrary to the county ode; (3) grading to facilitate commercial

26    cannabis cultivation; (4) development in a mapped streamside management area to facilitate

27    commercial cannabis cultivation; (5) junk and/or inoperable vehicles; and (6) piles of junk.

28

United States District Court
Northern District of California

1      329.    The third NOV assessed daily fines of $42,000: a $10,000 fine for each of the four

2  cannabis-related violations and $1,000 each for the two junk-related violations.

3      330.    As with the other two parcels, there was no cannabis while Rhonda owned it; the

4  police had cleared it all out during their raid of the prior owner, before the County issued NOVs.

5      331.    In total, Rhonda faced $104,000 in daily fines for cannabis-related charges on land

6  she just bought days prior for $60,000.

7      332.    Rhonda has never grown marijuana on the property.

8      333.    The day after receiving the abatement orders, Rhonda hired an engineer to inspect

9  her property.

10      334.    The engineer sent the County a letter on October 5, 2020.  He explained that law

11  enforcement had terminated the illegal growing operation, there was no cannabis on the property,

12  and any grading happened more than a decade before Rhonda purchased the property.  He also noted

13  (and included pictures showing) that Rhonda had removed all the hoop houses and was in the

14  process of removing the junk.

15      335.    Rhonda filled out the Attachment C forms to request an administrative hearing and

16  sent them by certified mail on October 7, 2020.

17      336.    She explained on her Attachment C that she was the new owner and "did not make

18  the nuisance and had a clear title as of September 10, 2020."  She let the County know she was

19  working to correct any nuisances the prior owners left, including by clearing out the junk.

20      337.    Rhonda contracted an engineer to put together a plan relating to all the alleged

21  grading on the property.  He recommended filling in some soil on the parcel and not rebuilding the

22  hoop houses on top of the ridge.

23      338.    Filling in the soil was not enough for the County, however.

24      339.    Rhonda also hired an engineer to test the soil and water on the vacant parcel with the

25  vineyard in preparation for installing sewage and building a home.

26      340.    She emailed the County to let them know she conducted the testing and to request

27  the necessary permits to begin building.

28                            Complaint – Case No. 1:22-cv-5725

United States District Court
Northern District of California

34

341.   County officials responded by email on March 23, 2021, and warned, "Just an FYI, no permits will be issued for properties with open Code Enforcement cases."

342.   The email also clarified that the County prosecutes grading as a Category 4 violation regardless of the reason the owner graded it: "I also received your email regarding another property where you stated that the grading was done for a timber harvest plan.  Unfortunately, the fact that the flats were used for cannabis cultivation is why the violation exists.  For normal timber operations flats are permitted but the moment they are used for unpermitted cannabis cultivation they will need to be addressed by a licensed engineer."

343.   County officials also acknowledged by email that the police removed all cannabis from the property prior to Rhonda's purchase.

344.   But the County kept its abatement orders in place anyway.

345.   The County sent Rhonda an offer to settle the abatements in March 2021.  The agreement, which noted that it opened its case against her property on April 16, 2018, over two years before she purchased it, required Rhonda to wrongfully admit to committing all the violations on the property.

346.   The County also sent Rhonda an invoice, asking her to pay $15,000 in "carryover fines and penalties" that the prior owner agreed to pay the County before Rhonda bought the property.  The invoice told Rhonda she had 30 days to pay.

347.   One month later, on April 21, 2022, now over a year after Rhonda bought the property, the county re-issued NOVs (dated April 5, 2022), this time in Rhonda's name.

348.   The new set of NOVs dropped several of the allegations from the first and reduced the daily penalties to $83,000, bringing the fines that Rhonda faces to $7,470,000.

349.   The County re-charged Rhonda with the same cannabis-related violations from the last NOVs even though she had already provided proof that the prior owner's violations no longer existed on the property.

350.   Rhonda developed shingles on her face due to the stress of the millions of dollars in fines hanging over her head, and she temporarily lost the use of her eye.

United States District Court
Northern District of California

351. Rhonda again submitted her Attachment C to request an administrative hearing.

352. To date, the County has not provided her a hearing or issued her the permits she needs to develop her property.

**CLASS ALLEGATIONS**

353. Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson maintain this action on behalf of themselves individually and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(2). Plaintiff Blu Graham was planning to be a class representative until the County suddenly agreed to dismiss his abatement order the week before filing.

354. The County's conduct toward the Plaintiffs is part of a broader policy and practice, pursuant to which the County cites landowners for enhanced cannabis-related code violations without regard to probable cause, fails to schedule administrative hearings at a meaningful time and in a meaningful manner, imposes unconstitutional conditions on permits for those properties, imposes unconstitutionally excessive fines and fees, and denies accused landowners the right to a jury of their peers to decide factual questions that determine whether the Plaintiffs owe hundreds of thousands—if not millions—of dollars in fines.

355. Plaintiffs propose a putative class with the following class definition: "All persons who are currently facing penalties for cannabis-related Category 4 violations that were levied after January 1, 2018, who filed an 'Attachment C' to request an administrative hearing within 10 days of the County effecting service, and who have still not received a hearing for their appeal."

356. Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson and members of the proposed Class have suffered, or will suffer, the following policies and practices of the County:

a. Issuing cannabis-related code violations without adequate investigation or regard for probable cause;

b. Issuing enhanced cannabis-related penalties for minor code violations like the failure to obtain a permit;

c. Refusing to allow landowners to abate permitting violations by obtaining the permit at issue;

d. Refusing to dismiss citations for enhanced cannabis-related violations based on photographic proof that cannabis is not on the property;

e. Refusing to provide a timely administrative hearing;

f. Refusing to issue unrelated permits to landowners while abatement orders are pending;

g. Imposing unconstitutional conditions on the issuance of permits for landowners facing abatement orders;

h. Obscuring the time landowners have to comply with an abatement order;

i. Failing to toll the accrual of fines before an accused can receive an administrative hearing;

j. Charging up to $4,500 for an administrative hearing or a settlement agreement;

k. Failing to provide a jury at the administrative hearing.

357. The proposed Class meets all the Rule 23(a) prerequisites for maintaining a class action.

358. **Numerosity**: The proposed Class is so numerous that joinder of all members is impracticable. On information and belief, the County has issued cannabis-related Category 4 violations to over 1,200 landowners since it began its cannabis-enforcement program in 2018. On information and belief and based on publicly available records, at least 48 landowners who have requested a hearing still face penalties but have not yet received hearings. As a result, the proposed class is so numerous that individual joinder of all members is impracticable.

359. **Commonality**: This action presents questions of law and fact common to the proposed Class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff.

a. Common questions of fact include but are not limited to:

United States District Court
Northern District of California

   i. Does the County issue citations and impose enhanced penalties for cannabis-related violations without adequate investigation or regard for probable cause?

   ii. Does the County issue citations and impose enhanced penalties for cannabis-related violations without regard for actual harm to public health and safety?

   iii. Does the County fail to schedule timely administrative hearings?

   iv. Does the County refuse to dismiss charges in the face of exculpatory evidence?

   v. Does the County deny the issuance of permits to properties under abatement orders?

   vi. Does the County impose unconstitutional conditions on permits for properties under abatement orders?

   vii. Does the County refuse to toll the accrual of daily fines before it provides an accused landowner with an administrative hearing?

   viii. Does the County charge up to $4,500 for an administrative hearing or a settlement?

   ix. Does the County provide a jury at administrative hearings?

 b. Common questions of law include but are not limited to:

   i. Do the County's cannabis-related code-enforcement policies and practices violate the Due Process Clause?

   ii. Does the County's policy of issuing citations and imposing enhanced penalties for cannabis-related violations without adequate investigation or regard for probable cause violate the Due Process Clause?

   iii. Does the Due Process Clause prohibit the government from punishing harmless conduct?

   iv. Does the Due Process Clause prohibit the government from punishing an innocent person for someone else's conduct?

v.   Does the County impose unconstitutional conditions on the issuance of permits for properties facing cannabis-related abatement orders?

vi.  Does the Excessive Fines Clause prohibit the government from charging up to $10,000 in daily fines without regard for culpability or whether a violation poses harm to public safety?

vii. Does the Preservation Clause require the County to provide a jury when it imposes civil penalties for code violations?

360.   **Typicality**: Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson's claims are typical of the claims of the proposed Class.  Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson's claims, as well as those of the proposed Class, arise out of the same policy, practice, and custom of the County; are based on the same legal theories; and involve the same harms.  Additionally, Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson seek the same relief for themselves and members of the proposed Class in the form of declaratory and injunctive relief.

361.   **Adequacy:** Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson will fairly and adequately protect the interests of the class they seek to represent because their interests are aligned and there are no conflicts between them and the members of the putative class. Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson and members of the putative class have suffered the same injuries at the hands of the same defendants, and all are entitled to the same relief in the form of declaratory and injunctive relief.  All members share the same interest in ensuring that the County's code-enforcement procedures respect the constitutional rights of landowners and in securing relief for those constitutional rights the County has already violated.

362.   Plaintiffs are represented by counsel who will fairly and adequately represent the class.  Plaintiffs are represented *pro bono* by the Institute for Justice ("IJ").  IJ is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide, including challenges to inadequate procedure in criminal and civil enforcement proceedings.  IJ has also litigated several federal class actions and putative class actions involving

United States District Court
Northern District of California

property rights, including against the following municipalities: Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 244598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as class counsel and approving federal consent decree in challenge to civil forfeiture proceedings)); New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of putative class action under which New York City agreed not to enforce agreements extracted through coercive property seizures)); and Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (appointing firm class counsel and approving federal consent decree prohibiting abusive ticketing practices)). IJ also litigated a significant Second Circuit case about due process, notice, and the opportunity to be heard in *Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005).

363.    Local counsel Pillsbury Winthrop Shaw Pittman LLP is an international law firm whose predecessor was founded in San Francisco in 1874. They are now headquartered in New York, and their practice focuses on real estate, construction, energy, finance, and technology & media. Pillsbury has approximately 700 lawyers in 20 offices worldwide. It has a large, sophisticated, and effective California litigation practice—both in state and federal courts.

364.    The putative class also meets the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

365.    The County has acted, or refused to act, on grounds generally applicable to the putative class. Declaratory and injunctive relief is appropriate with respect to all members of the class pursuant to Fed. R. Civ. P. 23(b)(2).

366.    The class is entitled to the requested relief.

United States District Court
Northern District of California

# CLAIMS FOR RELIEF

## COUNT 1

### Denial of Procedural Due Process

### In Violation of the Fourteenth Amendment

### On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson on Behalf of the Class

367.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 366.

368.    On behalf of the named Plaintiffs and the Class, Plaintiffs bring this count against the County based on its policy and practice of issuing notices of Category 4 violations without regard for probable cause, refusing to drop baseless charges in the face of exonerating evidence, refusing to issue permits to properties facing abatement orders, allowing daily fines to accrue before the County can or will provide an opportunity for a hearing, and failing to schedule an administrative hearing indefinitely, and charging up to $4,500 in fees to resolve abatement orders.

369.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall … deprive any person of life, liberty, or property, without due process of law."

370.    The Due Process Clause guarantees a fair legal process in adjudicative and quasi-adjudicative proceedings, including code-enforcement actions.

371.    Among other things, the Due Process Clause requires that the government provide the accused with notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

372.    Additionally, the Due Process Clause prohibits the government from imposing penalties, including fines and fees, or adjudicating guilt or innocence before providing appropriate notice and a meaningful opportunity to be heard.

373.    The County, acting under color of law, deprived the named Plaintiffs and the Class of the due process of law in violation of the Fourteenth Amendment to the United States Constitution.

374.    The County has a duty under the Fourteenth Amendment to provide the named Plaintiffs and the Class with notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

375.    The County deprived the named Plaintiffs and the Class of due process by denying them adequate notice and a fair or meaningful opportunity to be heard.  It did so by:

    a.    Issuing cannabis-related code violation without adequate investigation or regard for probable cause;

    b.    Issuing cannabis-related code violations based on satellite images that predate the passage of the cannabis-related code at issue;

    c.    Refusing to dismiss citations for cannabis-related Category 4 violations based on photographic proof that there is no cannabis on the property;

    d.    Refusing to allow landowners to abate permitting violations by obtaining the permit at issue;

    e.    Refusing to issue permits to landowners with pending abatement orders;

    f.    Conditioning the issuance of permits on a landowner's payment of unrelated fines and fees;

    g.    Obscuring the time landowners have to comply with an abatement order;

    h.    Refusing to provide an administrative hearing indefinitely;

    i.    Failing to toll the accrual of fines before an accused can receive an administrative hearing; and

    j.    Charging up to $4,500 for an administrative hearing or a compliance agreement.

376.    The County's procedurally deficient system creates an unreasonable risk of erroneous deprivation of property.

377.    Named Plaintiffs and the Class possess fundamental property interests protected by the Fourteenth Amendment to the United States Constitution in their homes, accessory structures, possessions, earnings, income, and capital.

378. The County has interfered with these interests by, among other things, (a) issuing violations without adequate investigation or regard for probable cause; (b) relying on evidence that predates the code violations at issue; (c) refusing to allow landowners to abate permitting violations by obtaining the permit at issue; (d) refusing to dismiss violations in the face of evidence that the violation is unfounded; (e) refusing to schedule a timely hearing at which an accused can meaningfully contest the allegations; (f) refusing to toll the accrual of fines while an accused awaits a hearing; (g) refusing to issue permits to an accused while they await a hearing; (h) conditioning the issuance of permits on a landowner's payment of unrelated fines and fees; (i) obscuring the time landowners have to respond to an abatement order; and (j) charging up to $4,500 for a hearing at which an accused can finally contest the accusations.

379. When the County's cannabis-related code enforcement works as designed, a landowner is compelled to pay fines and fees without any hearing and without any county employee or hearing officer ever investigating whether probable cause supported the charges.

380. The policies and practices by which the County administers its cannabis-abatement program for code violations have deprived the named Plaintiffs and the members of the Class of the process guaranteed to them by the Fourteenth Amendment to the United States Constitution.

381. The County's policies and practices are arbitrary and shocking to the conscience and so offensive as to not comport with traditional ideas of fair play and decency.

382. The County has no legitimate governmental interest in depriving the named Plaintiffs and the Class of their right to due process.

383. As a direct and proximate result of the County's policy and practice, the named Plaintiffs and the Class have suffered irreparable injuries to their constitutional rights.

384. The named Plaintiffs and the Class are entitled to declaratory relief and an injunction barring the County from administering its abatement program in violation of due process.

385. The named Plaintiffs are also entitled to nominal damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## COUNT 2

### Denial of Substantive Due Process

### In Violation of the Fourteenth Amendment

### On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas,

### Doug Thomas, and Rhonda Olson on Behalf of the Class

386.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 366.

387.    On behalf of the named Plaintiffs and the Class, Plaintiffs bring this Count against the County based on its policy, practice, and custom of issuing citations and imposing penalties for code violations allegedly related to cannabis cultivation (a) without regard for probable cause that the accused has cultivated cannabis illegally and (b) unsupported by a valid governmental interest.

388.    The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving any person of life, liberty, or property, without due process of law.

389.    The Due Process Clause requires that law enforcement be neutral, impartial, and objective.

390.    Issuing citations and imposing fines and fees is an exercise of law-enforcement power.

391.    The County has a massive financial interest in imposing Category 4 penalties for code violations allegedly related to cannabis.  This financial interest includes the pressure those penalties place on individuals to settle their case and the fines and fees the County charges to hold an administrative hearing or settle, and the additional landowners whom the policy may drive into seeking permits to grow cannabis commercially.

392.    This financial interest has caused the County to adopt a policy and practice of abusing its prosecutorial discretion by charging Category 4 violations without regard for probable cause that a landowner has violated the county code for the purpose of cultivating cannabis without a permit.

393.    This financial interest incentivizes the County to charge cannabis-related Category 4 violations without regard for the public's interest in health and safety and without regard for landowners' constitutional rights.

Complaint – Case No. 1:22-cv-5725

394.    The County's policy and practice is to charge Category 4 violations and impose fines and fees on landowners without ensuring it has probable cause to believe those landowners have violated the code for the purpose of cultivating cannabis without a permit.

395.    Relying on satellite images alone, the County charges Category 4 violations for activity unrelated to cannabis like having a greenhouse or a water-catchment unit.

396.    The presence of an unpermitted greenhouse or water-catchment unit is not probable cause that a landowner is cultivating cannabis without a permit.

397.    Despite lacking probable cause that a landowner is growing cannabis without a permit, the County's policy and practice is to allege that landowners violated the code for the purpose of cultivating cannabis.

398.    The County publishes notice of the abatement orders in the newspaper to publicly accuse the landowners of growing cannabis illegally.

399.    Daily fines and administrative fees accrue against accused landowners before the County can or will schedule an administrative hearing.

400.    Charges brought without probable cause prevent a landowner from developing their property while they wait indefinitely for the County to schedule an administrative hearing.

401.    The County charges up to $4,500 in administrative fees to hold an administrative hearing or settle cannabis-related Category 4 violations that it brought without probable cause.

402.    The County's policy and practice of charging Category 4 violations without probable cause imposes a significant financial, reputational, and psychological cost on the named Plaintiffs and the Class as soon as they receive an NOV.

403.    The County has no legitimate governmental interest in charging cannabis-related Category 4 violations without regard for probable cause.

404.    The County's policy and practice of charging cannabis-related Category 4 violations without regard for probable cause deprives the named Plaintiffs and the Class of their due-process right to neutral, objective, and unbiased law enforcement.

405.    The County also violates substantive due process by charging cannabis-related Category 4 violations unsupported by any legitimate governmental interest.

406.    No process the government can provide could justify its deprivation of life, liberty, or property when there is no governmental interest in the deprivation.

407.    The County has no interest in punishing conduct that does not harm the public.

408.    Nor does the County have an interest in issuing fines and denying permits for land, structures, or other property based on a prior owner's misconduct.

409.    No process could justify the government's deprivation of an innocent person's life, liberty, or property based on someone else's conduct.

410.    The prior presence of marijuana on a property is not a continuing nuisance once the property is no longer used for illegal purposes.

411.    No process could justify the County ordering a new owner to destroy their property because the prior owner had previously used the property for an illegal purpose.

412.    The County has no legitimate governmental interest in depriving the named Plaintiffs and the Class of their property because a prior owner cultivated marijuana on the property without a commercial permit.

413.    As a direct and proximate result of the County's policy and practice of charging Category 4 violations (a) without regard for probable cause of unpermitted cannabis cultivation and (b) unsupported by any valid governmental interest, the named Plaintiffs and the Class have suffered and will suffer irreparable harm to their constitutional rights.

414.    The named Plaintiffs and the Class are entitled to declaratory relief and an injunction barring the County from issuing cannabis-related Category 4 violations (a) without probable cause and (b) unsupported by any valid governmental interest.

415.    The named Plaintiffs are also entitled to nominal damages.

United States District Court
Northern District of California

**COUNT 3**

**Unconstitutional Exactions**

**In Violation of the Fifth and Fourteenth Amendments**

**On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas,**

**Doug Thomas, and Rhonda Olson on Behalf of the Class**

416.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 366.

417.    On behalf of the named Plaintiffs individually and the Class, Plaintiffs bring this Count based on the County's policy and practice of denying permits to landowners who face cannabis-related Category 4 violations brought without regard for probable cause unless the landowner will agree to (a) pay a sum of money the County has proposed in an unrelated settlement agreement and (b) waive their due-process right to a hearing at which they can contest unrelated code violations.

418.    The unconstitutional-conditions doctrine vindicates constitutional rights by prohibiting the government from coercing people into giving them up in exchange for a discretionary benefit such as a building or grading permit.

419.    The government cannot coercively withhold a land-use permit from someone for exercising their constitutional rights.

420.    The unconstitutional-conditions doctrine prevents the government from demanding property, a monetary exaction, or the waiver of some other enumerated constitutional right in exchange for a land-use permit.

421.    The Constitution forbids such extortionate demands regardless of whether the government approves a permit due to a landowner's willingness to give up their rights or denies a permit based on a landowner's refusal to do so.

422.    The County has a policy and practice of denying land-use permits to landowners with outstanding abatement orders, even when the permits have no nexus to the abatement order.

423.    The County's policy and practice is to grant land-use permits only if the landowner facing an abatement order will pay the County a sum to settle an unrelated abatement case and waive their right to a hearing in that unrelated case.

424.    The County imposes two unconstitutional conditions on permit applicants who have outstanding cannabis-related abatement orders: The landowner must agree (1) pay the sum the County has proposed in a settlement offer for an unrelated abatement case and (2) give up their right to an administrative hearing.

425.    The sum that the County proposes in settlement offers, including fines and/or fees, is not roughly proportionate to the social costs associated with the landowner's permit application.

426.    This monetary exaction in exchange for a permit is an unconstitutional condition.

427.    The demand that landowners give up their constitutionally guaranteed right to a hearing on the County's unrelated claims against them in exchange for a permit is also an unconstitutional condition.

428.    As a direct and proximate result of the County's policy and practice, the named Plaintiffs and the Class have suffered irreparable injuries to their constitutional rights.

429.    The named Plaintiffs and the Class are entitled to declaratory relief an injunction barring the County from denying permits to landowners facing abatement orders unless they pay a settlement and waive their right to an administrative hearing.

430.    Plaintiff Blu Graham is entitled to a declaration that the County's exaction of $3,747.29 in administrative fees in exchange for a grading permit for his rainwater-catchment pond violated the doctrine against unconstitutional conditions.

431.    The named Plaintiffs are entitled to nominal damages.  Plaintiff Blu Graham is also entitled to damages or restitution in the amount of $832.11 in addition to nominal damages.

1

2

3

4

5

**COUNT 4**

**Excessive Fines and Fees**

**In Violation of the Eighth and Fourteenth Amendments**

**On Behalf of Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson**

**Individually and on Behalf of the Class**

432.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 366.

433.    On behalf of themselves individually and the Class, Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson bring this Count against the County based on its policy, practice, and custom of levying Category 4 penalties and ordering the destruction of property for violations of the county code (*e.g.*, the failure to obtain permits to build structures and grade land) that the County alleges have a nexus to the illegal cultivation of cannabis.

434.    The County has acted under color of state law in violating the constitutional rights of the Plaintiffs and the Class.

435.    The Excessive Fines Clause of the Eighth Amendment to the United States Constitution prohibits the government from imposing penalties that are grossly disproportionate to the offense for which they are imposed.

436.    The Fourteenth Amendment to the United States Constitution incorporated the Excessive Fines Clause against the states.

437.    The County is bound by the Excessive Fines Clause when is issues civil fines and fees.

438.    The Category 4 penalties that the County levies for code violations related to cannabis are punitive.

439.    The County's policy and practice is to levy $10,000 or more in daily penalties plus up to $4,500 in fees for minor code violations by elevating them to Category 4 violations based on an alleged nexus to cannabis.

440.    Contrary to the county code, the County's policy and practice does not consider the actual harm cause by a violation, whether there is any risk to public health or safety, a landowner's

Complaint – Case No. 1:22-cv-5725

culpability or ability to pay, alternative remedies available, or additional penalties that a landowner already faces.

441.    The County's policy and practice of elevating code violations to Category 4 offenses is a method of generating revenue by pressuring landowners into settlements or commercial permits.

442.    The penalties that the County levies are grossly disproportionate to the many near-harmless offenses that the County elevates to Category 4 violations based on their nexus to cannabis.

443.    The penalties for cannabis-related code violations are also duplicative, as the County already imposes Category 4 penalties for unpermitted cultivation.

444.    The County's demands that landowners return property to its "pre-cannabis state" are also punitive fines within the meaning of the Eighth Amendment.

445.    The ordered destruction of property is grossly disproportionate to the many near-harmless offenses to which Category 4 violations apply based on their nexus to cannabis.

446.    The penalties for cannabis-related Category 4 violations that the County imposes on new purchasers of property based on the prior owner's misconduct are also unconstitutionally excessive.

447.    Any penalty for innocent conduct is unconstitutionally excessive.

448.    On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson and the Class, the County's policy and practice of fining landowners $10,000 per day for code violations based on their nexus to cannabis violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

449.    On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson and the Class, the County's policy and practice of ordering landowners to destroy structures and re-grade land with a nexus to cannabis violates the Excessive Fines Clause of the Eighth Amendment.

450.    On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class, the County's policy and practice of ordering landowners pay up to

United States District Court
Northern District of California

United States District Court
Northern District of California

$4,500 in administrative fees for Category 4 violations violates the Excessive Fines Clause of the Eighth Amendment.

451.    As a direct and proximate result of the County's policy and practice of levying Category 4 penalties for code violations with a nexus to cannabis, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class have suffered and will continue to suffer irreparable injury to their constitutional rights.

452.    On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class are entitled to declaratory relief and an injunction barring the County from enforcing its policy and practice of imposing Category 4 fines and fees for code violations committed to facilitate cannabis cultivation.

453.    On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class are entitled to declaratory relief an injunction barring the County from enforcing its policy and practice of ordering landowners to return land to its pre-cannabis state.

<div align="center">

**COUNT 5**

**Denial of the Right to a Jury**

**In Violation of the Seventh and Fourteenth Amendments**

**On Behalf of Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson**

**Individually and on Behalf of the Class**

</div>

454.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 366.

455.    On behalf of themselves individually and the Class, Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson bring this Count against the County based on its policy, practice, and custom of imposing Category 4 penalties and ordering the destruction of property for violations of the county code without providing accused landowners the right to a jury.

456.    The Fourteenth Amendment to the United States Constitution incorporated against the states all rights that are fundamental to our scheme of ordered liberty and deeply rooted in this Nation's history and tradition.

457. Fundamental rights guaranteed by the Bill of Rights bind states and municipalities.

458. The right to a jury in civil actions is a fundamental right that is deeply rooted in history and tradition.

459. The Preservation Clause of the Seventh Amendment protects the individual right to a trial by jury in common-law actions where the value in controversy exceeds $20.

460. Actions brought by the government for fines are common-law actions.

461. A civil penalty is historically a remedy at common law that only courts of law can enforce.

462. The County imposes penalties through a civil-enforcement scheme to minimize the expense and delay associated with pursuing remedies through the criminal justice system.

463. Individuals have a right to a jury in civil cases brought to punish and deprive them of their protected liberty and property interests.

464. Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class possess fundamental property interests protected by the Fourteenth Amendment to the United States Constitution in their homes, accessory structures, possessions, earnings, income, and capital.

465. The County cannot deny the right to a jury by imposing penalties through administrative hearings rather than in court.

466. The factual determination of whether a landowner violated the code in order to grow marijuana without a permit can carry hundreds of thousands—if not millions—of dollars in penalties.

467. Because the finding of such facts against the accused results in the deprivation of property and liberty as punishment for the offense, the accused is entitled to have a jury of their peers decide those facts.

468. Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class have a right to have a jury adjudicate the facts underlying the County's claims for Category 4 penalties.

469. The County's imposition of penalties through an administrative process that does not include a jury has been conducted pursuant to a policy, practice, or custom that violated the

United States District Court
Northern District of California

Preservation Clause of the Seventh Amendment and the Fourteenth Amendment to the United States Constitution.

470.    As a direct and proximate result of the County's policy and practice of imposing penalties through an administrative process that does not include a jury, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class have suffered and will continue to suffer irreparable injury to their constitutional rights.

471.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and the Class are entitled to declaratory relief and an injunction barring the County from enforcing its policy and practice of imposing civil penalties through an administrative process that does not include a jury.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

472.    Certify a class under Rule 23(b)(2) consisting of: "All persons who are currently facing penalties for cannabis-related Category 4 violations that were levied after January 1, 2018, who filed an 'Attachment C' to request an administrative hearing within 10 days of the County effecting service, and who have still not received a hearing for their appeal."

473.    Declare that the County's cannabis-related code-enforcement policies and practices violate the procedural due process guaranteed by the Fourteenth Amendment.

474.    Declare that the County's cannabis-related code-enforcement policies and practices violate the substantive due process guaranteed by the Fourteenth Amendment.

475.    Declare the County imposes unconstitutional conditions on landowners who seek land-use permits while facing cannabis-related abatement orders.

476.    Declare that the County's policy and practice of imposing Category 4 penalties based on a code violation's nexus to cannabis growth violates the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution.

477.    Declare that the County's policy and practice of imposing cannabis-related Category 4 penalties without the right to a jury violates the Preservation Clause of the Seventh Amendment of the United States Constitution.

478.    Enjoin Defendants from enforcing their cannabis-related code-enforcement policies and practices in violation of the procedural due process guaranteed by the Fourteenth Amendment.

479.    Enjoin Defendants from enforcing their cannabis-related code-enforcement policies and practices in violation of the substantive due process guaranteed by the Fourteenth Amendment.

480.    Enjoin Defendants from imposing unconstitutional conditions on land-use permits for landowners facing cannabis-related abatement orders.

481.    Enjoin Defendants from issuing unconstitutionally excessive penalties for Category 4 violations based on a code violation's nexus to cannabis growth.

482.    Enjoin Defendants from imposing civil penalties for cannabis-related Category violations through an administrative process that does not include a jury.

483.    Award the named Plaintiffs nominal damages.

484.    Award Plaintiff Blu Graham $832.11 in damages or restitution in addition to nominal damages.

485.    Award Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 as well as any other costs and fees that are legal and equitable.

486.    Award any further legal or equitable relief the Court deems just and proper.

Dated: October 5, 2022

/s/ Joshua House

Joshua House (CA Bar No. 284856)
Jared McClain* (DC Bar No. 1720062)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
T: (703) 682-9320
F: (703) 682-9321
jhouse@ij.org
jmcclain@ij.org

Thomas V. Loran III (CA Bar No. 95255)
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
F: (415) 983-1200
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
PILLSBURY WINTHROP SHAW PITTMAN LLP
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
F: (916) 441-3583
derek.mayor@pillsburylaw.com

Robert Johnson* (OH Bar No. 0098498)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
T: (703) 682-9320
F: (703) 682-9321
rjohnson@ij.org

*Application for admission
pro hac vice forthcoming

*Counsel for Plaintiffs Corrine Morgan Thomas and Doug Thomas;*
*Blu Graham; and Rhonda Olson*