**INSTITUTE FOR JUSTICE**

Jared McClain*            Robert Johnson*
(DC Bar No. 1720062)     (OH Bar No. 0098498)
Joshua House             16781 Chagrin Blvd.,
(CA Bar No. 284856)      Suite 256
901 N. Glebe Rd,         Shaker Heights, OH 44120
Suite 900                T: (703) 682-9320
Arlington, VA 22203      rjohnson@ij.org
T: (703) 682-9320
jmcclain@ij.org          *Admitted *pro hac vice*
jhouse@ij.org

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
derek.mayor@pillsburylaw.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**EUREKA DIVISION**

United States District Court
Northern District of California

| | |
|---|---|
| CORRINE MORGAN THOMAS and DOUG THOMAS, a married couple; BLU GRAHAM; RHONDA OLSON; and CYRO GLAD, on behalf of themselves and all others similarly situated, | Case No. 1:22-cv-5725-RMI |
| *Plaintiffs*, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | Magistrate Judge Robert M. Illman |
| COUNTY OF HUMBOLDT, CALIFORNIA; HUMBOLDT COUNTY BOARD OF SUPERVISORS; HUMBOLDT COUNTY PLANNING AND BUILDING DEPARTMENT; STEVE MADRONE, REX BOHN, MIKE WILSON, MICHELLE BUSHNELL, and NATALIE ARROYO, in their official capacity as Supervisors of Humboldt County; and JOHN H. FORD in his official capacity as Planning and Building Director, | |
| *Defendants*. | |

**INTRODUCTION**

1.      Humboldt County fines landowners hundreds of thousands of dollars for things they never did because it files charges without regard for probable cause.  The accused then rarely ever get the chance to defend themselves because the County withholds hearings from those who fight the baseless charges against them.

2.      While the County makes accused landowners wait indefinitely for an administrative hearing, fines continue to accumulate and the County denies them permits they need to develop their property.  The only way out is to pay the County, one way or another.

3.      The County designed this code-enforcement policy to maximize its proceeds from legalized commercial marijuana growth, squeezing every possible dollar out of residents along the way.

4.      After California legalized recreational marijuana, Humboldt County created an "abatement" program, under which it cites landowners for nuisances and permitting violations that it alleges have some connection to cultivating marijuana without a permit.

5.      By alleging the violations are cannabis-related, the daily fines automatically jump from a few hundred dollars to between $6,000 and $10,000 per violation, regardless of whether the violations pose any harm to the community.

6.      The main way the County identifies properties to fine is by reviewing satellite images that show harmless things like greenhouses on a property.  The County will allege, without probable cause or any further investigation, that the greenhouse's presence means the landowner must be growing marijuana illegally.  Based solely on that image, the County will typically issue a $10,000 fine for the greenhouse, plus another $10,000 fine for unpermitted cultivation because the County will allege—again, without any proof or investigation—that the greenhouse must have unpermitted marijuana inside.  The County will often tack on another $10,000 daily fine by alleging that the owner couldn't have built a greenhouse without grading their land without a permit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

7.      The County's code-enforcement dragnet catches plenty of harmless conduct and innocent landowners, including people growing their own food and people who just purchased their property and have done nothing wrong.

8.      Landowners cited with cannabis-related violations become trapped in the abatement process unless they pay the County to let them out.  The entire system is designed to generate money for the County as efficiently as possible—by forcing accused residents to pay the County even when they have done nothing wrong.

9.      Providing proof that there is no cannabis on a property is not enough to get the County to drop its cannabis-related fines.  Nor can a landowner "abate" their failure to have a permit by simply applying for the permit at issue.  Indeed, the County won't issue *any* permits to properties facing abatement orders, ensuring that the daily fines will accrue while also depriving landowners of their ability to legally develop or repair their property.

10.     The County makes accused landowners wait several *years* and pay up to $4,500 for a hearing at which they can finally defend themselves against the County's accusations.  As the County delays the hearing, daily fines continue to accumulate, as do administrative fees that the County charges just to discuss the ongoing abatement.

11.     In the rare instance that the County ever does schedule an administrative hearing, the County does not let a jury decide whether a landowner violated the code in order to cultivate cannabis—a factual determination that can multiply the penalty by 10 times or more.  Instead, a law firm hired by the County decides the facts of the case.

12.     Humboldt County's cannabis-abatement program violates due process, imposes unconstitutional conditions and unconstitutionally excessive fines and fees, and deprives accused landowners of their right to a jury.

13.     Accordingly, the named Plaintiffs—on behalf of themselves and a putative class of similarly situated landowners—seek to enjoin the County's unconstitutional implementation and enforcement of its abatement program.

Amended Complaint – Case No. 1:22-cv-5725-RMI

United States District Court
Northern District of California

**JURISDICTION AND VENUE**

14.     Plaintiffs bring this civil-rights lawsuit pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, for violations of rights, privileges, or immunities secured by the U.S. Constitution.

15.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1343 (civil-rights jurisdiction).

16.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391.

**PARTIES**

17.     Plaintiffs Corrine Morgan Thomas and Doug Thomas are adult citizens of the United States and residents of Humboldt County, California.  The Thomases face $1,080,000 in fines, the ordered destruction of their three-story workshop (an additional cost of $180,000), plus thousands in fees to the County because someone else grew marijuana at their property over two years before they bought it.

18.     Plaintiff Blu Graham is an adult citizen of the United States and a resident of Humboldt County, California.  He faced $900,000 in fines for unfounded and uninvestigated allegations that he was growing marijuana in greenhouses that the County saw in satellite images of his property.  Really, he was growing vegetables for his restaurant.  He waited 4.5 years for the County to a hearing so he could contest the baseless charges that he was growing marijuana, during which time the County withheld a permit he needed for his house.  As Blu was preparing the filing of this lawsuit, the County suddenly scheduled his hearing and agreed to drop its claims against him (and issue a permit that it had been wrongfully denying since 2018) if he waived his right to a hearing and paid back the $3,747 in fees that the County charged him as the County dragged out his case for 4.5 years.

19.     Plaintiff Rhonda Olson is an adult citizen of the United States and a resident of Humboldt County, California.  She faces over $7 million in fines because someone else grew marijuana on her property before she purchased it.  The County has also prohibited her from

developing her property—the very reason she bought it—while her abatement case is pending. She's been waiting over two years for a hearing.

20.     Plaintiff Cyro Glad is an adult citizen of the States and a resident of Humboldt County, California.  He faces $900,000 in fines for cannabis-related violations on a property he had just purchased.  County officials never visited the property in person; they just levied the allegations and fines without probable cause.  Cyro requested an administrative hearing to contest the charges back in November 2018 and is still waiting for the County to provide him an opportunity to be heard.

21.     Defendant County of Humboldt is a general-law county within California.

22.     At all times relevant to the facts of this case, Humboldt County and its officials, agents, and employees have acted under color of law.  The actions that give rise to Plaintiffs' claims are, unless otherwise indicated, taken pursuant to the policies, practices, and customs of the County, at the direction of, with the knowledge of, and through the actions of its former and current policymakers, including its Board of Supervisors and its Planning and Building Department.

23.     Defendant Humboldt County Board of Supervisors is the legislative and executive body of the County's government.  The Board of Supervisors passed the ordinances at issue in this case, and it controls, directs, and funds the County's Planning and Building Department and its subsidiary Code Enforcement Unit.

24.     Defendant Humboldt County Planning and Building Department is a division of the Humboldt County government tasked with enforcing laws, ordinances, and policies regarding planning and building, including code violations.  Humboldt's Code Enforcement Unit is part of the Planning and Building Department.

25.     Defendant Steve Madrone is Chair of the Board of Supervisors.

26.     Defendant Rex Bohn is Vice Chair of the Board of Supervisors.

27.     Defendant Mike Wilson is a member of the Board of Supervisors.

28.     Defendant Michelle Bushnell is a member of the Board of Supervisors.

29.     Defendant Natalie Arroyo is a member of the Board of Supervisors.

United States District Court
Northern District of California

Amended Complaint – Case No. 1:22-cv-5725-RMI

30.     Defendant John H. Ford is the Director of the Humboldt County Planning and Building Department.   The Director supervises the Planning and Building Department, and he exercises the Department's statutory power, including that of the Department's Code Enforcement Unit.

### STATEMENT OF FACTS

31.     Humboldt County is a mostly rural community of about 54,000 households spread across 4,052 square miles, 80% of which is forestlands, protected redwoods, and recreation areas.

32.     About half of Humboldt residents live in unincorporated and isolated parts of the County.

33.     The County is economically depressed.  Humboldt residents earn an average yearly income of roughly $29,500, well below the national average; about 16% of residents live in poverty.

34.     For decades, the County has attracted off-the-grid homesteaders, hippies, and other counterculture and anti-government types.

35.     As a likely result of the County's geographic, economic, and political makeup, Humboldt has scarcely enforced its building code as thousands of its residents built homes and accessory structures and graded land without first obtaining a permit from the County.

36.     The County allowed this culture of unpermitted development to grow unabated.

37.     After Californians voted to legalize the recreational use of marijuana, however, Humboldt County discovered a newfound rigor for enforcing the permitting requirements and nuisance laws that it had overlooked or left unenforced for decades.

38.     The County amended its code to authorize the Planning and Building Department to police cannabis cultivation in tandem with these nuisances and permitting requirements.

39.     Faced with the same constraints that made code enforcement difficult historically in Humboldt, the Planning and Building Department devised a strategy to supercharge its abatement regime: *ticket everyone* and force the accused to prove their innocence.

United States District Court
Northern District of California

40.     The Planning and Building Department instituted an "abatement" program, under which it charges residents with code violations and alleges that those violations must be connected to illegal marijuana growth.

41.     Code violations that the County alleges have a nexus to cannabis—often without evidence or investigation—carry tens of thousands of dollars in daily fines.

42.     The County's policy and practice is to accuse landowners of code violations relating to marijuana without regard for probable cause that a landowner grew marijuana illegally.

43.     The County then imposes ruinous daily fines for things like the failure to get a permit before building structures as basic as a temporary greenhouse if the County says that someone might have, at some point, grown marijuana on the property.

44.     Even when an alleged code violation is the failure to obtain a permit, the County doesn't allow the landowner to abate the "nuisance" by obtaining the permit in question.  Indeed, the County won't issue *any* permits to properties under abatement orders.

45.     Instead, the County orders landowners to destroy unpermitted structures within 10 days or it begins issuing daily fines—simply because the County alleges that the structures once had something to do with marijuana.

46.     Photographic proof that there is no marijuana growing on their property is not enough to get the County to stop the fines.

47.     Nor is evidence that the violations pre-existed the landowner's ownership or the County's allegations of cannabis growth.

48.     Landowners who weren't growing marijuana illegally and who don't want to destroy their property must appeal the charges to an administrative "court" run by Code Enforcement.

49.     Ever since the County began its abatement program around the end of 2017, the County has had a policy and practice of waiting several years—sometimes over *four years*—before it schedules an initial administrative hearing.

50.     While landowners wait indefinitely for the County to schedule an initial hearing, the fines continue to accumulate, the County charges administrative fees for every interaction the

Amended Complaint – Case No. 1:22-cv-5725-RMI

landowner (or their attorney) has with the government about their abatement, and the County refuses to issue other necessary permits unless the landowner agrees to pay the County to settle their case.

51.    Landowners who agree to apply for permits to grow cannabis commercially, however, can get their fines reduced or even dismissed.

52.    The County's enforcement regime is designed to squeeze every dollar the County can out of its residents as it tries to maximize its proceeds from legalized marijuana.

53.    Landowners fined without probable cause cannot escape the abatement process without paying the County—either in the form of fines, a settlement, administrative fees, or the licensing fees and taxes that the County charges to allow them to grow commercially in exchange for dismissing the code violations.

54.    The County's unconstitutional implementation and enforcement of this abatement program gives rise to the facts in this Complaint.

**A. Humboldt County Began Aggressively Prosecuting Building Code Violations Following Marijuana Legalization**

55.    California voters passed Prop 64 in November 2016 to legalize marijuana use for adults over 21 years old as of January 1, 2018.

56.    In response to legalization, Humboldt amended its tax system and civil code throughout 2017.

57.    Under the County's tax and fee schemes for marijuana, a commercial permit costs up to $86,560 in application and licensing fees, plus thousands of dollars in additional fees to cover the time that County staff works on an application.  Commercial growers must also pay annual taxes up to $3 per square foot of a cultivation area, which the County charged for years regardless of whether marijuana was actually grown on the property.

58.    These laws created a massive financial incentive for the County to push landowners into purchasing commercial permits.

59.    In 2018 alone, the County took in about $5 million in permits and fees.

1

2

3

4

60.    Correspondent to this legal pathway for commercial growth, the Board of Supervisors also passed several other ordinances in 2017 to increase enforcement and impose massive fines and fees on anyone who it thinks might be growing marijuana in Humboldt without buying a permit from the County.

5

6

7

8

61.    Growing cannabis without a permit now qualifies as a "Category 4 violation" of the county code—the code's most severe offense, which carries a daily fine of $6,000 and $10,000 and applies to those violations that "have a significant and/or substantial impact" on public health and safety.

9

10

11

62.    But the County did not stop at punishing illegal growth: The Board of Supervisors also amended the county code to increase the penalties for *all* code violations that the County alleges "exist[] as a result of or to facilitate the illegal cultivation of cannabis."

12

13

14

63.    As a result of these changes, minor code violations become Category 4 violations subject to $10,000 in daily fines whenever the County alleges that a violation exists in order to facilitate the unpermitted growth of marijuana.

15

16

64.    Violations that would typically carry fines between $1 to $1,000 multiply by a factor of 10 or more based solely on a supposed nexus between the alleged violation and marijuana.

17

18

65.    To increase the County's capacity to enforce all its new cannabis-related regulations, the Board of Supervisors more than doubled the number of full-time Code Enforcement officers.

19

20

21

22

23

24

25

66.    The County also "substantially" reduced the time landowners have to correct alleged nuisances before they face an abatement order: A property owner used to get 30 days to correct any alleged nuisances before they would receive an abatement order, another 30 days to abate the nuisance after receiving an abatement order, and then another 15 days before the County could schedule a hearing to impose a penalty.  But the County combined those steps and reduced the total abatement period from 75 days to just 10 days, while landowners now faced exponentially larger fines if they don't comply in time.

26

27

28

United States District Court
Northern District of California

67.     While the issuance of civil penalties for an abatement used to require a hearing before the Board of Supervisors, the County amended that system to make a hearing by request only and in front of a hired hearing officer instead.

68.     The explicit purpose of shortening the abatement period and reducing process rights was to streamline the County's ability to recover costs from abatements.

69.     Additionally, the 2017 code changes replaced the County's complaint-based enforcement system and authorized the Code Enforcement Unit to proactively enforce state and local laws regarding marijuana cultivation.

70.     The County's proactive, cannabis-focused enforcement mandate extended the purview of the Planning and Building Department and its Code Enforcement Unit beyond the traditional role of processing permit applications and abating nuisances that pose a danger to the public welfare, as the Board of Supervisors made its Code Enforcement Unit the County's primary enforcement agency for cannabis-related violations.

71.     The Board of Supervisors directed the Planning and Building Department to implement its new cannabis-related abatement program by January 1, 2018, when legalization would take full effect in California.

72.     As a result, by the time marijuana became legal, a newly constituted Code Enforcement Unit was in place to aggressively enforce code violations in Humboldt County.

73.     The County's code and enforcement policy changes were calculated to boost county revenue by extracting fines and fees from residents who don't pay for costly commercial permits and increased property taxes for commercial growth.

74.     To maximize the County's cannabis-related revenue, County officials, including Planning Director John Ford instituted a policy and practice under which the County tickets all unpermitted greenhouses for cultivating unpermitted cannabis growth.

75.     Director Ford has also imposed extra-legal requirements on people seeking permits for greenhouses that have nothing to do with cannabis.

United States District Court
Northern District of California

76.     For instance, Director Ford will personally decide that a greenhouse is larger than what he thinks the landowners need to grow their own food, and he has demanded the landowners get a business license for their greenhouse even though the law requires none.

77.     Director Ford will also require that landowners seeking a permit for a greenhouse must sign a special form promising to never grow cannabis in the greenhouse under threat of criminal penalties instead of the civil penalties the County typically assesses.

78.     Director Ford's Planning Department treats greenhouses as inherently suspect despite their many legal uses.

79.     Although the County often has no idea what is inside a greenhouse, anyone with an unpermitted greenhouse faces fines for illegal cannabis cultivation to ensure the County does not miss out on any cannabis-related revenue.

**B. Humboldt County Imposes Ruinous Fines Without Regard for Probable Cause**

80.     The Planning and Building Department has run wild with its new fine-driven mandate and adopted a policy and practice of charging cannabis-related code violations without proof or process.

81.     By charging cannabis-related code violations indiscriminately, the County's policy has inevitably punished many innocent people throughout the County.

82.     In 2018, the Department's first full year prosecuting cannabis-adjacent building and permitting issues, the County increased code enforcement by about 700 percent, resulting in the County's assessment of $3 million in fines that year.

83.     The County accomplished that drastic increase in enforcement through a policy and practice of charging Category 4 violations without regard for probable cause.

84.     Category 4 violations, which carry fines of $10,000 per day, are those that are "committed intentionally or through inexcusable neglect and have a significant and/or substantial impact on the health, safety, comfort, and/or general welfare of the public."

85.     The County's policy and practice, however, is to charge cannabis-related Category 4 violations without regard for any evidence that landowners violated the county code intentionally,

United States District Court
Northern District of California

1

2

3

or through inexcusable neglect, to grow cannabis illegally, and without regard for whether a cannabis-related code violation has a significant or substantial impact on health, safety, comfort, or general welfare.

4

5

86.     The County administers its blanket enforcement by using drones and a satellite-imaging program that provides the County with aerial images of property in the County.

6

7

87.     Satellite imaging is the County's primary basis of enforcement, with 119 of the 200 abatement cases in 2021 coming through the County's satellite program.

8

9

88.     Prior to the County's use of drones and satellite imagery, it issued far less than 100 citations per year.

10

11

89.     In the four years after the County began using drones and satellite imagery, it has issued cannabis-related citations to over 1,200 properties.

12

13

14

90.     Using aerial imaging, County officials identify properties that may have a greenhouse, building, a graded flat of land, an access road, or trees removed without a permit on record.

15

16

91.     One problem with the County's reliance on these aerial images is that they often misrepresent property boundaries.

17

18

19

92.     The County has ticketed a residents for their neighbors' greenhouses, simply because Code Enforcement was mistaken about where the property boundaries lined up with their satellite images.

20

21

22

93.     Worse, the County's inability to properly identify property lines on its aerial images has led county officials to execute armed *raids* of properties for growing cannabis without a permit based on permitted activity on a neighbor's property.

23

24

25

94.     When the County does identify the correct property, its crude satellite images reveal plenty of activities wholly unrelated to cannabis growth—let alone *illegal* growth in a state that allows residents to grow cannabis for medical and recreational use.

26

27

28

95.     But the County persists in relying on imprecise aerial images because it's profitable; it provides a cheap way to pressure residents to pay the County fines, fees, and permitting costs, and it shifts the costs of the County's errors to its residents.

96.     Many of the citations the County has issued are completely unfounded.

97.     And even when County officials can be sure that they've spotted an unpermitted structure in an aerial image, the image does not reveal anything about the contents of a greenhouse or other structure.

98.     A greenhouse in a crude aerial image is not probable cause that a landowner is growing marijuana in the greenhouse.

99.     It is common for people in rural Humboldt to grow their own food, often out of necessity.

100.    The crude aerial images that the County relies on cannot distinguish between a greenhouse growing food and one growing cannabis illegally.

101.    The County's enforcement-by-satellite practice is so crude and indiscriminate that it has led the County to accuse the nuns at the Redwoods Abbey of running an illegal cannabis operation based on their vegetable garden.

102.    The County has also mistaken a patch of solar panels for a greenhouse and a patch of tomatoes for an outdoor cannabis grow.

103.    The County has similarly accused vegetable and lavender farmers of having cannabis in their greenhouses when it was just vegetables and lavender.

104.    Similarly, a chicken farmer received a cannabis-abatement order for a greenhouse in which he was rearing chicks.

105.    Nevertheless, the County's policy and practice is to charge landowners with unpermitted commercial cannabis cultivation based merely on a satellite image that shows a hoop house (a temporary greenhouse built from PVC pipes and a plastic covering), a larger greenhouse, or some other accessory structure.

106.    The County follows similar enforcement practices for unpermitted grading.

Amended Complaint – Case No. 1:22-cv-5725-RMI

United States District Court
Northern District of California

107.    Many people in Humboldt live on property once owned by logging companies that graded the land to help clear timber for decades.

108.    The crude satellite images that the County relies on, which merely provide a snapshot in time, are unable to reveal the purpose of a grade.

109.    Nor can the crude satellite images show whether the amount of soil graded exceeded the threshold that requires a permit.

110.    Indeed, the two-dimensional images often can't show whether there is any grade at all.

111.    But the County treats a greenhouse as proof that there must be grading.

112.    A greenhouse in a crude satellite image is not probable cause that a landowner graded land without a permit.

113.    More importantly, the County cannot determine from a crude satellite image alone that a landowner built a greenhouse or graded their land *for the purpose of* cultivating cannabis.

114.    The County charges a range of cannabis-related Category 4 violations based solely on satellite images that show greenhouses, gardens, graded flats of land, and rainwater-catchment units.

115.    The County elevates these charges to Category 4 violations without evidence of cannabis cultivation—let alone evidence amounting to probable cause that the landowner violated the code to facilitate illegal growth.

116.    The County often takes no investigative steps to confirm the presence of *any* cannabis in the greenhouse or on the graded flat found in a satellite image—let alone whether the cultivation is illegal.

117.    Code Enforcement refers to these satellite-imaging cases it brings as "unreviewed."

118.    When accused landowners have protested fines based on only satellite images, County officials have responded that they are not authorized to come check the property to confirm the presence of cannabis before issuing a fine.

United States District Court
Northern District of California

119.    Yet the County also maintains that it has all the evidence of a code violation it needs before it issues a notice of violation.

120.    The clear implication is that the County (wrongly) believes it can issue code violations accompanied by hundreds of thousands of dollars in penalties, administrative fees, and restrictions on the use of property based on a lower quantum of suspicion than the probable cause required to obtain a warrant.

121.    When the County does have probable cause of illegal cultivation, the Sheriff's Department seeks a warrant and raids the property along with Code Enforcement (and other government agencies).

122.    When the County does not have probable cause of illegal cultivation, it issues fines and notices of violations instead.

123.    The County also has a policy and practice of imposing fines on new purchasers or inheritors of land in Humboldt despite lacking any probable cause that these new owners committed Category 4 violations.

124.    This policy ignores the *mens rea* requirement for Category 4 violations, which limits the code's most severe punishments to those committed intentionally or with inexcusable neglect.

125.    The County charges cannabis-related Category 4 violations without regard for intent or culpability.

126.    When someone purchases or inherits a parcel, the County's policy and practice is to wait until a new owner records their title and then fine the new purchaser for violations relating to a prior owner's alleged cannabis growth—even when the County knows that the new owner has not grown cannabis or committed the cannabis-related violations it charges.

127.    The County treats the fines as if they run with the land, holding new owners responsible for the violations and corresponding fines that were based on a prior owner's conduct.

128.    Director Ford has announced the County's position when someone purchases a piece of property not knowing there were outstanding violations: "Not wanting to be cold-hearted, but the

1  reality is that a property owner is responsible for their property and subsequent property owners

2  inherit that responsibility."

3       129.    Consistent with this policy of holding new owners responsible for the conduct of

4  prior owners, the County has cited new purchasers for the prior owner's abatement orders, sent new

5  purchasers a prior owner's outstanding bills, and even told new purchasers that they should track

6  down prior owners and get them to pay if the new owners do not want to pay themselves.

7       130.    Although county law requires the County to record code violations against the

8  property after the 10 days to abate the violation has elapsed, the County has not and does not do so.

9       131.    As a result of the County's failure to record outstanding abatement orders, the alleged

10  code violations and corresponding penalties do not appear in a title search, depriving new purchasers

11  of fair notice that the County plans to hold them responsible for someone else's wrongdoing.

12       132.    Without regard for notice or culpability, the County will still insist, under threat of

13  tens of thousands of dollars in daily fines, that the new owner must return their new property to its

14  "pre-cannabis state," a murky concept that requires the owner to destroy any structures and re-grade

15  land that the County alleges once had a nexus to cannabis.

16       133.    In many cases, the County's punitive order that landowners return a property to its

17  pre-cannabis state is more hazardous to the environment than leaving structures or grading in place.

18       134.    The County imposes these penalties and fees regardless of the cost to the current

19  owner and regardless of whether there was no cannabis cultivated in a structure or on a flat of land

20  after the current owner's purchase of the property.

21       **C.  The County's Abatement Program Is Designed to Force Owners into Settlements**

22       135.    The County designed its cannabis-related enforcement regime to inflict so much pain

23  and pressure on accused landowners that they feel compelled to settle the County's claims,

24  regardless of their validity.

25       136.    The County creates settlement pressure from the very day it issues a Notice of

26  Violation and Proposed Administrative Civil Penalty and Notice of Abatement (together an

27  "NOV").

28

137.    To effect service under the county code, the County must send notice by certified mail and post a copy on the subject property.

138.    The 10-day clock can, therefore, begin to run before a landowner receives actual notice of an alleged violation in the mail.

139.    And the County's policy and practice is to trick landowners into believing the clock started even earlier by pre-dating violations before the date the County actually effects service.

140.    For instance, the County might date a notice Tuesday, November 29, but not place it in the mail and post it on a property until Friday, December 2—so, whenever the landowner sees the posted notice or receives their certified mail, they are given the misimpression that the 10-day clock started on November 29.

141.    The County's pattern and practice of failing to correctly date a notice and adequately explain the date the fines will begin to run obscures how much time landowners have to respond.

142.    The County further shortens the time landowners think they have to respond through its practice of posting the notice on a Friday to create the false impression that four of the 10 days fall on a weekend, leaving landowners with the mistaken belief that they have just one full week to weigh the risks of costs of incurring fines, fees, and the other costs associated with abating or opposing any alleged cannabis-related violations.

143.    The County also posts notice in the newspaper to publicly accuse landowners of growing cannabis illegally.

144.    The County makes these public accusations against landowners regardless of whether it has probable cause that they have grown marijuana illegally.

145.    These public accusations increase pressure on landowners to settle abatement orders, and the County never retracts the accusation after a landowner establishes the accusations were baseless.

146.    Even when the County dismisses an unsubstantiated notice of violation, it still charges landowners the cost of publishing its baseless accusations in the newspaper, along with fees to cover other administrative costs of initiating a case against them.

United States District Court
Northern District of California

147.    Landowners who have done nothing wrong still face over $650 in administrative fees, including $207 to cover the cost of publishing the County's untrue accusations against them. If they refuse to pay, the County will send them to collections.

148.    Once served with an abatement order, landowners face immediate costs and immense pressure to settle due to the County's issuance of ruinous fines unsupported by any legitimate governmental interest, its refusal to drop baseless charges, its undue delay in providing hearings, its denial of permits while abatements are pending, and the cost the County imposes to prove one's innocence.

1.    **Humboldt County Issues Ruinous Fines and Fees Unsupported by Any Governmental Interest**

149.    The County imposes cannabis-related Category 4 penalties without any regard for whether the penalty serves a valid governmental interest.

150.    When assessing fines for cannabis-related code violations, the County's policy and practice is to ignore the county code's mitigating factors such as the owner's culpability, history of similar offenses, and the severity of the impact on public health and safety.

151.    The County's policy and practice is to issue the maximum $10,000 daily fines even when there are no health and safety concerns, complaints, prior violations, or culpability, and even when the County's entire investigation consisted of viewing a satellite image.

152.    County officials even have insisted that a violation does not need to cause *any* actual harm to justify a maximum daily fine of $10,000.

153.    While one daily fine of $10,000 would be unconstitutionally excessive for the innocent and harmless conduct and the paperwork violations for which the County imposes Category 4 violations, the County multiplies exponentially the pressure it places on landowners through a policy and practice of charging duplicative violations.

154.    On average, the County charges about three Category 4 violations per property.

United States District Court
Northern District of California

155.    The most typical trifecta of fines are for a single unpermitted hoop house: (1) building a hoop house without a permit; (2) grading the land without a permit to build the hoophouse; and (3) growing marijuana illegally in the hoophouse.

156.    Taken together, Code Enforcement will impose up to $30,000 in *daily* fines for building a temporary hoop house without a permit by alleging—without further investigation or evidence—that a hoop house itself is proof that a landowner also graded their land and grew cannabis without a permit.

157.    A single day's worth of $30,000 daily fines already exceeds the average yearly income for Humboldt residents.

158.    The daily fines accumulate for 90 days—quickly exceeding one million dollars in many cases—unless the landowner "abates" the alleged nuisance within 10 days.

159.    To afford the County's excessive fines, the average Humboldt resident would have to work for over 90 years just to earn enough gross income to cover the penalties for not obtaining a building permit that would have cost a couple hundred dollars.

160.    The fines are so unaffordable that even Supervisor Rex Bohn, one of the program's chief architects, asked the Planning Department what the fines are meant to accomplish: "We throw out these fines that are gonna be 35 million dollars if you don't do anything. … Should we bring that back to something more reasonable or is it to scare the panties off them?"

161.    And, as if 90 days of excessive fines were not enough, the County can re-notice the violation after 90 days and impose another set of daily fines for 90 more days.

**2.  Innocent Landowners Cannot Escape an Abatement Order Without Paying**

162.    Other than immediately paying to settle an abatement order, there is rarely a way for innocent landowners to quickly resolve their case.

163.    For instance, when the County charges a Category 4 violation for the failure to obtain a permit, its policy and practice is to refuse to issue the permit(s) necessary to resolve the abatement order on the grounds that the property is facing the abatement order that the permit would resolve.

164.    In other words, the County makes it impossible to "abate" the nuisance and then charges the landowner 90 days of fines plus fees for their failure to do the impossible.

165.    Without regard for public safety, the environmental impact, or the cost to the owner, an abatement notice will order landowners to destroy unpermitted structures and re-grade land solely because someone grew marijuana on the property at some point.

166.    The County requires landowners to demolish structures that qualify for permits just because it alleges the structures once had a nexus to illegal cultivation.

167.    And for structures that would not immediately qualify for permits, it is still often cheaper for landowners to bring the structures into compliance than to demolish them; yet, the County insists on its demolition regardless.

168.    But the County has rarely allowed landowners to bring a structure up to code because its policy and practice of ordering the destruction of buildings with an alleged nexus to cannabis is a major part of the leverage it creates for its fine-driven enforcement scheme.

169.    For those rare structures that the County will permit as built, it charges a penalty of treble permitting fees without regard for whether the current owner was the one who failed to obtain the permit(s) at issue.

170.    Some structures under abatement orders are large, structurally sound, permanent buildings that require an engineer, demolition permits, high labor and hauling costs, and even an environmental impact study before the owner can tear them down.

171.    As a result, complying with an abatement order can cost a landowner well over $100,000 to demolish harmless and stable structures and land simply because cannabis may have once been cultivated on the land—even when it was a prior owner or trespasser who grew the cannabis.

172.    On March 22, 2022, in response to a news story about Code Enforcement's unjust treatment of the Thomases, Rhonda, and other innocent purchasers in Humboldt, the Board of Supervisors held a meeting to reconsider the County's policy toward unpermitted buildings once used for unpermitted cannabis cultivation.

United States District Court
Northern District of California

173.    At that meeting, Director Ford bemoaned publicly that the article elicited sympathy for the innocent purchasers whom his office was fining millions of dollars for someone else's code violations.

174.    Director Ford confirmed his Department's policy that new owners like the Thomases and Rhonda had inherited responsibility for all issues on the property, even if his office had not recorded the violations to provide them notice of the violations and penalties they were inheriting.

175.    Under the new policy adopted at the March 22 meeting, property owners can now prepare a plan describing their desired non-cannabis use for an unpermitted structure if:

    a.    The use is permitted under zoning and land-use laws;

    b.    The structure is within the 2-acre curtilage of an existing residence;

    c.    The structure can be permitted;

176.    If the building does not fit those criteria, the owner must seek a conditional use permit, even if the use would be allowed without a conditional use permit had there not been cannabis on the property.

177.    Innocent owners must also pay for all permits, "including penalty fees (i.e., triple fees for building permits)," because of the prior cannabis cultivation on the property.

178.    Demolishing a structure within 10 days instead of seeking a permit is often still not enough to get the County to dismiss a violation.

179.    Owners willing to demolish a structure fare no better than those who can't obtain a permit: the County refuses to dismiss their violations either way.

180.    Dozens of landowners in Humboldt have sent the County pictures during the 10-day abatement period to show that they destroyed an unpermitted hoop house and that there is no cannabis on their land, and the County still refused to drop the charges.  Often, the County doesn't even respond.

181.    Neither proof of innocence nor proof that the alleged nuisance is abated is enough to escape the County's clutches.

United States District Court
Northern District of California

182.    The County's policy and practice is to keep landowners trapped in its abatement process until they pay the County, one way or another.

### 3.  The County Refuses to Provide Timely Administrative Hearings While It Pressures Accused Landowners to Settle

183.    Another way the County pressures landowners to settle is by delaying administrative hearings indefinitely.

184.    An NOV includes an "Attachment C," which an accused landowner can file to seek an initial administrative hearing to contest the County's charges.

185.    Once an accused landowner files their Attachment C, the county code permits Code Enforcement to schedule an administrative hearing "no *sooner*" than 15 days after the notice of appeal—even though the daily fines begin to accrue after just 10 days.

186.     The code does not impose a maximum time limit on how long the County can take to schedule an administrative hearing.

187.    The County does not stay the accrual of daily fines upon the filing of an Attachment C to request an administrative hearing, nor does it do so during settlement negotiations.

188.    Since the County adopted its new abatement program in 2017, the County's policy and practice has been and still is to wait years before scheduling an administrative hearing.

189.    There is no legitimate governmental reason for the delay in scheduling initial hearings on abatement orders, as the County maintains that it has all the evidence it needs *before* it issues an NOV.

190.    The purpose of the delay is to increase the pressure the County places on those landowners facing abatement orders.

191.    Even if the County were to schedule a hearing within 15 days, the soonest the code allows, a landowner must incur *at least* five days of daily fines before they are even allowed to receive their hearing.

192.    Again, a single day of fines typically exceeds the average yearly income of county residents, so five days of fines quickly becomes unpayable for accused landowners.

193.   To make matters worse, the County's policy and practice is to ensure that the full 90 days of fines run against anyone who seeks an administrative hearing.

194.   Consequently, people who seek an administrative hearing must incur hundreds of thousands—if not *millions*—of dollars in fines just to defend themselves.

195.   The fines that accrue while an owner waits for a hearing multiply the risk and cost of exercising one's right to a hearing—even when the County brought the charges without regard for probable cause and cannot ultimately prove that the accused violated the code to cultivate cannabis.

196.   If a landowner requests a hearing because they were falsely accused of violating the code *for the purpose* of growing cannabis, and then successfully shows at their hearing that they did not grow cannabis, the County can still "prevail" by proving simply that the accused committed the underlying code violation (*e.g.*, building a cannabis-free greenhouse without a permit).

197.   In other words, by delaying hearings and refusing to stay the accrual of fines, the County ensures that a landowner subjects themselves to 90 days' worth of *some* fines—even when the County never had the evidence to prove the alleged nexus to cannabis that led the County to file the charges and the landowner to insist on their right to a hearing.

198.   So even when the County can't prove its allegations of cannabis cultivation that were the crux of its case, it can still demand that landowners pay $90,000 per violation—instead of $900,000—for exercising their right to a hearing instead of "abating" the issue within 10 days.

199.   As landowners wait indefinitely for the County to schedule their hearing, they must also work with the County to address the very abatement orders they haven't yet had the chance to oppose in order to maintain any hope of leniency from the County's hearing officer, because the code restricts the hearing officer's authority to reduce the fines unless the landowner took "immediate steps" to abate an issue.

200.   Working with the County also comes at an additional cost, as the County charges administrative fees for the time its officials and employees spend talking to landowners and their attorneys about pending abatement orders.

United States District Court
Northern District of California

201.    County officials have told accused landowners exactly that: hiring an attorney to contest an abatement order increases the ultimate cost that the County charges landowners in administrative fees.

202.    Code Enforcement officials will even contact landowners without their lawyers present to pressure them into a settlement, even when the County knows that landowner has retained counsel to challenge the abatement order.

203.    In some cases, the County makes clear that it is more willing to work with landowners if they do not bring their lawyer to negotiations.

204.    Fully aware of the financial and psychological costs that its abatement regime brings to bear, County officials routinely check in with landowners to pressure them into waiving their right to a hearing and settling their case instead.

205.    Code Enforcement officials warn landowners that an appeal is not in their personal interest because the County does not lose before its own hearing officer.

206.    Code Enforcement Officer Warren Black has told innocent landowners, "You're going to lose the hearing; it's our people.  We're going to impose the maximum fine on you [if you insist on a hearing], and you're going to owe us $270,000."

207.    Similarly, Mr. Black has told other landowners that it "would be better to enter into an agreement" than go forward with their demand for a hearing because "the judges and attorneys work for the county and are on the side of the Code Enforcement Unit."

208.    The County's threats appear to be correct: Whenever the County actually does schedule a hearing before the law firm it hired to decide cannabis-related cases, the County wins.

209.    The County makes clear to accused landowners that settling their case is the only logical thing to do in the face of ever-increasing penalties and indefinite delays.

210.    Granted, the County's win-rate is, at least in part, a product of its refusal to schedule hearings on charges brought without probable cause and its willingness to drop cannabis-related allegations once it schedules a hearing.

211.    The system works as it's designed: to streamline the County's collection of fines and fees without regard for culpability.

212.    The County's undue delay in scheduling hearings facilitates this unjust outcome by forcing an accused landowner to endure years under the threat of fines, fees, and abatement costs, while also being unable to develop their land with no guarantee that the County will ever schedule their hearing.

**4.    The County Illegally Prohibits Landowners from Developing Their Property While an Abatement Order Is Pending**

213.    The County also increases settlement pressure by making permits costly or completely unavailable to landowners facing abatement orders.

214.    The County has a policy and practice of denying all permits to landowners with pending cannabis-related abatement orders, even if the permits are wholly unrelated to the abatement issue.

215.    The County adopted this blanket-denial policy despite a county ordinance that limits its authority to deny permits to only those *projects* that are subject to unpaid administrative civil penalties.

216.    As part of this policy, the County denies landowners the very permits that the County is fining them for not having.

217.    The County will also deny unrelated permits to landowners who are awaiting a hearing on an abatement order, including permits under the County's "Safe Home Program."

218.    The County created its Safe Home Program at the same time it adopted its cannabis-driven code enforcement.  The program, as extended, gives landowners from October 2017 through the end of 2027 to come forward and apply for as-built permits for their property without facing penalties.

219.    While the County dangled the carrot of amnesty for permitting violations, its Code Enforcement unit began blindly swinging the stick of crippling fines at any violation it perceived to have a nexus to cannabis.

United States District Court
Northern District of California

220.     The County will refuse to issue as-built permits for homes—or any other permits—to landowners facing a cannabis-related abatement order unless a landowner agrees to enter a settlement agreement or apply for a permit to grow cannabis commercially.

221.     County officials go so far as to make the extortive settlement pressure explicit—telling landowners that they cannot get permits for their property unless they settle their abatement cases.

222.     The County's denial of permits leaves an accused landowner unable to develop or maintain their property for years as they await an initial hearing on the merits of the County's cannabis-related abatement order.

223.     The County's illegal denial of permits increases the undue pressure on landowners to settle by denying their right to develop their property and by putting them at risk of additional permitting violations unless they give up their right to appeal any abatement orders.

### 5.   Challenging an Abatement Order Comes at a Great Cost

224.     If the County would ever finally provide an accused an administrative hearing, the hearings are extremely costly.

225.     Administrative hearings take place before a hearing officer for Code Enforcement.

226.     Despite the massive fines that the County levies "to minimize the expense and delay associated with pursuing alternative remedies through the … criminal justice system," the County does not allow the accused to have a jury decide the facts of their case.

227.     The hearing is conducted before a contractor from a private law firm that the County hires to serve as the hearing officer.

228.     Under the County's agreement with this private firm, the County pays hearing officers $240 per hour for their work plus $120 per hour for their travel time.

229.     The County passes on the cost of the hearing officer to the accused in the form of another administrative fee.

230.     The County charges up to $4,500 in administrative fees to landowners who request an administrative hearing.

231.    In addition to the cost of the hearing officer, the County also charges landowners for the time their salaried staff members spend preparing for the hearing.

232.    These fees the County charges for exercising one's right to an initial hearing are in addition to the daily fines that a landowner necessarily accrued waiting for the County to schedule the hearing.

233.    The county code permits the hearing officer to reduce the penalty below the amount that Code Enforcement assessed in the NOV *only* if the landowner immediately remedied a violation that did not impact the health, safety, or general welfare of the public.

234.    Perversely, the County supposedly interprets any attempts by a landowner to work with the County to remedy parts of underlying violations—including permitting issues unrelated to cannabis cultivation—as a reason to continue delaying the initial hearing, further increasing the cost to accused landowners without ever telling them that their cooperation might delay their hearing.

235.    As a result, exercising one's right to an initial hearing guarantees increased fines and fees, which the hearing officer cannot reduce because the landowner chose to contest an abatement order rather than caving to the demands of an NOV within 10 days.  Any attempt to mitigate violations in the meantime further delays the hearing while increasing the administrative fees a landowner incurs as they await their initial hearing.

236.    The County reminds landowners of all the associated risks—and the fact that all landowners are sure to lose their administrative appeal—as it pressures landowners to settle their case and waive their right to contest an abatement order.

237.    The County's system for adjudicating cannabis-related code violations is designed to pressure landowners into settlements instead of hearings to determine the merits of the County's allegations.

238.    If the hearing does go forward, any party aggrieved by a hearing officer's decision may then file a request for judicial review in the county superior court within 20 days.

239.    The appeal to the superior court is a limited civil case for which the record from the administrative hearing is admitted as prima face evidence of the County's claims.

Amended Complaint – Case No. 1:22-cv-5725-RMI

United States District Court
Northern District of California

240.     The County can enforce its administrative order and collect any penalties before a landowner appeals the hearing officer's decision and receives a hearing in superior court.

241.     As a result, the County can collect the ruinous fines it issued without probable cause before an accused landowner can ever step foot in a real court.

**6.   The Pressure Is the Point**

242.     The pressure campaign described throughout this section—with the ruinous fines, time pressure, the inability to obtain permits, the lack of a timely hearing, and the County's refusal to dismiss baseless charges—is all designed to generate revenue for the County.

243.     Once a landowner receives an NOV, they are trapped in an abatement unless they pay the County to let them out.

244.     When a landowner appeals an NOV, the County typically responds by immediately offering a compliance agreement under which the landowner agrees to pay one day's worth of the daily fines plus administrative fees up to $4,500.

245.     The administrative fees include things like the time that County employees have spent answering a landowner's phone calls or responding to emails about the case, down to the 15-minute increment.

246.     The fees also include the cost of the County publishing its accusations against the landowner in the newspaper.

247.     Paying fines and fees as part of a settlement agreement isn't the only way a landowner can pay their way out of an abatement order.

248.     The County has also offered to drop cannabis-related abatement orders for landowners who will agree to enter the costly process to grow commercially.

249.     The County has even offered to dismiss a cannabis-related abatement order in exchange for a landowner transferring to the County the title to the very unpermitted building that the County insisted the landowners had no other choice but to destroy.

United States District Court
Northern District of California

250.     In other words, because someone else once grew marijuana on a property before their purchase, the new landowners would have to pay to destroy a structure on their property or turn over the property to the County, without compensation, for public use.

251.     Those landowners who don't respond to an NOV get a $900,000 lien put on their property.

252.     As of August 2022, the County had placed a $900,000 lien on 24 properties, plus a $150,000 lien on a 25th.

253.     For those who resist the County's settlement offers and insist on an administrative hearing, the financial and psychological pressures remain unabated indefinitely, until the County eventually agrees to schedule an administrative hearing.

254.     Once the County does schedule a hearing, it increases the pressure to settle yet again by finally dropping any pretext of its baseless cannabis allegations and instead seeking 90 days' worth of fines for the underlying code violations that the landowner might not have ever contested if not for the cannabis charges, plus thousands in administrative fees.

255.     For many landowners, the only sensible way out of a cannabis-related abatement order—whether brought based on probable cause or not—is to settle before the fines and fees become insurmountable.

256.     About one-third of landowners facing abatement orders have agreed to settle their case and waive their right to a hearing, generating millions in fines and fees for the County without Code Enforcement ever having to prove the allegations it brings without regard for probable cause.

**D.  The County's Violation of the Individual Plaintiffs' Constitutional Rights**

**1.  Corrine Morgan Thomas & Doug Thomas**

257.     Corrine and Doug Thomas live in Miranda, California.

258.     The Thomases are both disabled and on a fixed income.

259.     They are retired aside from their work for a non-profit they run called the Miracle Run Foundation for Autism.

United States District Court
Northern District of California

United States District Court
Northern District of California

260.    The Miracle Run Foundation is named after a book Corrine wrote and the movie based on that book, which depicts their twin autistic sons' perseverance through school.

261.    Through their foundation, the Thomases raise awareness and money to support families with autism.

262.    The Thomases lived in Los Angeles County with their twin sons until the Woolsey Fire destroyed their home in November 2018.

263.    Using the insurance money from the fire, the Thomases decided to purchase their "forever home" in the middle of a redwood forest in Humboldt, where they always dreamt of living.

264.    The Thomases closed on a home in Miranda on August 20, 2021.

265.    The home sits on top of a ridge above the Avenue of the Giants.

266.    Behind the home, there is a detached garage alongside a three-story building that the listing referred to as a workshop.

267.    When the Thomases purchased the property, the workshop was empty and the electrical wiring inside had all been cut.

268.    Six days after the Thomases closed on their new home, on August 26, they received an NOV addressed to Summerville Creek LLC, the property's prior owner.

269.    The code-enforcement case for the violations listed in the notice had existed since 2019, over two years prior to the Thomases' purchase of the property.

270.    The notice listed two violations: (1) violation of the commercial cannabis land use ordinance; (2)(a) construction of building/structure in violation of building, plumbing and/or electrical codes; and (b) facilities/activities in violation of the commercial cannabis land use ordinance.

271.    The paperwork described the conditions causing a nuisance as "[u]npermitted commercial cannabis operation with approximately 2,500 square feet of cultivation" and a "[s]tructure facilitating commercial cannabis activity and constructed contrary to the provisions of Humboldt County Code."

272.    The notice said the owner faced a daily administrative penalty of $12,000 for 90 days unless they (1) ceased all commercial cannabis cultivation operations and removed all cannabis and infrastructure supporting commercial cannabis including water infrastructure and power sources; and (2) removed all structures with a nexus to cannabis cultivation and constructed in violation of the Humboldt County Code, including applying for and obtaining a demolition permit when applicable.

273.    The Thomases filled out the Attachment C to their NOV and submitted their request for a hearing on September 2, 2021, stating that they were the new owners as of 12 days prior and that there was no cannabis operation on the property.

274.    The Thomases have never grown cannabis.

275.    The Thomases certainly did not set up an illegal grow operation in Humboldt within days of moving into their new home.

276.    It should have come as no surprise to the County that there was no cannabis operation on the Thomases' property given that the County had raided the property and shut down the cannabis operation at issue in 2019, over two years before the Thomases bought the property.

277.    During a 2019 raid, the County had already cleared out all the remnants of the prior owner's growing operation and cut the electric to the three-story workshop, leaving no illegal cannabis growth for the Thomases to abate.

278.    The County would have also known that the property changed hands before it issued the NOV, as the Thomases had already recorded their deed with the County as the county code requires.

279.    Despite having raided the property and initiated a code-enforcement case over two years prior to the Thomases' purchase of the property, the County waited until after the Thomases purchased the property to serve the Thomases with a NOV for the prior owner's wrongdoing.

280.    Frightened by the penalties in the NOV, the Thomases contacted the County and informed County officials of their new ownership of the property—but that did not deter the County for pursuing its abatement order against them.

United States District Court
Northern District of California

281.    No County official has ever suggested to the Thomases or the attorney they hired to defend themselves against the County's charges that the Thomases are not responsible for the NOV and its corresponding civil penalties.

282.    To the contrary, since the County issued the Thomases an NOV for someone else's conduct, the County has made clear consistently that, pursuant to the County's established policy and practice, the Thomases must pay fines and fees for the prior owner's conduct or sign a settlement agreement pursuant to which they relinquish a variety of their rights as landowners.

283.    Having successfully terrified the Thomases under the threat of more than a million dollars in fines, the County sought the Thomases' consent to inspect their property, ostensibly so the County could confirm once again that the workshop had been used to cultivate cannabis—something, again, the County was well aware of already.

284.    Code Enforcement Officer Brian Bowes visited the Thomases property on September 8, 2020.

285.    The Thomases told him that they do not smoke pot and do not grow pot.

286.    Mr. Bowes responded that he did not care who they are or what they've done and that the Thomases are still responsible for the violations on the property they bought, including the citation for the unpermitted cultivation of cannabis.

287.    The Thomases asked if they could just get the building permitted because they intended to use it for woodworking and storage, but Mr. Bowes responded that the County would not let them permit it and said that the Thomases were stuck having to tear it down.

288.    Mr. Bowes concluded that—even if the County did not have a policy prohibiting the permitting of buildings used to cultivate cannabis—the only permissible use for the building was a barn, but the Thomases could not use the workshop as a barn because they do not raise livestock or store agricultural products on their property.

289.    Even though the Thomases did nothing wrong, the County still insisted that they must destroy the three-story workshop solely because the prior owners used it to cultivate cannabis.

290.     The three-story workshop that the County wants to demolish is situated behind the family's home, surrounded by old-growth trees.

291.     The Thomases hired an engineer in response to the abatement order.  He estimated that the cost to remove the building with minimal environmental impact was about $180,000 plus the cost of the necessary demolition permits.

292.     The Thomases do not want to destroy the three-story building, which Doug planned to use as a workshop for projects related to his renovations to their home.

293.     Nor do the Thomases want to remove old-growth trees from their scenic yard, considering the trees were the main appeal to the Thomases living in a redwood forest.

294.     The Thomases also cannot afford the cost of removing the building.

295.     After losing everything in the Woolsey Fire, the Thomases invested their insurance money into their new home.

296.     They cannot afford nearly $200,000 in abatement costs designed to punish someone else's wrongdoing.

297.     The threat of over a million dollars in fines, plus nearly $200,000 in abatement costs has caused the Thomases an incredible amount of emotional distress, as they could not afford the costs and penalties.

298.     On October 7, 2021, rather than rescinding the NOV, the County offered the Thomases a settlement agreement under which they would be required to admit to the County's cannabis-related accusations, remove the unpermitted structure from their property, and pay administrative fees.

299.     The settlement offer confirmed that Code Enforcement opened the case against the Thomases on July 12, 2019, more than two years before they purchased the property.

300.     As the Thomases contemplated their options, the fines continued to accrue.

301.     By November 8, 2021, the fines had reached $756,000, plus the $200,000 to destroy their workshop.

1    302.    The Thomases' fixed retirement income does not include a spare $956,000 to pay for

2    someone else's wrongdoing.

3    303.    Out of duress, and feeling like they had no other option, the Thomases signed a

4    settlement agreement under which the County was willing to "stay enforcement" of its NOV and

5    proposed civil penalty if the Thomases purchased a demolition permit and paid to demolish the

6    workshop within six months.

7    304.    The agreement also required the Thomases to consent to warrantless inspections of

8    their property and prohibited them from transferring ownership.

9    305.    If they failed to comply, the County would reinstitute the abatement order and civil

10   penalties.

11   306.    The Thomases could not afford the associated costs and decided not to destroy their

12   building; instead, they waited for their administrative hearing.

13   307.    On March 22, 2022, a news story about the plight of the Thomases and other innocent

14   purchasers in Humboldt caused the Planning Department and the Board to Supervisors to reconsider

15   their policy toward unpermitted buildings used for unpermitted cannabis cultivation.

16   308.    The County confirmed at that meeting that new owners like the Thomases inherited

17   responsibility for all violations on the property prior to their purchase—regardless of whether they

18   had notice of those violations.

19   309.    Under the new policy adopted at the March 22 meeting, the Thomases can obtain a

20   permit for their workshop only if their desired use is permitted under the zoning and land-use laws.

21   310.    Accepting Mr. Bowes' conclusion that the Thomases' workshop has no permissible

22   use under the county code, the Thomases would have to seek a conditional use permit.

23   311.    To do so, they must pay treble fees as a penalty for the prior owner's cannabis

24   cultivation on the property.

25   312.    As the County has made clear to the Thomases' attorney, there is no guarantee that

26   the County will issue a conditional use permit even after the Thomases pay a penalty for someone

27   else's wrongdoing.

28

Amended Complaint – Case No. 1:22-cv-5725-RMI

United States District Court
Northern District of California

313.    The Thomases' attorney emailed the Planning Department to confirm that his innocent clients, including the Thomases, would still have to pay triple permitting fees.

314.    By email on April 4, 2022, Code Enforcement Officer Branden Howton replied: "As for your list of clients below, please inform them they will still have to be paying three (3) times the cost for permitting[.] … Although some of the buildings listed below meet [the new policy's] criteria, some do not.  Please keep that in mind.  Due to the time required for the permitting process, we will be offering No-Penalty Compliance Agreements.  Other requirements for abatement will still apply as the policy only applies to the structures used for cultivation."

315.    The policy took effect on April 5, 2022.

316.    The Thomases' November 2021 agreement with the County lapsed on May 16, 2022.

317.    On August 16, 2022, the County offered the Thomases a new settlement agreement.

318.    Much like the prior year's offer, the August 2022 agreement acknowledged that the abatement case pre-dated the Thomases' ownership, but it still required them to falsely admit that they committed the prior owner's cannabis-related offenses.

319.    The August 2022 agreement also required the Thomases to consent to warrantless searches, prohibited them from transferring ownership, and required that they pay administrative fees that the County incurred bringing a case against them for someone else's wrongdoing.

320.    The August 2022 agreement, however, allowed the Thomases to keep the three-story workshop if, within eight weeks, they submitted a restoration plan and permit application.

321.    The County confirmed again with the Thomases' attorney that the County would charge the Thomases triple the permit fees to obtain any permits they needed, again, as punishment for someone else's wrongdoing.

322.    If, upon reviewing the Thomases' permit application, the County determined that it could not permit the structure, the Thomases would then have three months from the County's denial of the permit to obtain demolition permits and demolish the structure.

323.    Once the Thomases either obtained a permit for the structure or demolished the structure, the County would then dismiss the code-enforcement case against them.

324.    The Thomases rejected the agreement because they remain intent on keeping the three-story accessory structure they purchased with their property, but they are not willing to pay penalties for the prior owner's wrongdoing.

325.    The Thomases also do not want to admit guilt or otherwise waive their right to privacy, their right to be heard, or their right to sell or transfer their property.

326.    To date, the Thomases have still not received an administrative hearing since filing their notice of appeal on September 2, 2021.

### 2. Blu Graham

327.    Blu Graham has lived in and around southern Humboldt County for most of his life.

328.    Blu owns a hiking company called Lost Coast Adventure Tours and, along with his wife, owns a restaurant called Mi Mochima near their home in Shelter Cove.  Blu also works as a contractor for a national outdoor-recreation retailer, serving as a guide on hiking tours in Humboldt.

329.    Blu was the chief of the Whale Gulch Volunteer Fire Company for about five years and remains a captain for the company.

330.    Back in December 2012, Blu purchased an 80% interest in a parcel of land in Whitethorn, and he has been slowly developing a homestead there ever since.

331.    Blu constructed greenhouses on his property to grow fresh produce for his family's restaurant.

332.    Blu's property also contains a fire road and rainwater-catchment pond for fire control.

333.    Back in May 2018, Blu was in the second group of Humboldt residents to receive an NOV from the County.

334.    The notice alleged three violations: (1) violation of the commercial cannabis ordinance; (2) construction of building/structure in violation of building, plumbing, and/or electrical codes; and (3) grading land to install a rainwater-catchment pond without permits.

335.    The notice informed Blu that he'd face $10,000 in fines per day for a period of 90 days unless he completely abated the alleged nuisances within 10 days.

336.   To abate the issues, the notice required Blu to implement a restoration plan for all three violations, cease all cannabis cultivation, and remove all supporting infrastructure.

337.   Blu was not cultivating cannabis on his property and no infrastructure on his property supported cannabis cultivation.

338.   Along with the NOV, the County included a cover letter, also dated May 10.  The letter informed Blu that Code Enforcement "recently inspected" his property and "observed violations of County Code."  It warned that "these recorded Notices may hinder the landowner's ability to sell or refinance the property."

339.   On or about May 12, 2018, the County published in a local newspaper that Blu's property was under an abatement order relating to illegal cultivation.

340.   The publication of allegations that Blu was growing marijuana illegally caused him stress and embarrassment, as he had recently opened Mi Mochima and was trying to get the business off the ground with his wife.  He had to explain his innocence to inquiring customers.

341.   Blu went to Eureka on or around May 14, 2018, to speak with Code Enforcement about his NOV and file his request for an administrative hearing.

342.   Code Enforcement officers Brian Bowes and John Moredo assured Blu that everyone in Humboldt would get an NOV eventually.

343.   They told him he had three options: settle, appeal, or lose his land.  They tried to persuade Blu to take the first option—enter a settlement agreement under which he'd admit guilt and pay a $30,000 fine to the County.

344.   Blu rejected the County's settlement offer and insisted on having an administrative hearing.

345.   He told Code Enforcement officers that he knew they did not have proof of cannabis because there was none on his property.

346.   Code Enforcement officers responded, "Well, you're not just growing asparagus in there."

347.   Blu was, in fact, just growing vegetables in his greenhouses.

1    348.    The officers provided Blu with four aerial pictures of his property from 2012, 2014,

2    2015, and 2017.

3    349.    None of the images on which the County relied showed the property at the time of

4    the alleged violation in 2018, when its cannabis-related code provisions became law.

5    350.    It is impossible to detect marijuana cultivation from these crude images.

6    351.    It is impossible to detect *anything* inside Blu's greenhouses from these crude images.

7    352.    There was no marijuana cultivation on the property.

8    353.    The rainwater-catchment pond that the County alleged that Blu dug to cultivate

9    cannabis is situated about 1,000 feet up a ridge from Blu's house and greenhouses.  The pond exists

10   solely for fire prevention; it is designed so a firefighting helicopter can drop down and scoop up

11   water to fight a nearby fire.

12   354.    There are no pipes or irrigation leading from the pond to Blu's greenhouses below.

13   355.    Blu was not using his pond to grow marijuana illegally.

14   356.    Blu retained an attorney and timely filed his notice to request a hearing on the

15   abatement order, asserting that there was no marijuana on his property.

16   357.    On May 22, 2018, Blu's attorney sent a letter to the County inviting Code

17   Enforcement to come inspect the property.  The letter also explained that Blu wanted to keep and

18   permit his greenhouses because he uses them to grow fresh produce for his wife's restaurant.

19   358.    Along with the letter, Blu's attorney included pictures to show that there was no

20   illegal cultivation on Blu's property.

21   359.    The County made clear in response that they had no intention of visiting Blu's

22   property and refused to issue a permit for his greenhouses.  The County insisted that its cannabis

23   allegations pre-dated 2018.

24   360.    Unable to obtain a permit from the County, Blu removed his greenhouses to comply

25   with the abatement order despite his hopes to retain them to continue growing vegetables.

26

27

28

United States District Court
Northern District of California

361.   Blu's attorney sent a second letter on June 25, 2018, this time to Director John Ford. He expressed concern and confusion over the County's refusal to inspect the property and dismay at the fact that the County charged Blu based on crude aerial photos that do not show any marijuana.

362.   The June 25 letter conceded that Blu dug the rainwater-catchment pond in 2015 to aid the local fire company.  He sought a retroactive permit for the grading rather than filling it in, as the fire company inspects the pond annually and has expressed its pleasure with it.

363.   On July 5, 2018, Deputy Director Bob Russell responded by letter.  He acknowledged that the pond may be for fire prevention but claimed that the County also had evidence that Blu's grading was done with the intent to support cannabis infrastructure (which, again, was not true).

364.   Mr. Russell said that the NOV against Blu would stand and offered Blu a reduced penalty of $20,000 plus administrative fees if he signed a settlement agreement.  If he elected instead to move forward with his administrative hearing, the County warned that a settlement "may no longer be an option."

365.   Mr. Russell did not respond directly to Blu's request to permit his pond.  Instead, he said that the County may "eventually" allow Blu to permit existing "empty" structures on his property through the Safe Home Program.

366.   Blu again rejected the County's settlement offer; he maintained instead that he wished to go forward with the initial hearing he requested back in May because he knew the County had no evidence to support its baseless claims of illegal cultivation.

367.   The 90 days of fines for Blu ran through August 18, 2018, at which point Blu accumulated $900,000 in fines for his unresolved abatement order, despite his filing a timely request for an initial hearing that he never received.

368.   In September 2018, the County offered to settle Blu's case for $10,000 if Blu signed a settlement agreement pursuant to which he admitted that he graded land without a permit for the purpose of cultivating cannabis.

369.   Blu once again rejected the offer and demanded his initial hearing because the development of his property had nothing to do with marijuana.

370.    The County still refused to provide Blu an administrative hearing.

371.    Blu hired a register engineer to inspect the grade of his pond.

372.    On January 15, 2019, the engineer sent a letter to Bob Russell advising him that he did not observe any commercial-cannabis activity on Blu's property and that "[t]he property [was] developed for use as a rural homestead with site grading activities and building development occurring a little at a time over the past 40 years."

373.    The letter concluded that the grading did not create a geologic or erosion hazard and that the rainwater-catchment pond is stable and does not require corrective action to protect against erosion and sediment runoff.

374.    On February 6, 2019, the County offered another compliance agreement that would have required Blu to pay $20,000 (an increase from the $10,000 it offered the year before).  Blu again refused to pay the County's settlement demand and wrongfully admit that he was growing cannabis on his property.

375.    In a conversation with Code Enforcement officer Warren Black, Blu objected to the County's issuance of Category 4 violations without any evidence that a greenhouse contains cannabis.  Mr. Black responded that the prevalence of cannabis throughout Humboldt justifies the County's policy and practice of levying fines without individualized suspicion—just as police would be right to suspect that any shed contains methamphetamine in a region that has problems with that drug.

376.    The County offered Blu another settlement agreement on August 5, 2021.  He again refused to sign and—once again—insisted on an administrative hearing because the offer required him to accept responsibility for the County's baseless claim that he was cultivating cannabis.

377.    With his abatement case still unresolved, Blu went to the Planning Department to try to obtain a permit for his home through the Safe Home Program.  He paid $799 for the initial startup fee.

378.    Code Enforcement, however, learned that Blu was trying to participate in the Safe Home Program and put a hold on his application after he already began the process, paid the County fees, and hired and paid for contractors.

379.    Even though Code Enforcement knew that Blu had retained counsel for his abatement case who had already participated in settlement negotiations, County officials contacted Blu directly to pressure him into signing a settlement agreement in exchange for his Safe Home permit.

380.    Warren Black told Blu that it was in Blu's best interest to drop his request for a hearing and sign a settlement agreement instead because the County would not issue Blu a permit for his house while his abatement order was outstanding and because no one can win their administrative hearing before the County's hand-picked hearing officer.

381.    Mr. Black went so far as to encourage Blu to submit public-records requests to see the County's perfect win-rate in administrative hearings.

382.    Mr. Black followed up by email later the same day and gave Blu instructions on how to submit an information request for the results of all the administrative hearings held on cannabis-related charges.

383.    Blu interpreted this email as telling him he should settle his case because Code Enforcement does not lose at its administrative hearings.

384.    Mr. Black emailed Blu again on August 4, 2022, and confirmed that he would only "release the hold on [Blu's] safe homes project" if Blu signed the County's settlement offer in his unrelated abatement case.

385.    In September 2022, over four years after Blu requested his initial hearing but only a few weeks after he retained undersigned counsel to challenge the County's code-enforcement system, Code Enforcement suddenly sent Blu a notice of administrative hearing, scheduled for October 14.

386.    Shortly after the County served the notice of administrative hearing, Mr. Black once again contacted Blu directly to pressure him to settle.

Amended Complaint – Case No. 1:22-cv-5725-RMI

United States District Court
Northern District of California

387.    The County informed Blu that it was no longer pursuing the cannabis-related claims that Blu had contested for over four years.

388.    Instead, the County would limit its case at the hearing to one count of grading without a permit—wholly unrelated to the cultivation of cannabis.

389.    The County informed Blu that, if he exercised his right to a hearing, he would face $90,000 in fines for the failure to obtain a grading permit after he received an NOV: a fine of $1,000 per day for the full 90 days allowed by the ordinance, all of which ran while Blu awaited his hearing.

390.    Blu had tried to obtain the permit at issue back in 2018 but the County denied his request because he had a pending cannabis-abatement order.

391.    In other words, if Blu exercised his right to an administrative hearing, he faced $90,000 in penalties for failing to obtain the very permit that the County refused to issue him because he exercised his right to an administrative hearing.

392.    The County, however, offered to settle Blu's case if he would admit to grading land for the pond without a permit, pay up to $4,500 in fees, and waive his right to an administrative hearing.

393.    Rather than signing the settlement agreement, Blu contacted the County and requested a meeting with Director Ford.

394.    Blu met with Director Ford and other County officials on September 26, 2022.

395.    At the meeting, Director Ford confirmed the County's policy of refusing to issue *any* permits for a property under an abatement order.

396.    Director Ford agreed to drop Blu's case and to issue a permit for Blu's pond (which, again, Blu had been requesting—without success—since 2018) without a signed settlement agreement if Blu paid over $3,700 in administrative fees to cover the cost of the County prosecuting Blu's case while he was waiting for his initial hearing.

397.    Director Ford confirmed that the engineering report Blu's attorney submitted back in January 2019 was sufficient to obtain a grading permit for the pond.

United States District Court
Northern District of California

398.   Deputy Director Bob Russell told Blu that settling his case would have been a lot cheaper if Blu had not hired an attorney to defend himself against the County's claims for so long.

399.   That same day, Blu gave the County a cashier's check for $3,747.29 to pay the administrative fees associated with his case.

400.   These fees included $207 to post notice of his alleged cannabis-related violations in the newspaper and $3,747.10 in general staffing costs.

401.   In exchange for Blu paying the administrative fees, the County agreed to expedite the permit for his pond that it had denied him for over four years.

402.   Director Ford followed up by email and confirmed that the County would resolve the violations on Blu's property if he paid his administrative fees and paid for the grading permit.

403.   The County sent Blu a letter dated September 28, 2022, stating that it was processing a refund for him to return $2,951.18 of what he paid in administrative fees as a reduction for costs associated with preparing for his administrative hearing that the County never held.

404.   All told, Blu had to pay the County $795.92 in administrative fees to defend himself against baseless cannabis-related charges that the County filed against him without probable cause and eventually dropped over four years later for lack of evidence.

405.   The only reason Blu paid these administrative fees in exchange for the County dropping his abatement case was because the County was holding hostage the permits Blu needed for his property.

406.   On Monday, October 3, 2022, Blu paid the County another $936 for his grading permit.

407.   That same day, the County issued a permit for Blu's pond and closed its abatement case against him.

408.   The County then released its hold on the permit for Blu's house under the Safe Home program because he paid the County $795.92 in administrative fees to drop his abatement case.

1

### 3. Rhonda Olson

2      409.   Rhonda Olson is a longtime resident of Orleans, California, an unincorporated area

3  of Humboldt County more than two hours northeast of the county seat in Eureka.

4      410.   On September 10, 2020, Rhonda closed escrow on the purchase of three adjacent

5  parcels of land near her house in Orleans for $60,000.

6      411.   She planned to use the property to provide housing for her family and close friends

7  in the properties' existing homes and to build affordable housing that she could sell on the

8  undeveloped parcel.

9      412.   The property came with scattered junk and needed renovations that Rhonda planned

10  to undertake to improve the property.

11      413.   The first parcel is on the top of a large hill.  It has a modular home and the remnants

12  of several hoop houses; it also has an industrial garage and a logging flat atop a steep driveway, all

13  of which dates back to a logging operation on the property from the 1980s.

14      414.   The second parcel is below the first and leads to the street; it has a home and a

15  spacious yard.

16      415.   The third parcel is a naturally sloped field across the street; it is empty aside from

17  some grapevines and the remnants of a hoop house.

18      416.   At the time of purchase, Rhonda knew that the prior owners had been raided by law

19  enforcement and that law enforcement had cleared an illegal growing operation from the property.

20      417.   Because she was aware of the raid, she conditioned her purchase on the property

21  having a clean title.

22      418.   The title search showed no outstanding violations or liens on the property.

23      419.   It wasn't long after Rhonda's purchase, however, before the County brought

24  Rhonda's development plans to an abrupt halt.

25      420.   On October 1, 2020, Rhonda received an NOV for each of the three parcels, each

26  dated September 11—just one day after she closed escrow on the property.  The NOVs were all

27  addressed to the prior owner, a corporation based out of Santa Rosa.

28

United States District Court
Northern District of California

421.    The first NOV, for the vacant parcel across the street, cited four nuisances: (1) unpermitted commercial cannabis cultivation; (2) two hoop-house structures facilitating commercial cannabis activity; (3) grading without permit to facilitate commercial cannabis cultivation; and (4) multiple piles of junk.

422.    The first NOV assessed daily fines of $31,000: a $10,000 fine for each of the cannabis-related violations and $1,000 for the junk.

423.    There was no cannabis on the property at the time of the NOV, and an engineer would later confirm that no grading was done on the parcel.

424.    The second NOV, for the parcel with the house, also cited four nuisances: (1) unpermitted commercial cannabis operation; (2) structures facilitating commercial cannabis activity and constructed contrary to the county code; (3) grading to facilitate commercial cannabis cultivation activity; and (4) piles of junk.

425.    The second NOV also assessed daily fines of $31,000: a $10,000 fine for each of the cannabis violations and $1,000 for the junk.

426.    There was no cannabis on the second parcel at the time of the NOV, and a simple check of tax records or historical satellite imaging would have confirmed for the County that the structure at issue was constructed decades ago—not as part of the prior owner's cannabis operation.

427.    The third NOV, for the parcel up the hill with the modular home, cited six violations: (1) unpermitted commercial cannabis cultivation; (2) four structures facilitating commercial cannabis activity and constructed contrary to the county ode; (3) grading to facilitate commercial cannabis cultivation; (4) development in a mapped streamside management area to facilitate commercial cannabis cultivation; (5) junk and/or inoperable vehicles; and (6) piles of junk.

428.    The third NOV assessed daily fines of $42,000: a $10,000 fine for each of the four cannabis-related violations and $1,000 each for the two junk-related violations.

429.    As with the other two parcels, there was no cannabis while Rhonda owned it; the police had cleared it all out during their raid of the prior owner, before the County issued NOVs.

1    430.    Code Enforcement officials later acknowledged in March 2022 that the grading on

2    this parcel was an "old logging pad" that they were "not really worried about" because it pre-dated

3    any cannabis cultivation on the property.

4    431.    The County fined her for it anyway.

5    432.    In total, Rhonda faced $104,000 in daily fines for cannabis-related charges on land

6    she just bought days prior for $60,000.

7    433.    Rhonda has never grown marijuana on the property.

8    434.    The day after receiving the abatement orders, Rhonda hired an engineer to inspect

9    her property.

10    435.    The engineer sent the County a letter on October 5, 2020.  He explained that law

11    enforcement had terminated the illegal growing operation, there was no cannabis on the property,

12    and any grading happened more than a decade before Rhonda purchased the property.  He also noted

13    (and included pictures showing) that Rhonda had removed all the hoop houses and was in the

14    process of removing the junk.

15    436.    Rhonda filled out the Attachment C forms to request an administrative hearing and

16    sent them by certified mail on October 7, 2020.

17    437.    She explained on her Attachment C that she was the new owner and "did not make

18    the nuisance and had a clear title as of September 10, 2020."  She let the County know she was

19    working to correct any nuisances the prior owners left, including by clearing out the junk.

20    438.    Rhonda contracted an engineer to put together a plan relating to all the alleged

21    grading on the property.  He recommended filling in some soil on the parcel and not rebuilding the

22    hoop houses on top of the ridge.

23    439.    Filling in the soil was not enough for the County, however.

24    440.    Having not heard anything from the County following her submission of proof that

25    she cleared up the abatement issues on the third parcel with the grapevines, Rhonda paid an engineer

26    $3,200 to test the soil and water in preparation for installing septic and building a home.

27

28

*United States District Court*
*Northern District of California*

441.    She emailed the County to let them know she conducted the testing and to request the necessary permits to begin building and installing a septic system.

442.    County officials responded by email on March 23, 2021, and warned, "Just an FYI, no permits will be issued for properties with open Code Enforcement cases."

443.    The email also clarified that the County prosecutes grading as a Category 4 violation even when the grading originally had nothing to do with cannabis: "I also received your email regarding another property where you stated that the grading was done for a timber harvest plan. Unfortunately, the fact that the flats were used for cannabis cultivation is why the violation exists. For normal timber operations flats are permitted but the moment they are used for unpermitted cannabis cultivation they will need to be addressed by a licensed engineer."

444.    County officials also acknowledged by email that the police removed all cannabis from the property prior to Rhonda's purchase, despite the notices of violations citing her for cultivating cannabis on the property.

445.    Similarly, in public comments on March 22, 2022, Code Enforcement told the Board of Supervisors that "all that's left is some grading" on Rhonda's properties, which could be "chalk[ed] up to pre-cannabis logging activity."

446.    But despite acknowledging that nearly all of the alleged conditions do not exist, pre-dated cannabis cultivation, and were not Rhonda's fault, the County kept its abatement orders—with their $9.36 million in fines—in place anyway.

447.    The County sent Rhonda an offer to settle the abatements in March 2021.  The agreement, which noted that it opened its case against her property on April 16, 2018—over two years before she purchased it—required Rhonda to wrongfully admit that she committed all the violations on the property.

448.    After Rhonda refused the settlement agreement, the County sent Rhonda an invoice in her name dated April 27, 2021, stamped "PAST DUE," telling Rhonda she had 30 days to pay $15,000 in "carryover fines and penalties" that the prior owner still owed on a settlement agreement

United States District Court
Northern District of California

with the County, it seems, from some time in 2018—several years before Rhonda purchased the property.

449. About a year later, on April 21, 2022, the county re-issued NOVs (dated April 5, 2022) for the prior owner's conduct, this time in Rhonda's name.

450. The new set of NOVs dropped a few of the allegations from the first and reduced the daily penalties to $83,000, bringing the fines that Rhonda faces down to a still staggering $7,470,000.

451. The County re-charged Rhonda with the same cannabis-related violations from the last NOVs even though the County had already publicly acknowledged that Rhonda had cleaned up almost all of the prior owner's violations and that it was "not really worried" about the legacy logging grades.

452. Emails between Code Enforcement Officers Brian Bowes and Warren Black reveal that the County re-noticed the violations in Rhonda's name because she had not completed the abatement "voluntarily." (Ironic quotation marks in original).

453. Rhonda again submitted her Attachment C to request an administrative hearing.

454. Rhonda developed shingles on her face due to the stress of the millions of dollars in fines hanging over her head, and she temporarily lost the use of her eye.

455. To date, the County has not provided her a hearing or issued her the permits she needs to develop her property.

**4. Cyro Glad**

456. Cyro Glad moved to Humboldt County from North Lake Tahoe in the 1990s to attend the Heartwood Institute for vocational training as a massage therapist.

457. After working between Humboldt and Tahoe for years, in 2008, Cyro began leasing a property in New Harris, an unincorporated area of Humboldt to the southeast of Garberville.

458. He cared for and helped develop a piece of rental property for several years until the tragic death of his life partner in 2015.

United States District Court
Northern District of California

459.    Following her death, Cyro left the property in Humboldt for several years during which he spent most of his time in Nevada caring for his mother while she suffered from terminal cancer.

460.    Then, in 2018, one of Cyro's former landlords in Humboldt contacted him and offered to sell him a set of adjacent properties where he used to live.

461.    They were selling the land because they were aging and explained that they wanted to sell to Cyro because he had always cared for the property and the subsequent tenants had not treated the property with the same respect.

462.    Cyro had always dreamed of owning a piece of land in Humboldt but never thought he'd have the chance; with his mother's blessing, he jumped at the opportunity.

463.    The property consists of adjacent 40-acre parcels in New Harris.

464.    At the time of purchase, there was a greenhouse and several hoop houses scattered around the front parcel; the back parcel consisted almost entirely of an undeveloped mountain covered in forest.

465.    Cyro closed on the properties on September 1, 2018, and recorded the transfer of ownership with the County.  He began moving onto the property shortly thereafter.

466.    When Cyro took over the property, there was no cannabis cultivation and none of the structures on the property were being used to cultivate cannabis.

467.    Cyro began immediately cleaning up the property—clearing junk, removing the hoophouses, and preparing the dirt driveways for winter.

468.    On November 16, 2018, just over two months after he purchased the property, Cyro's neighbor called him to let him know that he found a NOV addressed to Cyro posted on a gate a few roads over from Cyro's address.

469.    The NOV, dated November 2, 2018, listed four violations: (1) violation of the building code to cultivate cannabis; (2) grading without a permit to cultivate cannabis; (3) unpermitted cultivation of cannabis; and (4) development within a streamside management system.

470.   The NOV informed Cyro that he had 10 days to abate all nuisances or else he'd face $10,000 in daily fines for 90 days.

471.   The notice did not specify which structures or grading on the 40-acre parcel that the County believed were constructed to cultivate cannabis.

472.   Indeed, the County never visited the property to have any idea whether any of the structures or grading were constructed to cultivate cannabis—it couldn't even find the correct gate (or road, even) to post Cyro's NOV.

473.   Had the County bothered to investigate its charges, it would have learned that Cyro just moved in a few weeks prior and had not been cultivating cannabis on the property.

474.   The County assessed $10,000 in daily fines against the property based solely on satellite images showing hoop houses.

475.   Cyro filled out the Attachment C, requesting an administrative hearing the same day he received the NOV.  He explained on the form that the property just became his responsibility as of September 2018 and that he was already working to clean the property and bring it up to the County's standards.

476.   When Cyro got to the post office to mail in his Attachment C, he found another copy of the NOV waiting for him at the post office, so he filled out and submitted that Attachment C as well.

477.   Cyro then hired an engineer to assess the property, and he continued his work of cleaning up the mess that the prior occupants had left.

478.   Having still not heard anything else from the County by February 2019, Cyro sent a letter to Director Ford to plead with him and seek compassion over the violations the County cited Cyro for just weeks after he purchased the property.

479.   Cyro never received a response.

480.   Over four years have passed since Cyro requested his initial hearing, but the County has still not scheduled one for him.

United States District Court
Northern District of California

481.    The County's abatement records as of August 2022 confirmed that the County still has Cyro's case listed as "appeal requested."

## CLASS ALLEGATIONS

482.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad maintain this action on behalf of themselves individually and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(2).  Plaintiff Blu Graham was planning to be a class representative until the County suddenly agreed to dismiss his abatement order the week before filing the initial complaint.

483.    The County's conduct toward the Plaintiffs is part of a broader policy and practice, pursuant to which the County cites landowners for enhanced cannabis-related code violations without regard for probable cause, fails to schedule administrative hearings at a meaningful time and in a meaningful manner, imposes penalties unsupported by any governmental interest, imposes unconstitutional conditions on permits for those properties, imposes unconstitutionally excessive fines and fees, and denies accused landowners the right to a jury of their peers to decide factual questions that determine whether the Plaintiffs owe hundreds of thousands—if not millions—of dollars in fines.

484.    Plaintiffs propose a putative class with the following class definition: "All persons who are currently facing penalties for cannabis-related Category 4 violations that were levied after January 1, 2018, who filed an 'Attachment C' to request an administrative hearing within 10 days of the County effecting service, and who have still not received a hearing for their appeal."

485.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and members of the proposed Class have suffered, or will suffer, the following policies and practices of the County:

      a.  Issuing cannabis-related code violations without adequate investigation or regard for probable cause;

      b.  Issuing enhanced cannabis-related penalties for minor code violations like the failure to obtain a permit;

c. Refusing to allow landowners to abate permitting violations by obtaining the permit at issue;

d. Refusing to dismiss citations for enhanced cannabis-related violations based on photographic proof that cannabis is not on the property;

e. Refusing to provide a timely administrative hearing;

f. Refusing to issue unrelated permits to landowners while abatement orders are pending;

g. Exacting unconstitutional conditions for the issuance of permits from landowners facing abatement orders;

h. Obscuring the time landowners have to challenge or comply with an abatement order;

i. Failing to toll the accrual of fines before an accused can receive an administrative hearing;

j. Charging excessive administrative fees for basic interactions with the County;

k. Charging up to $4,500 for an administrative hearing or a settlement agreement;

l. Failing to provide a jury at the administrative hearing.

486. The proposed Class meets all the Rule 23(a) prerequisites for maintaining a class action.

487. **Numerosity**: The proposed Class is so numerous that joinder of all members is impracticable. On information and belief, the County has issued cannabis-related Category 4 violations to over 1,200 landowners since it began its cannabis-enforcement program in 2018. On information and belief and based on publicly available records, at least 48 landowners who have requested a hearing still face penalties but have not yet received hearings. As a result, the proposed class is so numerous that individual joinder of all members is impracticable.

488. **Commonality**: This action presents questions of law and fact common to the proposed Class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff.

a. Common questions of fact include but are not limited to:

      i.  Does the County issue citations and impose enhanced penalties for cannabis-related violations without adequate investigation or regard for probable cause?

    ii.  Does the County issue citations and impose enhanced penalties for cannabis-related violations without regard for actual harm to public health and safety?

   iii.  Does the County fail to schedule timely administrative hearings?

   iv.  Does the County refuse to dismiss charges in the face of exculpatory evidence?

    v.  Does the County deny the issuance of permits to properties under abatement orders?

   vi.  Does the County impose unconstitutional conditions on permits for properties under abatement orders?

  vii.  Does the County refuse to toll the accrual of daily fines while landowners await an initial administrative hearing?

 viii.  Does the County charge up to $4,500 for an administrative hearing or a settlement?

   ix.  Does the County provide a jury at administrative hearings?

b.  Common questions of law include but are not limited to:

      i.  Do the County's cannabis-related code-enforcement policies and practices violate the Due Process Clause?

    ii.  Does the County's policy of issuing citations and imposing enhanced penalties for cannabis-related violations without adequate investigation or regard for probable cause violate the Due Process Clause?

   iii.  Does the Due Process Clause prohibit the government from punishing harmless conduct?

   iv.  Does the Due Process Clause prohibit the government from punishing an innocent person for someone else's conduct?

Amended Complaint – Case No. 1:22-cv-5725-RMI

v. Does the County impose unconstitutional conditions on the issuance of permits for properties facing cannabis-related abatement orders?

vi. Does the Excessive Fines Clause prohibit the government from charging up to $10,000 in daily fines without regard for culpability or whether a violation poses harm to public safety?

vii. Does the Preservation Clause require the County to provide a jury when it imposes civil penalties for code violations?

489. **Typicality**: Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad's claims are typical of the claims of the proposed Class. Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad's claims, as well as those of the proposed Class, arise out of the same policy, practice, and custom of the County; are based on the same legal theories; and involve the same harms. Additionally, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad seek the same relief for themselves and members of the proposed Class in the form of declaratory and injunctive relief.

490. **Adequacy:** Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad will fairly and adequately protect the interests of the class they seek to represent because their interests are aligned and there are no conflicts between them and the members of the putative class. Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad, and members of the putative class, have suffered the same injuries at the hands of the same defendants, and all are entitled to the same relief in the form of declaratory and injunctive relief. All members share the same interest in ensuring that the County's code-enforcement procedures respect the constitutional rights of landowners and in securing relief for those constitutional rights the County has already violated.

491. Plaintiffs are represented by counsel who will fairly and adequately represent the class. Plaintiffs are represented *pro bono* by the Institute for Justice ("IJ"). IJ is a nonprofit, public-interest law firm that, since its founding in 1991, has successfully litigated constitutional issues nationwide, including challenges to inadequate procedure in criminal and civil enforcement

United States District Court
Northern District of California

proceedings.  IJ has also litigated several federal class actions and putative class actions involving property rights, including against the following municipalities: Philadelphia (*Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 244598, at *1 (E.D. Pa. Jan. 28, 2021) (appointing firm as class counsel and approving federal consent decree in challenge to civil forfeiture proceedings)); New York City (*Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF 111) (approving settlement of putative class action under which New York City agreed not to enforce agreements extracted through coercive property seizures)); and Pagedale, Missouri (*Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF 116) (appointing firm class counsel and approving federal consent decree prohibiting abusive ticketing practices)).  IJ also litigated a significant Second Circuit case about due process, notice, and the opportunity to be heard in *Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005).

492.    Local counsel Pillsbury Winthrop Shaw Pittman LLP is an international law firm whose predecessor was founded in San Francisco in 1874.  They are now headquartered in New York, and their practice focuses on real estate, construction, energy, finance, and technology & media.  Pillsbury has approximately 700 lawyers in 20 offices worldwide.  It has a large, sophisticated, and effective California litigation practice—both in state and federal courts.

493.    The putative class also meets the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

494.    The County has acted, or refused to act, on grounds generally applicable to the putative class.  Declaratory and injunctive relief is appropriate with respect to all members of the class pursuant to Fed. R. Civ. P. 23(b)(2).

495.    The class is entitled to the requested relief.

## CLAIMS FOR RELIEF

### Count 1

**Denial of Procedural Due Process**

**In Violation of the Fourteenth Amendment**

**On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas,**

**Doug Thomas, Rhonda Olson, and Cyro Glad on Behalf of the Class**

496.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 495.

497.    On behalf of the named Plaintiffs and the Class, Plaintiffs bring this count against the County based on its policy and practices that, taken together, deprive owners facing cannabis-abatement orders of a meaningful opportunity to be heard.

498.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall … deprive any person of life, liberty, or property, without due process of law."

499.    The Due Process Clause guarantees a fair legal process in adjudicative and quasi-adjudicative proceedings, including code-enforcement actions.

500.    Among other things, the Due Process Clause requires that the government provide the accused with notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

501.    Additionally, the Due Process Clause prohibits the government from imposing penalties—including fines and fees—or adjudicating guilt or innocence before providing appropriate notice and a meaningful opportunity to be heard.

502.    The County, acting under color of law, deprived the named Plaintiffs and the Class of the due process of law in violation of the Fourteenth Amendment to the United States Constitution.

503.    The County has a duty under the Fourteenth Amendment to provide the named Plaintiffs and the Class with notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

504.    The County deprived the named Plaintiffs and the Class of due process.   The following policies, individually and in conjunction, deny them adequate notice and a fair or meaningful opportunity to be heard:

    a.   Issuing cannabis-related code violations without adequate investigation or regard for probable cause;

    b.   Issuing cannabis-related code violations based on satellite images that predate the passage of the cannabis-related code at issue;

    c.   Refusing to dismiss citations for cannabis-related Category 4 violations based on photographic proof that there is no cannabis on the property;

    d.   Refusing to allow landowners to abate permitting violations by obtaining the permit at issue;

    e.   Refusing to issue permits to landowners with pending abatement orders;

    f.   Conditioning the issuance of permits on a landowner's payment of unrelated fines and fees;

    g.   Obscuring the time landowners have to comply with an abatement order;

    h.   Refusing to provide an administrative hearing indefinitely;

    i.   Failing to toll the accrual of fines before an accused can receive an administrative hearing; and

    j.   Charging up to $4,500 for an administrative hearing or a compliance agreement.

505.    The County's procedurally deficient system creates an unreasonable risk of erroneous deprivation of property.

506.    Named Plaintiffs and the Class possess fundamental property interests protected by the Fourteenth Amendment to the United States Constitution in their homes, accessory structures, possessions, earnings, income, and capital.

507.    Due to the procedural defects in the County's administrative processes, it is substantially likely that the County's cannabis-abatement program is baselessly depriving the Named Plaintiffs and the Class of their property interests.

508.     The County has interfered with property interests by, among other things, (a) issuing violations without adequate investigation or regard for probable cause; (b) relying on evidence that predates the code violations at issue; (c) refusing to allow landowners to abate permitting violations by obtaining the permit at issue; (d) refusing to dismiss violations in the face of evidence that the violation is unfounded; (e) refusing to schedule a timely hearing at which an accused can meaningfully contest the allegations; (f) refusing to toll the accrual of fines while an accused awaits a hearing; (g) refusing to issue permits to an accused while they await a hearing; (h) conditioning the issuance of permits on a landowner's payment of unrelated fines and fees; (i) obscuring the time landowners have to respond to an abatement order; and (j) charging up to $4,500 for a hearing at which an accused can finally contest the accusations.

509.     The County's cannabis-related abatement program is designed to—and very much does—compel landowners to pay fines and fees without a timely or meaningful opportunity for a hearing to determine whether the landowner actually engaged in the conduct the County has publicly accused them of doing.

510.     The policies and practices by which the County administers its cannabis-abatement program for code violations have deprived the named Plaintiffs and the members of the Class of the process guaranteed to them by the Fourteenth Amendment to the United States Constitution.

511.     The County's policies and practices are arbitrary and shocking to the conscience and so offensive as to not comport with traditional ideas of fair play and decency.

512.     The County has no legitimate governmental interest in depriving the named Plaintiffs and the Class of their right to due process.

513.     As a direct and proximate result of the County's policy and practice, the named Plaintiffs and the Class have suffered irreparable injuries to their constitutional rights.

514.     The named Plaintiffs and the Class are entitled to declaratory relief and an injunction barring the County from administering its abatement program in violation of due process.

515.     The named Plaintiffs are also entitled to nominal damages.

COUNT 2

**Denial of Substantive Due Process**

**In Violation of the Fourteenth Amendment**

**On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas,**

**Doug Thomas, Rhonda Olson, and Cyro Glad on Behalf of the Class**

516.    Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 495.

517.    On behalf of the named Plaintiffs and the Class, Plaintiffs bring this Count against the County based on its policy, practice, and custom of issuing citations and imposing penalties for code violations allegedly related to cannabis cultivation (a) without regard for probable cause that the accused has cultivated cannabis illegally and (b) unsupported by a valid governmental interest.

518.    The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving any person of life, liberty, or property, without due process of law.

519.    The Due Process Clause requires that law enforcement be neutral, impartial, and objective.

520.    Issuing citations and imposing fines and fees is an exercise of law-enforcement power.

521.    The County has a massive financial interest in imposing Category 4 penalties for code violations allegedly related to cannabis.  This financial interest includes the pressure those penalties place on landowners to settle their case, the fines and fees the County charges to hold an administrative hearing or settle, and the incentive for other landowners to seek permits to grow cannabis commercially instead of paying excessive fines and fees.

522.    This financial interest has caused the County to adopt a policy and practice of abusing its prosecutorial discretion by charging Category 4 violations without regard for probable cause that a landowner has violated the county code for the purpose of cultivating cannabis without a permit.

523.    This financial interest incentivizes the County to charge cannabis-related Category 4 violations without regard for the public's interest in health and safety and without regard for landowners' constitutional rights.

United States District Court
Northern District of California

524.     The County's policy and practice is to charge Category 4 violations and impose fines and fees on landowners without ensuring it has probable cause to believe those landowners have violated the code for the purpose of cultivating cannabis without a permit.

525.     Relying on aerial images alone, the County charges Category 4 violations for activity unrelated to cannabis like having a greenhouse or a rainwater-catchment unit.

526.     The presence of an unpermitted greenhouse or rainwater-catchment unit is not probable cause that a landowner is cultivating cannabis without a permit.

527.     Despite lacking probable cause that a landowner is growing cannabis without a permit, the County's policy and practice is to allege that landowners violated the code for the purpose of cultivating cannabis.

528.     Landowners facing a cannabis-related abatement order are injured as soon as they receive a notice of violation.

529.     The County publishes notice of the abatement orders in the newspaper to publicly accuse the landowners of growing cannabis illegally.

530.     The County then charges accused landowners the cost of publishing that notice, regardless of whether the County published it without probable cause and could never substantiate its allegations.

531.     Daily fines and administrative fees then accrue against accused landowners before the County can or will schedule an administrative hearing.

532.     Charges brought without probable cause also deprive a landowner of their right to develop their property while they wait indefinitely for the County to schedule an administrative hearing.

533.     The County charges up to $4,500 in administrative fees to hold an administrative hearing or settle cannabis-related Category 4 violations that it brought without probable cause.

534.     The County's policy and practice of charging Category 4 violations without probable cause imposes a significant financial, reputational, and psychological cost on the named Plaintiffs and the Class as soon as they receive an NOV.

United States District Court
Northern District of California

535.    The County has no legitimate governmental interest in charging cannabis-related Category 4 violations without regard for probable cause.

536.    The County's policy and practice of charging cannabis-related Category 4 violations without regard for probable cause deprives the named Plaintiffs and the Class of their due-process right to neutral, objective, and unbiased law enforcement.

537.    The County also violates substantive due process by charging cannabis-related Category 4 violations unsupported by any legitimate governmental interest.

538.    No process the government can provide could justify its deprivation of life, liberty, or property when there is no governmental interest in the deprivation.

539.    The County has no interest in punishing conduct that does not harm the public.

540.    Nor does the County have an interest in issuing fines and denying permits for land, structures, or other property based on a prior owner's misconduct.

541.    No process could justify the government's deprivation of an innocent person's life, liberty, or property based on someone else's conduct.

542.    The prior presence of marijuana on a property is not a continuing nuisance once the property is no longer used for illegal purposes.

543.    No process could justify the County ordering a new owner to destroy parts of their property because the prior owner had previously used the property for an illegal purpose.

544.    The County has no legitimate governmental interest in depriving the named Plaintiffs and the Class of their property because a prior owner cultivated marijuana on the property without a commercial permit.

545.    As a direct and proximate result of the County's policy and practice of charging Category 4 violations (a) without regard for probable cause of unpermitted cannabis cultivation and (b) unsupported by any valid governmental interest, the named Plaintiffs and the Class have suffered and will suffer irreparable harm to their constitutional rights.

546.     The named Plaintiffs and the Class are entitled to declaratory relief and an injunction barring the County from issuing cannabis-related Category 4 violations (a) without probable cause and (b) unsupported by any valid governmental interest.

547.     The named Plaintiffs are also entitled to nominal damages.

**COUNT 3**

**Unconstitutional Exactions**

**In Violation of the Fifth and Fourteenth Amendments**

**On Behalf of the Named Plaintiffs Individually and Plaintiffs Corrine Morgan Thomas,**

**Doug Thomas, Rhonda Olson, and Cyro Glad on Behalf of the Class**

548.     Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 495.

549.     On behalf of the named Plaintiffs individually and the Class, Plaintiffs bring this Count based on the County's policy and practice of denying permits to landowners who face cannabis-related Category 4 violations brought without regard for probable cause unless the landowner will agree to (a) pay a sum of money the County has proposed in an unrelated settlement agreement; (b) waive their due-process right to a hearing at which they can contest unrelated code violations; (c) consent to limitless warrantless searches of their property; and (d) waive their right to sell or otherwise transfer their property.

550.     The unconstitutional-conditions doctrine vindicates constitutional rights by prohibiting the government from coercing people into giving them up in exchange for a discretionary benefit such as a building or grading permit.

551.     The government cannot coercively withhold a land-use permit from someone for exercising their constitutional rights.

552.     The unconstitutional-conditions doctrine prevents the government from demanding property, a monetary exaction, or the waiver of some other enumerated constitutional right in exchange for a land-use permit.

553.    The Constitution forbids such extortionate demands regardless of whether the government approves a permit due to a landowner's willingness to give up their rights or denies a permit based on a landowner's refusal to do so.

554.    The County has a policy and practice of denying land-use permits to landowners with outstanding abatement orders, even when the permits have no nexus to the abatement order.

555.    The County's policy and practice is to grant land-use permits only if the landowner facing an abatement order will pay the County to settle an unrelated abatement case and waive their right to a hearing in that unrelated case.

556.    The County imposes two unconstitutional conditions on permit applicants who have outstanding cannabis-related abatement orders: The landowner must agree to (1) pay the sum the County has proposed in a settlement offer for an unrelated abatement case; (2) give up their right to an administrative hearing; (3) give up their right to deny warrantless searches of their property; and (4) give up their right to sell or otherwise transfer their property.

557.    The sum that the County proposes in settlement offers, including fines and/or fees, is not roughly proportionate to the social costs associated with the landowner's permit application.

558.    This monetary exaction in exchange for a permit is an unconstitutional condition.

559.    The demand that landowners give up their constitutionally guaranteed right to a hearing on the County's unrelated claims against them in exchange for a permit is also an unconstitutional condition.

560.    As a direct and proximate result of the County's policy and practice, the named Plaintiffs and the Class have suffered irreparable injuries to their constitutional rights.

561.    The named Plaintiffs and the Class are entitled to declaratory relief and an injunction barring the County from denying permits to landowners facing abatement orders unless they pay a settlement and waive their right to an administrative hearing.

562.    Plaintiff Blu Graham is entitled to a declaration that the County's exaction of $3,747.29 (later reduced to $795.92) in administrative fees in exchange for a grading permit for his rainwater-catchment pond violated the doctrine against unconstitutional conditions.

United States District Court
Northern District of California

563.   The named Plaintiffs are entitled to nominal damages.  Plaintiff Blu Graham is also entitled to damages or restitution in the amount of $795.92 in addition to nominal damages.

## COUNT 4

### Excessive Fines and Fees

### In Violation of the Eighth and Fourteenth Amendments

### On Behalf of Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson,

### and Cyro Glad Individually and on Behalf of the Class

564.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 495.

565.   On behalf of themselves individually and the Class, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad bring this Count against the County based on its policy, practice, and custom of levying Category 4 penalties and ordering the destruction of property for violations of the county code (*e.g.*, the failure to obtain permits to build structures and grade land) that the County alleges have a nexus to the illegal cultivation of cannabis.

566.   The County has acted under color of state law in violating the constitutional rights of the Plaintiffs and the Class.

567.   The Excessive Fines Clause of the Eighth Amendment to the United States Constitution prohibits the government from imposing penalties that are grossly disproportionate to the offense for which they are imposed.

568.   The Fourteenth Amendment to the United States Constitution incorporated the Excessive Fines Clause against the states.

569.   The County is bound by the Excessive Fines Clause when is issues civil fines and fees.

570.   The Category 4 penalties that the County levies for code violations related to cannabis are punitive.

571.   The County's policy and practice is to levy $10,000 or more in daily penalties plus up to $4,500 in fees for minor code violations by elevating them to Category 4 violations based on an alleged nexus to cannabis.

572.   Contrary to the county code, the County's policy and practice does not consider the actual harm cause by a violation, whether there is any risk to public health or safety, a landowner's culpability or ability to pay, alternative remedies available, or additional penalties that a landowner already faces.

573.   The County's policy and practice of elevating code violations to Category 4 offenses is a method of generating revenue by pressuring landowners into settlements or commercial cannabis permits.

574.   The penalties that the County levies are grossly disproportionate to the many near-harmless offenses that the County elevates to Category 4 violations based on their nexus to cannabis.

575.   The penalties for cannabis-related code violations are also duplicative, as the County already imposes Category 4 penalties for unpermitted cultivation.

576.   The County's policy of requiring that landowners return property to its "pre-cannabis state" are also punitive fines within the meaning of the Eighth Amendment.

577.   The ordered destruction of property is grossly disproportionate to the many near-harmless offenses to which Category 4 violations apply based on their nexus to cannabis.

578.   The penalties for cannabis-related Category 4 violations that the County imposes on new purchasers of property based on the prior owner's misconduct are also unconstitutionally excessive.

579.   Any penalty for innocent conduct is unconstitutionally excessive.

580.   On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class, the County's policy and practice of fining landowners $10,000 per day for code violations based on their nexus to cannabis violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

581.   On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class, the County's policy and practice of ordering landowners to destroy structures and re-grade land with a nexus to cannabis violates the Excessive Fines Clause of the Eighth Amendment.

582.   On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class, the County's policy and practice of ordering landowners pay up to $4,500 in administrative fees for Category 4 violations violates the Excessive Fines Clause of the Eighth Amendment.

583.   As a direct and proximate result of the County's policy and practice of levying Category 4 penalties for code violations with a nexus to cannabis, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class have suffered and will continue to suffer irreparable injury to their constitutional rights.

584.   On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class are entitled to declaratory relief and an injunction barring the County from enforcing its policy and practice of imposing Category 4 fines and fees for code violations committed to facilitate cannabis cultivation.

585.   On its face and as applied to Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class are entitled to declaratory relief an injunction barring the County from enforcing its policy and practice of ordering landowners to return land to its pre-cannabis state.

**COUNT 5**

**Denial of the Right to a Jury**

**In Violation of the Seventh and Fourteenth Amendments**

**On Behalf of Plaintiffs Corrine Morgan Thomas, Doug Thomas, and Rhonda Olson**

**Individually and on Behalf of the Class**

586.   Plaintiffs reallege and incorporate the allegations in paragraphs 1 through 495.

587.    On behalf of themselves individually and the Class, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, and Cyro Glad bring this Count against the County based on its policy, practice, and custom of imposing Category 4 penalties and ordering the destruction of property for violations of the county code without providing accused landowners the right to a jury.

588.    The Fourteenth Amendment to the United States Constitution incorporated against the states all rights that are fundamental to our scheme of ordered liberty and deeply rooted in this Nation's history and tradition.

589.    States and municipalities cannot violate the fundamental rights guaranteed by the Bill of Rights in the United States Constitution.

590.    The right to a jury in civil actions is a fundamental right that is deeply rooted in history and tradition.

591.    The Preservation Clause of the Seventh Amendment protects the individual right to a trial by jury in common-law actions where the value in controversy exceeds $20.

592.    Actions brought by the government for fines are common-law actions.

593.    A civil penalty is historically a remedy at common law that only courts of law can enforce.

594.    The County imposes civil penalties through a administrative-enforcement scheme to minimize the expense and delay associated with pursuing remedies through the criminal justice system.

595.    Individuals have the right to a jury in civil cases brought to punish and deprive them of their protected liberty and property interests.

596.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class possess fundamental property interests protected by the Fourteenth Amendment to the United States Constitution in their homes, accessory structures, possessions, earnings, income, and capital.

597.    The County cannot deny the right to a jury by imposing penalties through administrative hearings rather than in court.

598.    The factual determination of whether a landowner violated the code in order to grow marijuana without a permit can carry hundreds of thousands—if not millions—of dollars in penalties.

599.    Because the finding of such facts against the accused results in the deprivation of property and liberty as punishment for the offense, the accused is entitled to have a jury of their peers decide those facts.

600.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class have a right to have a jury adjudicate the facts underlying the County's claims for Category 4 penalties.

601.    The County's imposition of penalties through an administrative process that does not include a jury has been conducted pursuant to a policy, practice, or custom that violated the Preservation Clause of the Seventh Amendment and the Fourteenth Amendment to the United States Constitution.

602.    As a direct and proximate result of the County's policy and practice of imposing penalties through an administrative process that does not include a jury, Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class have suffered and will continue to suffer irreparable injury to their constitutional rights.

603.    Plaintiffs Corrine Morgan Thomas, Doug Thomas, Rhonda Olson, Cyro Glad, and the Class are entitled to declaratory relief and an injunction barring the County from enforcing its policy and practice of imposing civil penalties through an administrative process that does not include a jury.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

604.    Certify a class under Rule 23(b)(2) consisting of: "All persons who are currently facing penalties for cannabis-related Category 4 violations that were levied after January 1, 2018,

who filed an 'Attachment C' to request an administrative hearing within 10 days of the County effecting service, and who have still not received a hearing for their appeal."

605.    Declare that the County's cannabis-related code-enforcement policies and practices violate the procedural due process guaranteed by the Fourteenth Amendment.

606.    Declare that the County's cannabis-related code-enforcement policies and practices violate the substantive due process guaranteed by the Fourteenth Amendment.

607.    Declare the County imposes unconstitutional conditions on landowners who seek land-use permits while facing cannabis-related abatement orders.

608.    Declare that the County's policy and practice of imposing Category 4 penalties based on a code violation's nexus to cannabis growth violates the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution.

609.    Declare that the County's policy and practice of imposing cannabis-related Category 4 penalties without the right to a jury violates the Preservation Clause of the Seventh Amendment of the United States Constitution.

610.    Enjoin Defendants from enforcing their cannabis-related code-enforcement policies and practices in violation of the procedural due process guaranteed by the Fourteenth Amendment.

611.    Enjoin Defendants from enforcing their cannabis-related code-enforcement policies and practices in violation of the substantive due process guaranteed by the Fourteenth Amendment.

612.    Enjoin Defendants from imposing unconstitutional conditions on land-use permits for landowners facing cannabis-related abatement orders.

613.    Enjoin Defendants from issuing unconstitutionally excessive penalties for Category 4 violations based on a code violation's alleged nexus to cannabis growth.

614.    Enjoin Defendants from imposing civil penalties for cannabis-related Category 4 violations through an administrative process that does not include a jury.

615.    Award the named Plaintiffs nominal damages.

616.    Award Plaintiff Blu Graham $795.92 in damages or restitution in addition to nominal damages.

617.   Award Plaintiffs attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 as well as any other costs and fees that are legal and equitable.

618.   Award any further legal or equitable relief the Court deems just and proper.

Dated: January 20, 2023

/s/ Jared McClain
Jared McClain* (DC Bar No. 1720062)
Joshua House (CA Bar No. 284856)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
T: (703) 682-9320
F: (703) 682-9321
jhouse@ij.org
jmcclain@ij.org

Robert Johnson* (OH Bar No. 0098498)
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
T: (703) 682-9320
F: (703) 682-9321
rjohnson@ij.org

PILLSBURY WINTHROP SHAW PITTMAN LLP
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
F: (415) 983-1200
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
F: (916) 441-3583
derek.mayor@pillsburylaw.com

*Application for admission
pro hac vice forthcoming

*Counsel for Plaintiffs*

United States District Court
Northern District of California