**INSTITUTE FOR JUSTICE**

Jared McClain*
(DC Bar No. 1720062)
Joshua House
(CA Bar No. 284856)
901 N. Glebe Rd,
Suite 900
Arlington, VA 22203
T: (703) 682-9320
jmcclain@ij.org
jhouse@ij.org

Robert Johnson*
(OH Bar No. 0098498)
16781 Chagrin Blvd.,
Suite 256
Shaker Heights, OH 44120
T: (703) 682-9320
rjohnson@ij.org

*Admitted *pro hac vice*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
derek.mayor@pillsburylaw.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## EUREKA DIVISION

CORRINE MORGAN THOMAS and DOUG THOMAS, a married couple; BLU GRAHAM; RHONDA OLSON; and CYRO GLAD, on behalf of themselves and all others similarly situated,

　　　　　*Plaintiffs*,

　　v.

COUNTY OF HUMBOLDT, CALIFORNIA; HUMBOLDT COUNTY BOARD OF SUPERVISORS; HUMBOLDT COUNTY PLANNING AND BUILDING DEPARTMENT; STEVE MADRONE, REX BOHN, MIKE WILSON, MICHELLE BUSHNELL, and NATALIE ARROYO, in their official capacity as Supervisors of Humboldt County; and JOHN H. FORD in his official capacity as Planning and Building Director,

　　　　　*Defendants*.

Case No. 1:22-cv-5725-RMI

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Magistrate Judge Robert M. Illman

Date: April 25, 2023
Time: 11:00am
Ctrm: McKinleyville Courthouse

Trial Date: None Set

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................................iii

ISSUES TO BE DECIDED ........................................................................................................1

INTRODCUTION ........................................................................................................................1

CONCISE STATEMENT OF RELEVANT FACTS..................................................................2

    A.  The County's Cannabis Abatement Program ..................................................................2

    B.  The Plaintiffs' Ongoing Constitutional Injuries ............................................................3

STANDARD OF REVIEW ........................................................................................................4

I. THE PLAINTIFFS' CLAIMS ARE JUSTICIABLE ..............................................................5

    A.  The Plaintiffs Have Standing to Challenge the Process They're Stuck In ...................5

    B.  The Plaintiffs' Claims Are Ripe ....................................................................................6

    C.  The Plaintiffs' Claims Are Not Time Barred ................................................................8

    D.  The Individual Defendants Are Not Entitled to Immunity.............................................8

    E.  The Individual Defendants Are Necessary Parties ........................................................9

II. THE PLAINTIFFS HAVE STATED FIVE COGNIZABLE CLAIMS ...............................9

    A.  The County's Cannabis-Abatement Program Violates Due Process .............................9

        1.  The Plaintiffs' Interests Are Substantial..............................................................10

        2.  The County's Abatement Program Maximizes the Risk of Erroneous
            Deprivation............................................................................................................10

        3.  The County Has No Legitimate Interest in Its Insufficient Procedures ...............13

    B.  The County's Indifference to Innocence Violates Substantive Due Process................14

        1.  The County Cannot Impose Punishments Without Probable Cause .....................14

        2.  Due Process Prohibits Punishing Innocent Purchasers.........................................16

    C.  The Plaintiffs Have Stated a Claim Under the Unconstitutional Conditions Doctrine..........17

D.  The Cannabis-Related Abatement Penalties Violate the Excessive Fines Clause ...................18

    1.  Category 4 Fines for Cannabis-Related Code Violations Are Facially
       Excessive..................................................................................................................20

    2.  The Penalties Are Excessive as Applied to the Plaintiffs ................................21

       a.  The Fines Are Grossly Disproportionate to the Conduct at Issue ............21

       b.  The Order Destruction of Buildings and Imposition of Treble Fees
          on Innocent Owners Are Also Unconstitutionally Excessive Fines............22

       c.  The California Cases on Which the County Relies Are Inapposite ............23

E.  The Seventh Amendment Guarantees a Jury in Suits for Civil Penalties .................24

**CASES**

*Akins v. Epperly,*
588 F.3d 1178 (8th Cir. 2009)..................................................................................15

*Armstrong v. Manzo,*
380 U.S. 545 (1965)..................................................................................................9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................................4

*Austin v. United States,*
509 U.S. 602 (1993)................................................................................................22

*Ballinger v. City of Oakland,*
24 F.4th 1287 (9th Cir. 2022) ........................................................................... 17, 18

*Barry v. Barchi,*
443 U.S. 55 (1979)..................................................................10, 11, 13, 14

*Cheffer v. Reno,*
55 F.3d 1517 (11th Cir. 1995)..............................................................................7, 8

*Colbert v. Chicago,*
851 F.3d 649 (7th Cir. 2017) ..................................................................................16

*Cnty. of Sacramento v. Lewis,*
523 U.S. 833 (1998) ......................................................................................... 14, 15

*District of Columbia v. Heller,*
554 U.S. 570 (2008)................................................................................................25

*Dolan v. City of Tigard,*
512 U.S. 374 (1994)................................................................................................17

*FDIC v. Mallen,*
486 U.S. 230 (1988)................................................................................................11

*Galfer v. Los Angeles,*
2015 WL 13917043 (C.D. Cal. Mar. 6, 2015) ........................................................13

*Gerstein v. Pugh,*
420 U.S. 103 (1975)................................................................................................15

*Granfinanciera, S.A. v. Nordberg,*
   492 U.S. 33 (1989) ............................................................................................................24

*Halverson v. Skagit Cnty.,*
   42 F.3d 1257 (9th Cir. 1994) ............................................................................................14

*Harris v. Riverside,*
   904 F.2d 497 (1990) ....................................................................................................10, 11

*Hernandez v. Kennedy,*
   595 F. App'x 673 (9th Cir. 2014) ....................................................................................15

*Jackson Water Works, Inc. v. Pub. Utilities Comm'n,*
   793 F.2d 1090 (9th Cir. 1986) ..........................................................................................25

*Joseph v. Koh,*
   2020 WL 5824491 (N.D. Cal. Oct. 1, 2020) ....................................................................7

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013) ..................................................................................................*passim*

*Langley v. City of San Luis Obispo,*
   2022 WL 18585987 (C.D. Cal. Feb. 7, 2022) ..................................................................23

*Lent v. Cal. Coastal Comm'n,*
   62 Cal. App. 5th 812 (2021) ............................................................................................23

*Leslie v. Doyle,*
   125 F.3d 1132 (7th Cir. 1997) ..........................................................................................21

*Leonard v. Caskin,*
   15 F. Cas. 337 (D.S.C. 1799) ..........................................................................................15

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ..............................................................................................9, 10, 13

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ..........................................................................................................25

*Miller v. Vazquez,*
   868 F.2d 1116 (9th Cir. 1989) ..........................................................................................15

*Minneapolis & St. Louis R. Co. v. Bombolis,*
   241 U.S. 211 (1916) ..........................................................................................................25

*Monell v. Dep't of Soc. Servs.,*
   436 U.S. 685 (1978) ............................................................................................................8

United States District Court
Northern District of California

*Nollan v. Cal. Coastal Comm'n,*
  483 U.S. 825 (1987)...................................................................................17

*Nozzi v. Hous. Auth.,*
  806 F.3d 1178 (9th Cir. 2015).................................................................9-10, 11

*Parsons v. Bedford,*
  (3 Pet.) 443 (1830).................................................................................24

*Patsy v. Bd. of Regents,*
  457 U.S. 496 (1982)..................................................................................7

*People v. Braum,*
  49 Cal. App. 5th 342 (2020).........................................................................23

*Pimentel v. City of Los Angeles,*
  974 F.3d 917 (9th Cir. 2020)................................................................. 19, 21

*Potrero Hills Landfill, Inc. v. Cnty. of Solano,*
  657 F.3d 876 (9th Cir. 2011)........................................................................9

*Presbyterian Church (U.S.A.) v. United States,*
  870 F.2d 518 (9th Cir. 1989)........................................................................9

*Ramachandran v. Los Altos,*
  359 F. Supp. 3d 801 (N.D. Cal. 2019)...............................................................8

*St. Ann v. Palisi,*
  495 F.2d 423 (5th Cir. 1974).......................................................................16

*Shinault v. Hawks,*
  782 F.3d 1053 (9th Cir. 2015)......................................................................10

*Shurtleff v. City of Boston,*
  142 S. Ct. 1583 (2022)..............................................................................9

*Snyder & Assocs. Acquisitions LLC v. United States,*
  859 F.3d 1152 (9th Cir. 2017).......................................................................4

*Stypmann v. San Francisco,*
  557 F.2d 1338 (9th Cir. 1977)............................................................ 11-12, 13, 14

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)..................................................................................6

*Sweeney v. Cal. Reg. Water Quality Ctrl. Bd.,*
  61 Cal. App. 5th 1093 (2021).......................................................................23

United States District Court
Northern District of California

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019)................................................................ 18-19, 22, 25

*Tull v. United States,*
    481 U.S. 412 (1987).................................................................... 24, 25

*United States v. $100,348.00 in U.S. Currency,*
    354 F.3d 1110 (9th Cir. 2004).................................................... 19, 20, 21

*United States v. 2007 Honda Civic EX Sedan,*
    2014 WL 4211203 (W.D. Wis. Aug. 25, 2014) .........................................21

*United States v. Bajakajian,*
    524 U.S. 321 (1998).................................................................. 19, 20, 22

*United States v. Crozier,*
    777 F.2d 1376 (9th Cir. 1985)..................................................................12

*United States v. Garcia,*
    151 F.3d 1243 (9th Cir. 1998)..................................................................16

*United States v. Salerno,*
    481 U.S. 739 (1987)................................................................................14

*Ward v. Caulk,*
    650 F.2d 1144 (9th Cir. 1981)....................................................................8

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)................................................................................14

*Weber v. Aetna Cas. & Sur. Co.,*
    406 U.S. 164 (1972)......................................................................... 16, 21

*Winslow v. Smith,*
    696 F.3d 716 (8th Cir. 2012)....................................................................15

*Wright v. Beck,*
    981 F.3d 719 (9th Cir. 2020)......................................................................9

*Yagman v. Garcetti,*
    852 F.3d 859 (9th Cir. 2017)....................................................................12

**CONSTITUTIONAL PROVISIONS**

Const. Amend VII ...................................................................... 9, 24, 25

United States District Court
Northern District of California

**RULES**

Fed. R. Civ. P. 8(d)(2) ...........................................................................................................4

Fed. R. Evid. 201 ..................................................................................................................4

**CODES**

Humboldt Cnty. Code § 352-2(b)(2) .....................................................................................7

Humboldt Cnty. Code § 352-3(*i*) ..........................................................................................7

Humboldt Cnty. Code § 352-3(m)(2) ....................................................................................7

Humboldt Cnty. Code § 352-4(h) ........................................................................................19

Humboldt Cnty. Code § 352-6(b) ..........................................................................................7

**OTHER AUTHORITIES**

2 James Kent,
    Commentaries on American Law (The Blackstone Publishing Co. 1889) .......................25

Suja A. Thomas,
    *Nonincorporation: The Bill of Rights After* McDonald v. Chicago,
    88 Notre Dame L. Rev. 159 (2012) ...............................................................................25

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**ISSUES TO BE DECIDED**

2    1. Whether the Plaintiffs' claims are justiciable.

3    2. Whether the Plaintiffs pleaded cognizable claims of (A) procedural due process; (B) substantive

4        due process; (C) unconstitutional conditions; (D) excessive fines; and (E) the right to a jury.

5

**INTRODUCTION**

6        Humboldt County fines people millions of dollars for minor permitting violations and then

7    denies indefinitely their right to a hearing and their right to freely use and enjoy their property. Many

8    of the people the County is punishing are innocent because the County does not investigate its charges

9    and it punishes new purchasers for their predecessors' conduct.

10        Rhonda Olson, for instance, faces $2.7 million in fines for an empty field that she purchased to

11    build housing because the prior owner once grew cannabis in a temporary hoophouse on the parcel.

12    Even after Rhonda took down the hoophouse and the County acknowledged that the permitting

13    violations (and cannabis growth) predated her ownership, it reaffirmed that she owed those exorbitant

14    penalties for someone else's conduct. Like other abatement victims in Humboldt, Rhonda and the rest

15    of the Plaintiffs have waited several *years* for a hearing to contest the baseless orders against them. As

16    they wait, the County refuses to issue permits for their property and charges administrative fees for their

17    every interaction with the County about their case.

18        The point of the County issuing penalties without proof or process is to pressure people like

19    the Plaintiffs into paying the County to settle their claims. That way the County never has to admit that

20    it lacked the evidence to justify punishing them in the first place. The County's indifference to

21    innocence—and the system it designed to deny any meaningful opportunity to contest abatement

22    orders—violates due process. The millions of dollars in fines and fees that the County charges and the

23    extortive tactics it employs to coerce settlements in exchange for permits are also unconstitutional. So

24    is the County's refusal to let a jury decide the facts relevant to those penalties.

25        The Plaintiffs ask this Court to deny the County's motion to dismiss so that they can finally

26    have the day in court that the County has denied them for years.

27

28

## CONCISE STATEMENT OF RELEVANT FACTS

### A. The County's Cannabis Abatement Program

In 2017, following California's legalization of cannabis, the County began assessing $10,000 in daily fines on anyone it thinks might be growing cannabis without a permit. ¶ 61.[1] In addition to those fines, the County also imposes a penalty enhancement for all other code violations that the County alleges relate to the cultivation. ¶ 62. By having an alleged nexus to cannabis, permitting offenses that would otherwise carry a daily fine of $1 to $1,000, and could be resolved without a fine by obtaining a retroactive permit, now multiply automatically to a daily fine between $6,000 and $10,000. ¶¶ 63-64. All told, the County charges up to $30,000 in *daily* fines for something as simple as an unpermitted hoophouse: (1) $10,000 for the unpermitted hoophouse; (2) another $10,000 because it says all hoophouses must contain cannabis; and (3) yet another $10,000 because it says you can't build a hoophouse without grading the land first. ¶¶ 154-57.

Landowners who receive a notice of violation and penalties ("NOV") get 10 days to "abate" the issue before the fines kick in. ¶ 66. But those charged with permitting violations cannot obtain the permits they need to resolve the issue because the County denies *all* permits to properties under an abatement order. ¶¶ 215-18. The denial of permits traps landowners into at least 90 days' worth of fines, after which the County can reissue the violations to start a new batch of daily fines. ¶ 193. Put differently, the County crafted a policy to ensure that landowners it accuses of growing cannabis without a permit face at least $900,000 in fines for cannabis cultivation, plus another $900,000 for every code violation the County claims bears some nexus to cannabis. ¶ 151.

If the sheer exorbitance of these penalties was not enough, the County enforces its policy with no regard for probable cause. ¶ 144. Without bothering to investigate, it takes the existence of an unpermitted greenhouse or graded flat of land in a satellite image as proof that the landowner must have grown cannabis at some point. ¶ 116. So a program the County designed to financially cripple anyone who does not pay cannabis permitting fees has led it to destroy the lives of residents who

---

[1] All ¶ cites are to the Plaintiffs' First Amended Complaint, Dkt. 41.

developed their land without a permit for plenty of reasons other than cannabis. ¶ 81, 96-112. Given its arbitrary enforcement, the County goes to great lengths to avoid ever having to put on evidence to support its sanctions. The County is still denying hearings to the first sets of people it fined back in 2018 (¶ 188), and it has spent the five years since withholding permits from those landowners and pressuring them into settlements under which they must pay the County and waive their constitutional rights.

As part of the pressure to settle, the County threatens that hiring a lawyer will only increase the fees that landowners have to pay (¶¶ 200-03, 398), and that the County will not allow a jury to decide the facts of their case. ¶ 226. Instead, an attorney the County hires decides the case and can reduce the fines *only* if the landowner abated the violations "immediately"—something, again, they can't do because of the County's policy of denying permits to anyone facing an abatement order. ¶¶ 215, 234. The County boasts that it has never lost a case before its own hearing officer. ¶¶ 205-07, 380-83.

### B. The Plaintiffs' Ongoing Constitutional Injuries

The Plaintiffs all received NOVs from the County for permitting violations on their properties that the County alleged had some nexus to unpermitted cannabis cultivation. In addition to thousands in administrative fees plus other penalties, the Thomases face $1,080,000 in fines plus nearly $200,000 in costs to destroy their three-story workshop; Rhonda faces $7,470,000 in fines for three adjoining parcels she just purchased; and Cyro faces $900,000 in fines for a property he just bought that the County can't even find. ¶¶ 17, 19-20. Blu Graham faced $900,000 in fines for four and a half years until he finally gave in to unconstitutional coercion to settle his case in exchange for a permit for his house. ¶ 18. The County also published these baseless and disparaging sanctions in the newspaper, the cost for which the Plaintiffs must pay even if the County dismisses their cases. ¶ 143-46. And the Plaintiffs all had to hire engineers (and lawyers) to respond to the demands in the NOVs. ¶¶ 170, 291, 371, 434, 477.

None of the Plaintiffs were growing cannabis on their properties. ¶¶ 274, 345, 433, 466. They received NOVs because of the County's systematic indifference to innocence. The County has a policy through which it issues cannabis fines without an investigation to both innocent purchasers and anyone

1    with an unpermitted greenhouse or graded flat of land.  ¶ 114.  Blu and Cyro received their NOVs

2    because the County saw greenhouses in historical satellite images of their properties.  ¶¶ 348, 468-74.

3    The Thomases and Rhonda received theirs because the County removed cannabis from their properties

4    before they purchased them.  ¶¶ 268, 276, 416.

5       The Plaintiffs all requested administrative hearings to contest the baseless abatement orders, but

6    the County has refused to schedule any.  Blu waited four and a half years; Cyro has been waiting since

7    November 2018; Rhonda has been waiting since October 2020; and the Thomases have been waiting

8    since September 2021.  ¶¶ 273, 385, 436, 480.  As the County delays hearings indefinitely, the Plaintiffs'

9    fines and fees continue to accumulate, and they remain unable to develop their properties due to the

10    County's policy of denying permits.  ¶ 214.  The County uses its delay of hearings and denial of permits

11    to pressure landowners into settlement agreements under which they'd have to pay the County fines

12    and fees, waive their right to a hearing, and allow the County to conduct warrantless searches of their

13    property.  ¶¶ 223, 319.

14       The County designed its abatement program to extract as much money as it can from

15    landowners without ever having to put its evidence before a neutral arbiter.  It violates a litany of

16    constitutional rights.

17                       **STANDARD OF REVIEW**

18       In evaluating the motions to dismiss, the Court must accept as true the Plaintiffs' allegations

19    and construe them in the light most favorable to them.  *Snyder & Assocs. Acquisitions LLC v. United States*,

20    859 F.3d 1152, 1156-57 (9th Cir. 2017).  The Court must deny the County's motion if the Amended

21    Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

22    on its face.'"[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  If the Plaintiffs plead in the

23    alternative, "the pleading is sufficient if any one of them is sufficient."  Fed. R. Civ. P. 8(d)(2).

24

25

26    [2] In conjunction with this opposition, the Plaintiffs have filed an objection to the County's request for
judicial notice (Dkt. 32-2) on the grounds that it impermissibly seeks to introduce facts that are

27    (i) beyond the allegations of Plaintiffs' Amended Complaint and thus impermissibly converts their
motion into a motion for summary judgment, and (ii) not judicially noticeable (*see* Fed. R. Evid. 201).

28

## I. THE PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A. The Plaintiffs Have Standing to Challenge the Process They're Stuck In

The County argues that Plaintiffs have alleged no injuries. MTD 17-18. But the Plaintiffs have alleged several injuries beginning as soon as they received NOVs. ¶¶ 148, 528, 534. They have had daily fines accrue against them,[3] and they hired engineers and lawyers in response to the County's sanctions. ¶¶ 291, 434, 477. They have also racked up administrative fees by contesting their cases and are now subject to treble fees for retroactive permits for any structure cited with a cannabis violation. ¶¶ 200-01, 245, 311-14. Even if the County were to eventually dismiss their cases, the Plaintiffs have already incurred reputational damage from the County's publication of its false charges, and they will have to pay fees for the cost of the County initiating a baseless case against them. ¶¶ 143-46, 400. Moreover, the NOVs made the Plaintiffs ineligible for permits to develop their property while their abatement cases are outstanding. ¶¶ 213-23; *see Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013) ("[T]he impermissible denial of a government benefit is a constitutionally cognizable injury."). These substantive injuries have amassed for *years* due to the County's ongoing refusal to provide the Plaintiffs a hearing—a hearing which itself is constitutionally inadequate. ¶ 587. In the meantime, the Plaintiffs have endured a years-long pressure campaign under which the County coerces them into waiving their constitutional rights in exchange for a permit. ¶¶ 221-23.

And with regard to Blu, the County's just wrong on the facts. The County says the only money Blu paid as part of his unconstitutional settlement was $523 for his grading permit. But the fee Blu paid for his permit (which really cost $936, *see* ¶ 406) was entirely separate from and in addition to the $795.92 that Blu paid in administrative fees to cover the cost of the County prosecuting him. ¶¶ 404-05, 408.

---

[3] That the Thomases received an NOV addressed to someone else is irrelevant. As they plausibly allege, the County holds them, as the current owner, responsible for the abatement case against their property. The County has confirmed this policy publicly (¶ 174), and it has offered the Thomases settlement agreements by which they would have to waive their own constitutional rights and incur other penalties to settle the County's claims against them. ¶¶ 298, 317. Ironically, the County confirms its view of NOVs elsewhere in its brief when it argues that the clock for Rhonda's appeal should run from the time the County served an NOV on the prior owner—before Rhonda even purchased the property. *See* MTD 19.

His payment of these fees confers standing, as does the County's unconstitutional denial of his Safe Home permit until he settled his abatement case. *See Koontz*, 570 U.S. at 607.

The County tries to ignore these injuries by claiming that some (but not all) are either hypothetical or partly the Plaintiffs' fault. But the Court must take as true the Plaintiffs' allegations that they are on the hook for fines and fees, and that the County has attempted to coerce them into paying unjust fines by withholding essential permits that would have allowed them to repair and improve their properties. ¶¶ 182, 197-200, 214-15, 253-55. These harms are concrete, and the Plaintiffs continue to endure them as they wait indefinitely for an administrative hearing—another harm of its own. ¶¶ 50, 183, 199. That the County has not yet collected the fines and fees it's assessed does not change this analysis. At the very least, the penalties in the NOVs—which the hearing officer is unable to reduce (¶¶ 199, 233-35)—are enough to confer standing because they are "certainly impending" and "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). A "credible threat of enforcement" is enough for standing. *Id.* at 161, 165.

Nor can the County defeat standing by creating an issue of fact as to whether the Plaintiffs' actions delayed their hearings or, as the Plaintiffs alleged, no governmental purpose justifies the County's delay—especially as they have rebuffed the County's requests to forgo their hearings. ¶¶ 188-90, 273, 326, 345, 366, 374, 436, 448, 453-55, 475, 479-80. Moreover, Cyro's languishing request shows that remaining silent does not get the County to schedule a hearing any faster. Since Cyro sent Director Ford a letter pleading with the County to be reasonable back in February 2019, he has not reached out to Code Enforcement about his case, and the County still has not scheduled his hearing. ¶¶ 478-79. The County's own inexcusable delays cannot defeat the Plaintiffs' standing.

**B. The Plaintiffs' Claims Are Ripe**

The County's only real ripeness arguments are that the Plaintiffs have not applied for permits or been forced to pay their fines yet. MTD 18. Neither is valid.

*First*, unlike the cases on which the County relies, no Plaintiff is challenging the substantive denial of a permit. Indeed, the Plaintiffs' claim is that the blanket denial of permits is part of an unconstitutional system of coercive penalties. ¶¶ 213-33. At the motion-to-dismiss stage, it is more

than enough that the Plaintiffs have plausibly alleged that the County has a policy of denying permits to people facing abatement orders and has applied that policy to the Plaintiffs. Besides, Rhonda *did* ask the County for permits, and its responded that none were available to her. ¶¶ 441-42. Likewise, County officials told the Thomases that they face "penalty" fees if they apply for a permit for their workshop because the prior owner cultivated cannabis inside. ¶ 177. Article III justiciability does not require that they complete futile administrative steps to ripen their constitutional claims. *Cf. Patsy v. Bd. of Regents*, 457 U.S. 496, 507 (1982). The blanket denial of permits is also material to the Plaintiffs' claim that the County coerces landowners into settlement agreements under which they waive their constitutional rights in exchange for a permit. ¶ 549. The County has made such offers to the Plaintiffs (indeed, Blu accepted one). ¶¶ 298, 317, 336, 448. "[T]he impermissible denial of a government benefit is a constitutionally cognizable injury." *Koontz*, 570 U.S. at 607. Their claims are ripe regardless of whether the Plaintiffs gave in to the coercion.

*Second*, the County is also wrong that the Plaintiffs' excessive-fines claims are not ripe because it considers sanctions to be mere "suggestions." The County's litigating position is contrary to the Plaintiffs' well-pleaded allegations, and to the County's own code, which repeatedly refers to Code Enforcement officers as "imposing" fines, *see, e.g.*, Humboldt County Code ("HCC") § 352-3(*i*), and the administrative hearing as "a process to appeal the imposition of such administrative civil penalties." *Id.* § 352-2(b)(2). An Excessive Fines claim is ripe as soon as its imposition is impending. *See Joseph v. Koh*, 2020 WL 5408042, at *12 (Sept. 9, 2020), *report and recommendation adopted,* 2020 WL 5824491 (N.D. Cal. Oct. 1, 2020); *see also Cheffer v. Reno*, 55 F.3d 1517, 1523-24 (11th Cir. 1995) (Excessive Fines claim ripens upon "the imposition, or immediately impending imposition, of a challenged punishment or fine"). For the County's cannabis-related violations, "the imposition of administrative civil penalties will start to accrue after service of [an NOV]." HCC § 352-3(m)(2) ("Imposition Date"). The Code Enforcement officer who issues the penalty is tasked with calculating what the landowner will be forced to pay and imposing that penalty through an NOV. *Id.* § 352-6(b). Once appealed, the hearing examiner has little to no authority to reduce the penalty imposed by Code Enforcement. ¶¶ 199, 233-35. For the Plaintiffs' purposes, then, the County has already imposed fines on them, and those fines are ripe for challenge.

And regardless of whether an NOV "imposes" a fine (or one is at least "impending"), the Plaintiffs can still challenge the excessive fines assessed against them so long as their constitutional challenge does not require factual development before the hearing officers. *Cf. Cheffer*, 55 F.3d at 1524 (explaining that Excessive Fines claims for people not yet charged are unripe because they "do not raise a purely legal issue which we can decide in the abstract"). The bulk of Plaintiffs' claims is that the cannabis-related penalties are unconstitutionally excessive, both facially and as applied to innocent purchasers like the Plaintiffs. Those claims do not require further factual development at the administrative level—especially given the hearing officer's lack of discretion to reduce them. ¶ 235. Likewise, their challenge to the imposition of treble penalty fees is also ripe. ¶ 321.

**C. The Plaintiffs' Claims Are Not Time Barred**

The Plaintiffs' claims are not time barred. The statute of limitations for a § 1983 action is two years in California. *Ramachandran v. Los Altos*, 359 F. Supp. 3d 801, 812 (N.D. Cal. 2019). And the statute tolls during "continual unlawful acts." *See Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981).

The County subjected Blu to the unconstitutional conditions that he's challenging in September 2022, mere weeks before he sued. ¶ 385. And the injuries to the Thomases, Rhonda, and Cyro are ongoing. They each requested a hearing and remain ensared in the very abatement process (such that it is) that they're challenging. The County cannot seriously contend that it has trapped the Plaintiffs in its interminable system for so long that the statute of limitations bars them from trying to get out.

**D. The Individual Defendants Are Not Entitled to Immunity**

The County does not allege that it is immune from municipal liability under *Monell v. Department of Social Services*, 436 U.S. 685 (1978), and has therefore forfeited any argument to the contrary. It just argues that the individual defendants are absolutely immune from suit over "legislative acts" and that they have qualified immunity for acts within their official discretion. MTD 20. Neither point is correct.

Legislative immunity is inapplicable here because the Plaintiffs do not challenge the enactment of any laws. Section 1983 permits the Plaintiffs to challenge the unconstitutional *enforcement* of ordinances, the penalties imposed, and the processes (or lack thereof) for challenging those penalties.

United States District Court
Northern District of California

1    *Cf. Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 879 (9th Cir. 2011) (law enforcement is a

2    "vital executive function").

3    Qualified immunity is likewise irrelevant. It does not apply to the Plaintiffs' claims for

4    declaratory and injunctive relief, *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir.

5    1989), and "is *not* available to those sued only in their official capacities." *Wright v. Beck*, 981 F.3d 719,

6    737 (9th Cir. 2020) (cleaned up).

7    **E. The Individual Defendants Are Necessary Parties**

8    The Plaintiffs sued both the County and the officials responsible for enforcing the law who

9    should be enjoined. ¶¶ 21-30. Courts routinely entertain suits against both municipal entities and their

10   officials. *See, e.g.*, *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022).

11   **II.  THE PLAINTIFFS HAVE STATED FIVE COGNIZABLE CLAIMS**

12   The Plaintiffs have plausibly alleged five distinct constitutional violations: (A) the County's

13   cannabis-abatement program violates their procedural due-process rights; (B) the County's enforcement

14   of its abatement program without regard for probable cause and against innocent purchasers violates

15   their substantive liberty interests; (C) the County places unconstitutional conditions on landowners who

16   need permits for their property while an abatement case is pending; (D) the penalties the County

17   imposes are unconstitutionally excessive; and (E) the County's refusal to provide a jury in abatement

18   cases violates the Seventh Amendment.

19   **A. The County's Cannabis-Abatement Program Violates Due Process**

20   The Due Process Clause guarantees that no one can be deprived of a property interest or

21   fundamental right without an opportunity to be heard "at meaningful time and in a meaningful manner."

22   *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). When the government deprives someone of their rights

23   or property interests, due process requires that the government provide enough procedural safeguards

24   to protect against the risk of erroneous deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

25   There should be little debate that the NOVs and their corresponding penalties—including

26   millions of dollars in fines, thousands in fees, and a years-long deprivation of the full use and enjoyment

27   of one's property—trigger the protections of the due process clause. *See Nozzi v. Hous. Auth.*, 806 F.3d

28

1178, 1193 (9th Cir. 2015) (holding that the plaintiffs had a "substantial" interest in losing hundreds of dollars they could not afford); *Harris v. Riverside*, 904 F.2d 497, 503 (9th Cir. 1990) (holding that a landowner had a substantial interest in using his property as an ATV park).

The more substantial the interest, the more process is due. *See Barry v. Barchi*, 443 U.S. 55, 64 (1979). How much process the County must provide the Plaintiffs turns on the *Mathews* factors: "(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional procedural safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015).

### 1. The Plaintiffs' Interests Are Substantial

The Plaintiffs have an obviously substantial interest in the millions of dollars in fines the County has assessed. And they also have a substantial interest in the property rights they lose as soon as the County issues an NOV. Just receiving an NOV guarantees that the Plaintiffs will have to pay administrative fees to cover the costs the County incurred initiating the cases against them. ¶¶ 528-31. And the NOVs also deprive the Plaintiffs of permits to develop their property for years as they wait for a hearing. *See Harris*, 904 F.2d at 503. Each interest is substantial.

As the Plaintiffs have thoroughly alleged, the County has a policy of denying *all* permits to properties with pending abatement orders. ¶¶ 215-17. This denial of permits imposes a substantial burden on the Plaintiffs' free use of their property—particularly Rhonda who purchased her property to develop it. ¶¶ 19, 412, 420. Only after she hired contractors to begin the development did the County inform her that its policy forbids her from developing her land while there's an abatement order against the property. ¶¶ 440-42. With so much at stake, the County's abatement program must have sufficient procedural safeguards to ensure that the County is not wrongfully depriving them of those interests. *Barchi*, 443 U.S. at 64 (holding that, because the interest was substantial, the government must hold "a prompt judicial or administrative hearing that would definitely determine the issues").

### 2. The County's Abatement Program Maximizes the Risk of Erroneous Deprivation

The Plaintiffs have plausibly alleged that the County's cannabis-related abatement program is constitutionally inadequate at just about every step of the enforcement process. Beginning with notice,

the County has a policy of issuing NOVs in a way that "trick[s] landowners" and "obscures how much time landowners have to respond." ¶¶ 140-42. The County leaves predated notices on the gate to a property (not always the correct property, though! *see* ¶¶ 468, 472) to create the misimpression that the 10-day clock begins before the landowner receives notice. ¶¶ 139-43. The notice then fails to list the specific area of the property that violates the code, using instead general phrases like "construction of building/structure in violation of building, plumbing and/or electrical codes." *E.g.*, ¶ 270. Rather than a notice "'reasonably certain' to 'actually inform' the party" of what their violation is and how long they have to address that violation, as due process requires, *Nozzi*, 806 F.3d at 1194, the County designed its NOVs to confuse landowners, so they feel no choice but to settle before the County has to substantiate its claims. This deficient notice not only increases the risk of erroneous deprivation—it *is* a deprivation because it imposes immediate costs and prevents landowners from obtaining permits.[4]

But the County's due-process violations start even before it even issues its deficient NOVs. The County has a policy of issuing violations and corresponding penalties without any process to ensure it has probable cause. ¶¶ 80-134. Relying solely on satellite images, the County concludes without investigation that any property with visible permitting violations necessarily has unpermitted cannabis, too. ¶¶ 87-95, 101-19, 151, 508. Because the issuance of an NOV immediately deprives the Plaintiffs of their ability to develop their properties, the County's process fails from the start. Generally, the government cannot deprive someone of a protected interest without a pre-deprivation hearing unless it has procedures to "satisfactorily establish[] probable cause." *See Barchi*, 443 U.S. at 64; *see also FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, *accompanied by a substantial assurance that the deprivation is not baseless or unwarranted*, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." (emphasis added)). The lack of procedures to establish probable cause creates a substantial likelihood that the charges are "mistaken." *Mallen*, 486 U.S. at 242; *see also Stypmann v. San Francisco*, 557 F.2d 1338, 1343 (9th Cir. 1977)

---

[4] That the County also publishes general notice in the newspaper does not cure the constitutional infirmity with its notices. *See Harris*, 904 F.2d at 504 (general notice published in newspaper "did not reasonably convey" the necessary facts to the landowner whose rights were at stake).

1   (towing procedures violated due process, in part, because there was "no procedure to assure the

2   reliability of the determination that the seizure and detention [we]re justified").

3   The County then compounds the problems arising from the failure to develop probable cause

4   by delaying hearings for years. To the extent due process allows the deprivation of a property interest

5   prior to a hearing, the government must provide procedures "designed to provide a reasonably reliable

6   basis for concluding that the facts justifying the official action are as a responsible governmental official

7   warrants them to be" *and* must provide "prompt postdeprivation review." *Yagman v. Garcetti*, 852 F.3d

8   859, 864, 866 (9th Cir. 2017) (citations omitted). Rather than the "prompt" hearing that might mitigate

9   the harm of its unconstitutional policy, the County has made the Plaintiffs wait *years*. ¶¶ 273, 385, 436,

10  480. *See United States v. Crozier*, 777 F.2d 1376, 1383-84 (9th Cir. 1985) (restraining use of property

11  without a hearing for "months or years after a restraining order is issued" violates due process because

12  hearing "cannot be construed as a hearing provided 'at a meaningful time'").

13  With no governmental interest to justify these incredible delays, the County just tries to blame

14  the Plaintiffs (MTD 23)—despite the Plaintiffs having repeatedly demanded a hearing. *See, e.g.*, ¶¶ 367,

15  370, 453. As the Plaintiffs have alleged, "[t]here is no legitimate governmental reason for the delay in

16  scheduling initial hearings on abatement orders, as the County maintains that it has all the evidence it

17  needs *before* it issues an NOV." ¶ 190. Instead of a legitimate one, "[t]he purpose of the delay is to

18  increase the pressure the County places on those landowners facing abatement orders." ¶ 191; *see also*

19  ¶ 198. This "indefinite" and "undue" delay (¶¶ 183, 209, 212) increases the risk of erroneous

20  deprivation by inducing settlements that extract more property from landowners than the County would

21  get without the delay.

22  As the undue delay drags on, fines and fees continue to accrue. ¶¶ 10, 50, 186, 195, 232, 300,

23  531. The County's ordinances ensure that anyone who wants a hearing must endure at least five days

24  of fines, and the County's policy is to ensure that a full 90 days of fines accumulate before anyone gets

25  a hearing. ¶¶ 192-94. Similarly, landowners facing an abatement order accrue up to $4,500 in

26  "administrative fees" for requesting a hearing and having their attorneys speak to County officials while

27  they await the hearing. ¶¶ 50, 230. County officials even make clear to landowners that hiring an

28

attorney and contesting charges will increase the cost they ultimately pay. ¶ 398. Rather than having procedures to mitigate the losses for unsubstantiated claims as due process requires, *see Stypmann*, 557 F.2d at 1343, the County makes innocent people shoulder the cost when it can't substantiate its cannabis allegations. Indeed, when the County doesn't have the proof to support its cannabis-related sanctions to begin with, it still requires falsely accused landowners to pay 90 days of fines for the underlying permitting violation—even though the County refused to let them cure that offense by obtaining the permit at issue while they waited for their hearing. ¶¶ 197-99, 390-92.

If the County's blanket ticketing policy and years of delays weren't bad enough, the County further exacerbates the risk of erroneous deprivation by refusing to consider exonerating evidence while the Plaintiffs and those similarly situated wait years for their initial hearing. ¶¶ 273, 385, 436, 480. *See Galfer v. Los Angeles*, 2015 WL 13917043, at *12-13 (C.D. Cal. Mar. 6, 2015) (holding the city increased the risk of erroneous deprivation through "a policy of failing to consider evidence capable of rebutting the prima facie case created by the traffic officer's statements in a facially valid citation").

Taken together, the County's abatement procedures are finely tuned to maximize the risk of erroneous deprivation. The entire process places undue pressure on landowners to settle the claims— through rapidly accruing fines and the blanket denial of permits—so the County never has to make its case to a neutral arbitrator. *See Mallen*, 486 U.S. at 246 (explaining that a scheme violates due process if the penalty attaches before "the State would be put to its proof").

### 3. The County Has No Legitimate Interest in Its Insufficient Procedures

No legitimate governmental interest prevents the County from adopting procedures that would eliminate these unnecessary risks of erroneous deprivation. ¶¶ 189-90. It's not surprising, then, that the County's brief does not address the third prong of the *Mathews* analysis. *See Barchi*, 443 U.S. at 66 ("We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing.").

To the extent that it has not forfeited this point, the County's general interests in regulating cannabis and the environment, *see* MTD 27, are inapposite. The relevant governmental interest isn't some abstract interest in cannabis regulation—it is the interest in delaying a prompt hearing. *See*

*Stypmann*, 557 F.2d at 1343 ("The only government interest at stake is that of avoiding the inconvenience and expense of a reasonably prompt hearing to establish probable cause for continued detention of the vehicle."). One would expect that the County's interest in regulating cannabis should compel it "to have an early and reliable determination" of its claims. *See Barchi*, 443 U.S. at 66. But the County has instead structured its system to deny a meaningful opportunity to be heard because doing so increases the likelihood that unsubstantiated claims will produce settlements and fees.

By design, the County's abatement system makes it at least "as likely as not" that the accused are punished for something they didn't do. *See id.* In doing so, it violates due process.

**B. The County's Indifference to Innocence Violates Substantive Due Process**

The Due Process Clause also "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations omitted). The Supreme Court's "early explanations of due process" established "the core" of due process "to be protection against arbitrary action" and "the exercise of power without any reasonable justification in the service of a legitimate governmental objection." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted). Official conduct that "'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty'" violates due process. *United States v. Salerno,* 481 U.S. 739, 746 (1987) (citations omitted). When the government's conduct is not justified "by any government interest," it is "most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849 (citation omitted); *see also Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1262 (9th Cir. 1994) (explaining that official action violates due process when it has "no substantial relation to the public health, safety, morals, or general welfare").

The County's abatement program violates due process because the County enforces it with systematic indifference to innocence. *First*, the County disregards probable cause and fails to investigate before it administers abatement penalties. *Second*, the County knowingly penalizes innocent purchasers for the conduct of others.

**1. The County Cannot Impose Punishments Without Probable Cause**

The government has no legitimate interest in imposing penalties unsupported by evidence or

an adequate investigation. Since the founding, laws imposing civil penalties have typically required a showing of probable cause. *See, e.g.*, *Leonard v. Caskin*, 15 F. Cas. 337, 337 (D.S.C. 1799) (outlining one such federal law from 1795). Although the government may in some instances charge someone on a lesser showing than probable cause, charges that impose an immediate restraint on liberty require probable cause. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 124-25 & n.26 (1975) (explaining that the Constitution only requires criminal charging decisions to be based on probable cause if they impose a restraint on liberty before trial). And even charges that do not immediately restrain liberty still violate due process if the "failure to investigate was intentional or reckless, thereby shocking the conscience." *Winslow v. Smith*, 696 F.3d 716, 732-33 (8th Cir. 2012) (citation omitted).[5] That failure can be systematic. *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009).

The Plaintiffs allege that the County has a policy of issuing cannabis-related abatement orders without an investigation to produce probable cause. ¶¶ 80-134. This policy infringes the liberty interests of the Plaintiffs and other landowners similarly situated. As the Plaintiffs have alleged (¶¶ 148, 528), an NOV imposes an immediate cost on landowners: Landowners under an abatement order accrue fines and fees, cannot obtain any permits to develop their property, ¶¶ 214-17, face immediate reputational harm due to the County publishing its baseless sanctions, and must then pay for the cost of publication. ¶¶ 143-47. The County then won't drop charges in the face of exculpatory evidence. ¶ 46; *Miller v. Vazquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."). Once charged with a cannabis-related violation, there is no way out without paying the County money—even when the County has falsely charges a landowner due to its systematic failure to investigate. ¶¶ 181-82. This policy is both arbitrary and shocks the conscience because no legitimate governmental interest justifies the County's established policy of knowingly penalizing landowners it has not bothered to investigate. *See Lewis*, 523 U.S. at 849.

---

[5] *Cf. also Hernandez v. Kennedy*, 595 F. App'x 673, 675 (9th Cir. 2014) (holding that a due process claim did not "shock the conscience" because the plaintiff's "evidence did not establish that Officer Kennedy knew or should have known that he was innocent").

### 2. Due Process Prohibits Punishing Innocent Purchasers

Due process also protects the right to not be penalized for someone else's crimes—a principle embedded in this nation's history, legal traditions, and practices since the founding. The "basic concept" of our legal system is that "legal burdens should bear some relationship to individual responsibility or wrongdoing." *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972). Imputing guilt on an innocent person for someone else's conduct is "contrary to fundamental principles of our justice system." *See United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998). Indeed, "[s]ubstantial Supreme Court authority" since the founding confirms that "predicating punishment only upon personal guilt" is a "fundamental" right. *St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974); *Colbert v. Chicago*, 851 F.3d 649, 659 (7th Cir. 2017) ("[P]roximity to a wrongdoer does not authorize punishment.").

The County's abatement program violates this fundamental concept by punishing innocent landowners for their predecessors' conduct. The Amended Complaint sets out how the County issues NOVs to new purchasers, imposing fines, fees, and land-use restrictions as punishment for the prior owner's alleged cultivation of cannabis on the property. ¶¶ 126, 165. The Thomases, Rhonda, and Cyro all received NOVs and corresponding penalties for prior owners' conduct. None of the violations were even recorded against the property to give them any notice. ¶¶ 131, 418. And none of this is by mistake. ¶ 174. Emails from County officials confirm that the County knew that Rhonda did not commit the violations it charged her with and that many no longer existed or posed any harm to the community. ¶¶ 443-46. Yet the County still issued her an NOV because she hadn't "voluntarily" complied with all its demands. ¶¶ 449-52. Similarly, the County fined the Thomases for cannabis cultivation even though it knew the County cleared the prior owner's cannabis two years before the Thomases bought the property. ¶ 276.

The County attempts to excuse its unconstitutional program by proclaiming that landowners are responsible for the conditions on their property. MTD 27. But the NOVs don't just order the abatement of existing nuisances—they impose penalties for past illegal *conduct*. This case would be different if the County merely required new purchasers to obtain permits for unpermitted structures that were on their property when they purchased it. In contrast to whatever anodyne system the County

would rather defend, however, the one it designed and enforced against the Plaintiffs imposes punishment for unpermitted cannabis cultivation on people who never cultivated cannabis. It applies Category 4 penalties for personal conduct without regard for personal guilt in contravention of the Plaintiffs' fundamental rights and this Nation's scheme of ordered liberty.

**C. The Plaintiffs Have Stated a Claim Under the Unconstitutional Conditions Doctrine**

The County "may not deny a benefit to a person because he exercises a constitutional right." *Koontz*, 570 U.S. at 604 (citation omitted). The "unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.* The doctrine broadly prohibits the government from making extortionate demands to pressure people into giving up their constitutional rights in exchange for a discretionary benefit. *Id.* at 604-05; *see also Ballinger v. City of Oakland*, 24 F.4th 1287, 1299 (9th Cir. 2022) ("[T]he doctrine barring unconstitutional conditions is broader than the exactions context.").

An extortive demand violates the unconstitutional-conditions doctrine regardless of whether it "ultimately succeeds in pressuring someone into forfeiting a constitutional right." *Koontz*, 570 U.S. at 606, 619. The government cannot demand land, an easement, money, or other property in exchange for granting a permit. *See id.* at 619. Its general power to deny a discretionary benefit does not empower the government to use the threat of denial to pressure an applicant into something that it couldn't constitutionally order them to do. *Id.* at 608, 612. To determine if a condition the government places on a benefit is unconstitutional, courts *first* look to "the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted[.]" *Dolan v. City of Tigard*, 512 U.S. 374, 386 (1994) (citation omitted). Demands unrelated to the requested benefit are "'an out-and-out plan of extortion.'" *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987). The *second* step is to assess the proportionality of the demand to "determine whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact" on the individual. *Dolan*, 512 U.S. at 388. The government bears the burden of demonstrating that its demand relates to the payment it's attempting to exact. *Id.* at 395.

The Plaintiffs have plausibly alleged that the County has a policy of imposing unconstitutional

conditions on landowners who face cannabis-abatement orders. The County uses its blanket refusal to issue permits to properties with pending cannabis-abatement orders (¶¶ 214-17) to extort landowners into waiving other constitutional rights. ¶ 244. The blanket denial of permits and the County's refusal to schedule hearings for cannabis-related abatements means that the only way landowners can obtain the permits they need is to waive their right to a hearing and pay the County to settle their unrelated abatement case. ¶ 223. In exchange for a permit—even one wholly unrelated to the abatement—the County demands that landowners waive their right to be heard on their abatement case, their right against warrantless searches, and it requires them to pay other fees unrelated to the permit. *E.g.*, ¶ 319.

Blu's case illustrates this unconstitutional policy in action. His request for an initial hearing on his abatement order languished for four and a half years. In the meantime, the County refused to grant him an unrelated permit he needed for his home. ¶¶ 379-85. County officials told him explicitly that there was a "hold" on his Safe Home permit unless he settled his unrelated abatement case. ¶ 384. The County demanded that Blu pay $3,747.29 (later reduced to $795.92) to settle his abatement case before it would grant him a permit for his home. ¶¶ 397-402, 405. Like the government in *Koontz*, the County "specifically identified" that it wanted Blu's "payment of money in exchange for granting a benefit to [his] parcel of land[.]" *Ballinger*, 24 F.4th at 1297. With the Safe Home program set to expire, Blu felt like he had no other choice; the "only reason" he agreed to pay the County a settlement agreement "was because the County was holding hostage the permits Blu needed for his property." ¶ 405.

Similarly, when Rhonda sought a permit to build on the land that she purchased to develop, ¶ 411, the County responded, "Just an FYI, no permits will be issued for properties with open Code Enforcement cases." ¶ 442. Unless she gives in and settles in her unrelated abatement case—under an agreement that requires she waive her due-process, Fourth Amendment, and property rights—she will remain ineligible for the permits she needs. Because there is no nexus between the demand and the permit, and because the settlement cost is disproportionate to the separate cost for a permit the landowner must still pay, these conditions are unconstitutional. *See Dollan*, 512 U.S. at 386, 388.

**D. The Cannabis-Related Abatement Penalties Violate the Excessive Fines Clause**

The Eighth Amendment prohibits the County from imposing excessive fines. *See Timbs v.*

*Indiana*, 139 S. Ct. 682, 686 (2019) (acknowledging that the Excessive Fines Clause applies to the states); *see also Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Eighth Amendment applies to fines imposes by state and local authorities). Dating back to Magna Carta, the government's authority to impose punitive economic sanctions is limited to fines that are "proportioned to the wrong and not so large as to deprive an offender of his livelihood." *Timbs*, 139 S. Ct. at 688. This right "is not a relic … but rather it remains a crucial bulwark against government abuse." *Pimentel*, 974 F.3d at 925.

To be constitutional, a punitive economic sanction "must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Although there is no "'rigid set of factors'" to determine proportionality, the Ninth Circuit typically considers four: "(1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1121-22 (9th Cir. 2004).

Applying those factors to this case, the County's imposition of Category 4 penalties for any code violation that relates to "the commercial cultivation of cannabis in Violation of any applicable local or state laws … or to facilitate the illegal cultivation of cannabis," HCC § 352-4(h), violates the Excessive Fines Clause. Violations that otherwise constitute Category 1 offenses, carrying a fine between $1 and $1,000 due to the minimal harm such offenses pose to the community, increase automatically to Category 4 violations with daily fines of $6,000 to $10,000 (but almost always $10,000, ¶ 151), *solely* because of a nexus to cannabis. ¶ 571.

At $10,000 per day, less than a week of fines exceeds the average yearly income in Humboldt. ¶¶ 33, 158-60. The County applies this multiplier as "a method of generating revenue" regardless of the culpability of the offender, the gravity of the violation, or the harm to the community. ¶ 151, 573. The hearing officer then cannot reduce the fine imposed unless "the landowner immediately remedied a violation," ¶ 233, which those charged with permitting violations cannot do because of the County's policy of denying permits to anyone facing a cannabis-related abatement order. ¶ 215. These penalties are unconstitutional both facially and as applied to innocent purchasers.

### 1. Category 4 Fines for Cannabis-Related Code Violations Are Facially Excessive

The Excessive Fines Clause requires that the government assess penalties proportionately to culpability, the gravity of the offense, and harm to the community. *§100,348.00*, 354 F.3d at 1122. The County flouts this requirement by imposing $10,000 daily fines with no regard for individualized proportionality. ¶¶ 150-51. *See §100,348.00*, 354 F.3d at 1123 ("The culpability of the offender should be examined specifically, rather than examining the gravity of the crime in the abstract."). As discussed, the County issues Category 4 penalties for cannabis-related violations with an indifference to innocence. Every fine issued by a system unconcerned with guilt is definitionally unrelated to culpability.

The penalties also lack proportionality because they're similarly unrelated to community harm or the gravity of the offense. County officials insist that a $10,000 daily fine is justified even if a violation does not cause *any* harm. ¶ 152. The Category 4 enhancement applies automatically to minor violations that would otherwise carry Category 1 penalties due to the minimal harm they cause. The failure to obtain a permit to build a temporary hoophouse, for instance, deprives the County of "a couple hundred dollars" at most. ¶ 159. *See Bajakajian*, 524 U.S. at 337 ("solely a reporting offense"). Worse, the County applies the Category 4 enhancement for violations that far pre-date any cultivation—even when the person responsible for the permitting violation no longer owns the land when someone else grows cannabis there. *See* ¶¶ 443-46. An unpermitted greenhouse causes no more harm to the environment or community just because cannabis gets near it at some point. A $10,000 daily fine for conduct that is otherwise subject to a fine as little as $1, based solely on the nexus to cannabis, is grossly disproportionate in every instance.

Even if unpermitted cannabis cultivation itself could justify a $10,000 daily fine "in a state that allows residents to grow cannabis for medical and recreational use," ¶ 99, the County assesses a *separate* Category 4 penalty for that offense. So landowners face $10,000 daily fines for permitting violations on top of $10,000 daily in fines for unpermitted cultivation. There is no legitimate justification for the County double (or triple, *see* ¶¶ 154-58) counting fines by imposing Category 4 penalties for violations related to cultivation when it already penalizes cultivation with $900,000 in penalties.

Given the County's disregard for culpability, the gravity of the offense, and community harm,

plus the separate offense it imposes to punish cannabis cultivation, the County's enhancement of Category 1 violations to Category 4 violations is facially unconstitutional.

### 2. The Penalties Are Excessive as Applied to the Plaintiffs

#### a. The Fines Are Grossly Disproportionate to the Conduct at Issue

At the very least, the imposition of Category 4 penalties for cannabis-related offenses is unconstitutional as applied to innocent purchasers like the Thomases, Rhonda, and Cyro.

*First*, the Plaintiffs bear no culpability for the cannabis-related offenses on their property. They did not grow the cannabis on their property (¶¶ 274, 433, 466), nor did they build or grade without a permit. ¶¶ 127, 131-32, 175, 279, 418-19, 465. The offenses the County is punishing are mere paperwork violations, for which the County faces no harm beyond the loss of a permitting fee. *See $100,348.00*, 354 F.3d at 1122. More importantly, though, the County is punishing the Plaintiffs for *someone else's* paperwork violations and cannabis cultivation. The Thomases, Rhonda, and Cyro all purchased property with clear title, and the County then punished them for the prior owner's conduct. Even if the County can make new property owners abate ongoing nuisances that pre-exist their ownership, it has no authority to penalize them for someone else's wrongful conduct. Any fine for innocent conduct is unconstitutionally excessive.[6] *See Weber.*, 406 U.S. at 175 ("[L]egal burdens should bear some relationship to individual responsibility or wrongdoing.").

*Second*, to the extent other crimes are relevant in a civil case, *see Pimentel*, 974 F.3d at 923, none of the Plaintiffs grew cannabis or faced criminal sanctions.

*Third*, the offenses at issue typically carry fines between $1 and $1,000. ¶¶ 64. And even then, the owner can avoid a fine by simply seeking a permit—a privilege the County denies to landowners facing cannabis-related penalties. ¶ 217. Plus, the County already imposes a separate $10,000 fine for unpermitted cultivation, on top of the Category 4 penalty for "related" code violations. ¶¶ 154-58, 575.

*Finally*, the offenses at issue are either harmless or nearly harmless. ¶¶ 7, 171, 574, 575. The

---

[6] *See also Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997) ("[A] punishment imposed for no offense at all is, as a matter of mathematics, disproportionate."); *United States v. 2007 Honda Civic EX Sedan*, 2014 WL 4211203, at *5 (W.D. Wis. Aug. 25, 2014) (forfeiture for innocent owner "would be grossly disproportionate because she committed no offense.").

Plaintiffs face penalties for someone else's failure to obtain a permit. Those fines remain even after the offending structures no longer exist. Rhonda, for instance, faces millions in penalties for an empty field. ¶ 415, 422-23. No harm to the community justifies the penalties the County has levied on the Plaintiffs.

**b. The Ordered Destruction of Buildings and Imposition of Treble Fees on Innocent Owners Are Also Unconstitutionally Excessive Fines**

The County's abatement penalties are not limited to fines: it also imposes thousands in administrative fees, ¶¶ 200-01, 231, 245, plus treble permitting fees as a "penalty" for structures used in cannabis cultivation. ¶¶ 169, 177, 311, 313, 321. For the same reason the fines are excessive, the County cannot impose these fees on innocent purchasers as punishment for someone else's conduct.

Likewise, the punitive orders that landowners must destroy structures that prior owners used to cultivate cannabis are also unconstitutional. ¶¶ 166-67, 272, 290-91, 303. The Excessive Fines Clause applies to any punitive economic penalty. *Cf. Timbs*, 139 S. Ct. at 689 ("[C]ivil *in rem* forfeitures fall within the Clause's protection when they are at least partially punitive."). "The purpose of the Eighth Amendment, putting the Bail Clause to one side, was to limit the government's power to punish." *Austin v. United States*, 509 U.S. 602, 609-10 (1993). "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *Id.* at 610.

The County's demolition orders are punitive because they're tied directly to the unpermitted cannabis cultivation. *See id.* at 620 ("Congress has chosen to tie forfeiture directly to the commission of drug offenses."). It imposes these demolition orders regardless of whether the structure is stable "simply because cannabis may have once been cultivated on the land—even when it was a prior owner or trespasser who grew the cannabis." ¶ 171. Demolition orders come at a steep cost to innocent purchasers. For example, it would cost the Thomases $180,000 to demolish their workshop as punishment for someone else growing cannabis inside before they owned it. ¶¶ 171, 291, 296. Because these demolition orders are purely punitive—to impose additional costs on people with cannabis-related violations, the orders must be proportional to the harm alleged. *See Bajakajian*, 524 U.S. at 332. The County' punitive demolition orders are unconstitutionally excessive as applied to innocent purchasers like the Plaintiffs.

### c. The California Cases on Which the County Relies Are Inapposite

To support its imposition of up to $7,470,000 in fines on innocent purchasers, the County proclaims its right, as a matter of law, to fine its residents millions of dollars because other municipalities have occasionally fined people almost much in different circumstances. For this point, the County relies on several cases from the intermediate state court of appeals—none of which were decided at the motion-to-dismiss stage. *Cf. Langley v. City of San Luis Obispo*, 2022 WL 18585987, at *4 (C.D. Cal. Feb. 7, 2022) (holding the government's excessive-fines defense "raises numerous factual issues inappropriate for resolution on a motion to dismiss). These cases are inapposite for several reasons.

*First*, unlike federal courts, California courts require the challenger of an excessive fine to prove their inability to pay the fine, and none in the County's cases could meet that burden. *See Lent v. Cal. Coastal Comm'n*, 62 Cal. App. 5th 812, 860 (2021); *Sweeney v. Cal. Reg. Water Quality Ctrl. Bd.*, 61 Cal. App. 5th 1093, 1140 (2021); *People v. Braum*, 49 Cal. App. 5th 342, 363 (2020). By contrast, the County imposed fines well outside of the Plaintiffs' means "to scare the panties off them." ¶¶ 158-61, 175, 254, 295-98.

*Second*, those cases all dealt with highly culpable offenders. *See Lent*, 62 Cal. App. 5th at 829, 857 ("particularly egregious," "high degree of culpability," "willfully" and "deliberately"); *Sweeney*, 61 Cal. App. 5th at 478 ("willful indifference," "knowing rejection," "high culpability"); and *Braum*, 49 Cal. App. 5th at 356, 361 ("flagrant" and "continuing" disobedience of court orders). Here, the County fined the Plaintiffs without regard for culpability, and they have none. ¶¶ 443-46.

And *third*, those cases involved widespread community harm: the Lents closed off public access to a public beach, 62 Cal. App. 5th at 829, 858; Sweeney committed "major" environmental violations that "adversely impacted beneficial uses at the Site including estuarine habitat, fish migration, preservation of endangered species, fish spawning, and wildlife habitat," 61 Cal. App. 5th at 1138, and Braum let his tenants operate an illegal grow and dispensary, in violation of a court order, "within 35 feet of an elementary school." 49 Cal. App. 5th at 361. There's no such public harm here. The County has imposed life-ruining fines for "harmless things like greenhouses on a property." ¶¶ 6, 172, 574.

**E. The Seventh Amendment Guarantees a Jury in Suits for Civil Penalties**

The Seventh Amendment to the United States Constitution provides that, "[i]n Suits at common law, where the value in controversy exceeds twenty dollars, the right to a jury shall be preserved[.]" The amendment guarantees the fundamental right to a jury in all common-law actions for more than $20. "'Suits at common law' … refer[s] to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (quoting *Parsons v. Bedford*, (3 Pet.) 443, 447 (1830)). Such suits include "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Id.* (citation omitted).

A two-step determines whether the civil-jury right applies: "First, we compare the statutory action to 18th-cetnury actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull v. United States*, 481 U.S. 412, 417-18 (1987) (citations omitted). "The second stage of this analysis is more important than the first." *Granfinanciera*, 492 U.S. at 42.

The Court has already applied this two-step analysis to conclude that the Seventh Amendment provides a jury right in actions the government brings to collect damages for environmental nuisances. *See Tull*, 481 U.S. 418-25. Historically, suits for civil penalties were "a particular type of an action in debt, requiring a jury trial." *Id.* at 418-19 (collecting cases). And more important than "an 'abstruse historical' search for the nearest 18th-century analog," was the fact that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 421-22. "Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity." *Id.* at 422. Because Congress passed the penalties provision at issue in *Tull* to achieve "retribution and deterrence"—not just "to disgorge profits but also to impose punishment"—the suit for civil penalties required a jury. *Id.* at 422-23.

The same logic applies to the County's cannabis-abatement program, which it created to punish wrongdoing without "the expense and delay associated with pursuing alternative remedies through the

1 … criminal justice system." ¶¶ 226, 321, 570, 576. These penalties aren't equitable—particularly

2 considering they impose fines on new purchasers who bear no culpability. *Tull* confirms that the

3 County's actions for civil penalties are "[s]uits at common law" for which the civil-jury right applies.

4 The right to a jury in actions at law applies to the County because it's "fundamental to our

5 scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *McDonald v. City*

6 *of Chicago*, 561 U.S. 742, 767 (2010). "Evidence at the time of the founding through the adoption of the

7 Fourteenth Amendment demonstrates that the Seventh Amendment was a fundamental right and thus

8 was incorporated against the states under the due process clause of the Fourteenth Amendment." Suja

9 A. Thomas, *Nonincorporation: The Bill of Rights After* McDonald v. Chicago, 88 Notre Dame L. Rev. 159,

10 191-94 (2012). The founders viewed "trial by jury" as one of the most "inherent rights and liberties";

11 "even in private suits at common law, the right of trial by jury is preserved in the Constitution of the

12 United States." 2 James Kent, Commentaries on American Law *5, 13 (Blackstone Publishing 1889).

13 The fundamental individual liberties guaranteed by the Bill of Rights apply equally to the states.

14 *See Timbs*, Oral Argument Tr. at 32 (Gorsuch, J.) ("[H]ere we are in 2018 … still litigating incorporation

15 of the Bill of Rights. Really? Come on, General."). Although the Court declined to apply the civil-jury

16 right to the states back in 1916, *see Minneapolis & St. Louis R. Co. v. Bombolis*, 241 U.S. 211 (1916), that

17 decision did not consider the 14th Amendment's Due Process Clause because it "predate[d] the era of

18 selective incorporation." *McDonald*, 561 U.S. at 784 n.30. But the Court has since held "that the Due

19 Process Clause fully incorporates particular rights contained in the first eight Amendments," *id.* at 763,

20 and has cast doubt on the "continuing validity on incorporation" of cases that "did not engage in the

21 sort of Fourteenth Amendment inquiry required by [the Court's] later cases." *District of Columbia v.*

22 *Heller*, 554 U.S. 570, 620 n.23 (2008).

23 The Plaintiffs recognize that the discrete issue of Seventh Amendment incorporation is

24 foreclosed by circuit precedent. *See, e.g.*, *Jackson Water Works, Inc. v. Pub. Utils. Comm'n*, 793 F.2d 1090,

25 1096 (9th Cir. 1986) ("[T]he state is not obligated under the federal Constitution to provide either a

26 right of appeal or a jury trial" (citing *Bombolis*)). They ask this Court to confirm as much, so that they

27 may seek relief on appeal.

28

Dated: April 3, 2023

/s/ Jared McClain
Jared McClain* (DC Bar No. 1720062)
Joshua House (CA Bar No. 284856)
**INSTITUTE FOR JUSTICE**
901 N. Glebe Road, Suite 900
Arlington, VA 22203
T: (703) 682-9320
F: (703) 682-9321
jhouse@ij.org
jmcclain@ij.org

Robert Johnson* (OH Bar No. 0098498)
**INSTITUTE FOR JUSTICE**
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
T: (703) 682-9320
F: (703) 682-9321
rjohnson@ij.org

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Thomas V. Loran III (CA Bar No. 95255)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
T: (415) 983-1865
F: (415) 983-1200
thomas.loran@pillsburylaw.com

Derek M. Mayor (CA Bar No. 307171)
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
T: (916) 329-4703
F: (916) 441-3583
derek.mayor@pillsburylaw.com

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*