1
2
3
4            UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6                   EUREKA DIVISION
7

8    CORRINE MORGAN THOMAS, et al.,          Case No.  22-cv-05725-RMI
9               Plaintiffs,
                                             **ORDER RE: MOTION TO DISMISS**
10        v.                                 **AMENDED COMPLAINT**

11   COUNTY OF HUMBOLDT,                      Re: Dkt. No. 32
     CALIFORNIA, et al.,
12
                Defendants.
13

14       Now pending before the court is Defendants' Motion to Dismiss (dkt. 32) and Request for

15   Judicial Notice (dkt. 32-2) ("RFJN"); Plaintiffs have filed a Response in Opposition (dkt. 36), and

16   have objected (dkt. 36-1) to Defendants' RFJN; Defendants filed a Reply Brief (dkt. 37), a

17   Supplemental Request for Judicial Notice (dkt. 37-2) ("SRFJN"), as well a Response to

18   Plaintiffs' objections to Defendants' RFJN (dkt. 37-3). For the reasons set forth below,

19   Defendants' requests for judicial notice and their motion to dismiss the operative complaint with

20   prejudice are granted.

21                        **FACTUAL BACKGROUND**

22              *Plaintiffs' Amended Class-Action Complaint*

23       Pursuant to 42 U.S.C. § 1983, and the Declaratory Judgment Act (28 U.S.C. §§ 2201-02),

24   on behalf of themselves and others similarly situated, five individuals have sued Humboldt County

25   (California), its Planning and Building Department, its Board of Supervisors, and six individual

26   county officials. *See* First Amend. Compl. ("FAC") (dkt. 31) at 4-6. The five named Plaintiffs are

27   Corrinne and Doug Thomas, Blu Graham, Rhonda Olson, and Cyro Glad – all of whom find

28   themselves embroiled in disputes related to the County's abatement efforts related to the

United States District Court
Northern District of California

1    appendages of illegal cannabis cultivation activity, as well as its non-cannabis code enforcement

2    efforts. *Id*. In addition to the County and its above-named subdivisions, Plaintiffs have also sued

3    John H. Ford (the Director of the Planning and Building Department), as well as the following five

4    members of the County Board of Supervisors: Steve Madrone, Rex Bohn, Mike Wilson, Michelle

5    Bushnell, and Natalie Arroyo. *Id*. at 5-6. Plaintiffs' class-action allegations are only advanced by

6    Plaintiffs Corrine and Doug Thomas (hereafter, "the Thomases"), Olson, and Glad; Plaintiff

7    Graham "was planning to be a class representative until the County suddenly agreed to dismiss his

8    abatement order the week before filing the initial complaint." *Id*. at 51. Plaintiffs propose a class to

9    be defined as such: all persons who are currently facing proposed penalties for cannabis-related

10   Category 4 violations – that were "levied" after January 1, 2018 – and who requested

11   administrative hearings within 10 days of service but who still have not received a hearing for

12   their appeal. *Id*. Plaintiffs, and the members of the proposed class, reportedly will suffer under a

13   litany of asserted policy failures by the County including – *inter alia* – the County's alleged

14   issuance of cannabis-related code violations without adequate investigation or due regard for

15   probable cause; its delays in providing administrative hearings; and, its failure "to provide a jury

16   at the administrative hearing." *Id*. at 51-54. Plaintiffs plead five causes of action: a claim asserting

17   procedural due process violations focused on alleged defects in the County's administrative

18   processes (Claim-1) (*see id*. at 56-58); a claim asserting substantive due process violations that, in

19   essence, contends that the allegedly baseless allegations, coupled with the delays in the hearing

20   process, and the alleged interference with the Plaintiffs' right to develop their properties while

21   awaiting resolution of the code enforcement matters result in unconstitutional "deprivations of life,

22   liberty, or property when there is no governmental interest in the deprivation" (Claim-2) (*see id*. at

23   59-62); a claim premised on the notion that the County's permitting fees, its settlement offers, its

24   fines, and its fees all constitute "unconstitutional exactions" in violation of the unconstitutional

25   conditions doctrine (Claim-3) (*see id*. at 62-64); a claim alleging the levying of excessive fines and

26   fees under the Eighth and Fourteenth Amendments (Claim-4) (*see id*. at 64-66); and, a claim

27   asserting that the Seventh and Fourteenth Amendments should be construed to mandate jury trials

28   in the sort of administrative hearings of which Plaintiffs have complained, at least as to the factual

2

determination of whether or not a landowner has violated the code (Claim-5) (*see id*. at 66-68). By way of relief, Plaintiffs seek the certification of the aforementioned class; a bevy of declaratory and injunctive relief; an award of nominal damages for the named Plaintiffs; an award of $795.92 "in damages or restitution in addition to nominal damages" for Blu Graham; and, an award of attorneys' fees, costs, and expenses. *Id*. at 68-70. As far as factual allegations go – Plaintiffs' FAC paints an implausible picture of the events underlying the above-mentioned claims. *See generally id*. at 6-55. Despite the FAC's length, overlooking its irrelevant content, and its conclusory and implausible assertions – and in light of the materials of which the court is taking judicial notice – it becomes clear, as set forth *infra*, that the underlying facts do not, and simply can not, entitle these Plaintiffs to any relief against these Defendants.

### *The Statutory Framework*

Chapter 2 of the Humboldt County Code ("HCC") was enacted pursuant to California Government Code § 53069.4 with the intention of serving as the primary procedure for the imposition of administrative civil penalties within the unincorporated areas of Humboldt County. *See* Defs.' Request for Judicial Notice (dkt. 32-2, Exh. NN) at 466[1]; *see also* Defs.' Supp. Request for Judicial Notice (dkt. 37-2) at 1-50. In promulgating the Code – the County's Board of Supervisors found that it was furthering the following goals: (1) protecting the public's health, safety, and welfare; (2) laying out an administrative process that employs objective criteria for the imposition of penalties and provides for a process to appeal the imposition of penalties; (3) providing a means of properly penalizing persons who fail or refuse to comply with the County's code and its other ordinances; and (4) minimizing the expense and delay associated with pursuing alternative remedies through the civil and criminal justice system. HCC § 352-2(b)(1)-(4). Whenever the County's Code Enforcement Unit ("CEU") becomes aware that a violation has

---

[1] Chapter 2 of the Humboldt County Code is appended to Defendants' RFJN at Exhibit NN. *See id*. at 465-485. For simplicity, the court will simply cite to those provisions by their codified section numbers. Plaintiffs do not offer any factual dispute about these code provisions; therefore, judicial notice of these local laws is appropriate here. *See Aids Healthcare Found., Inc. v. City & Cnty. of S.F.*, 208 F. Supp. 3d 1095, 1098 n.2 (N.D. Cal. 2016) (citing *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 954-56 n.3-4 (9th Cir. 2011) (taking judicial notice of undisputed contents of local ordinances and resolutions)).

3

occurred, the Unit "shall prepare, and serve upon each [r]esponsible [p]arty, a 'Notice of Violation and ***Proposed*** Administrative Civil Penalty, as set forth in this Chapter.' The Notice of Violation may be combined with a Notice to Abate Nuisance issued pursuant to the provisions of this division." *See id*. at § 352-7 (emphasis supplied).[2] Notices of this sort must contain a host of information including: the responsible party's name and last known address; the address and description of the property on which the violation exists; a description of the acts or omissions (and pertinent regulation or ordinance) constituting the violation; an order to correct or otherwise remedy the violation within 10 calendar days after service; a statement that each day after the 10th day that the violation persists constitutes a separate violation up to the 90th day; the amount of the proposed daily administrative civil penalty to be incurred after the 10th day; a statement that the responsible party may file a written appeal request with the CEU of the determination as to the existence of a violation and / or the amount of the proposed administrative civil penalty; a statement that such an appeal has already been taken (if that is the case) along with a bevy of attendant information pertaining to that appeal; and, a statement that, upon the lodging of such an appeal, the CEU shall set the matter for a hearing before a hearing officer appointed by the County Board of Supervisors and issue a notice of hearing no sooner than 15 calendar days after the notice. *Id*. at § 352-8(a)-(k). Further, the notice also must state that the administrative civil penalties will no longer be "proposed," and will become final – conferring jurisdiction on CEU to undertake collection actions (along with costs and attorneys' fees) – under the following circumstances: (1) within 10 days after service of a Notice of Violation and Proposed Administrative Civil Penalty if no appeal request is filed; or, (2) within 20 days of service of the Finding of Violation and Order Imposing Civil Penalty (following an appeal) if a request for judicial review of the hearing officer's final appeal decision is not filed with the Humboldt County Superior Court; or, (3) within 10 days after service of the Humboldt County Superior Court's final adverse decision. *See id*. at §352-8(I)(i)-(iii); *see also* §352-14(a). Lastly, the notice must state that

---

[2] As discussed in detail herein, a great deal of the thrust of Plaintiffs' lawsuit depends on obfuscating the "proposed" nature of the administrative civil penalties set forth in the County's § 352-7 notices, by couching them as finalized fines that have in fact been levied when that is not the case.

4

a finalized administrative civil penalty may become a lien against the property on which the violation occurred or exists, and will have "the same force, effect, and priority" as a judgment lien – also, an additional notice can be served if a new violation occurs or if an existing violation persists for more than 90 days. *Id*. at § 352-8(m), (n). In the case of illegal cannabis cultivation, as in the case of other code violations, the above-described procedure (including the provision for seeking judicial review in the Humboldt County Superior Court) applies. *See id*. at 352-3(m); 352-5; 352-13.

As to potential penalties through the 90th day of the existence of a violation, the proposed daily administrative civil penalty could be as high as $10,000 per day, or up to any amount allowed by state law – whichever is higher. *See id*. at 352-2(a). Violations and their attendant daily penalty ranges are graded by severity according to the following method: Category-1 ($1.00 to $1,000 per day), Category-2 ($1,000 to $3,000 per day), Category-3 ($3,000 to $6,000 per day), and Category-4 ($6,000 to $10,000 per day). *See id*. at 352-6(a). Factors that determine the category in which a violation should be placed include: the seriousness of its impact on the public's health, safety, or general welfare; the number of complaints received about it; issues pertaining to the responsible party's willfulness or negligence; the number of times a responsible party has committed the same or similar violations; the amount of penalties which have been imposed in similar situations in the past; and, any efforts made by the responsible party to correct or remediate the violation. *See id*. at 352-6(b).

On appeal from the CEU's issuance of a Notice of Violation and Proposed Penalty, hearing officers are empowered to find that no violation was committed at all, or to suspend or reduce fines upon a finding that a party took steps to remedy a violation that did not impact the health, safety, or general welfare of the pubic. *See id*. at §352-12(a)-(b). In the event of an adverse decision by a hearing officer, a Finding of Violation and Order Imposing Administrative Civil Penalty issued by such an officer "shall be final in all respects unless overturned or modified on appeal by the Humboldt County Superior Court . . . [and] shall be accompanied by instructions for obtaining [such] judicial review . . ." *See id*. at 352-12(c); *see also* 352-13 (describing the method for seeking judicial review of a hearing officer's final decision).

Prior to the completion of the administrative proceedings described above, in addition to any judicial review that may have been pursued in the Humboldt County Superior Court, the County is not empowered to collect any penalties. *See id*. at 352-14(a). Lastly, the County's Planning Director – either personally or through an assistant so designated – is statutorily authorized to reduce or eliminate penalties, costs, and attorneys' fees, and may enter into compliance and settlement agreements with owners or occupiers of the property on which violations have been deemed to exist; that is, "in exchange for compliance to correct or otherwise remedy the [v]iolation to preserve the public health, safety, and welfare of the County residents." *See id*. at 352-14(c).

### *The Code Enforcement Matter of Corrine and Doug Thomas*

In August of 2021, the Thomases purchased certain real estate in Miranda, California, situated atop a ridge near Avenue of the Giants in Humboldt County. *See* FAC (dkt. 31) at 30. Behind the residential structure on the property, there is a detached garage and a three-story building which was described in the real estate listing as a "workshop." *Id*. A few days after the closing of their purchase, the Thomases received a Notice of Violation and Proposed Civil Penalty addressed to Summerville Creek LLC, the property's previous owner. *Id*. Apparently referring to the three-story workshop, the Notice reportedly alleged the following violations: violation of the commercial cannabis land use ordinance; construction of a building or structure in violation of building, plumbing, and electrical codes; and, facilities or activities in violation of the commercial cannabis land use ordinance. *Id*.

As to the origin of the Notice, in mid-2021 satellite imagery and a realtor's listing revealed a metal building with a reflective roof used to grow cannabis at a home in Miranda (274 Lower Cathey Ln., APN 211-391-011-000). *See* RFJN, Exh. A (dkt. 32-2) at 13-17[3]; *see also* FAC (dkt.

---

[3] Plaintiffs do not offer any factual dispute about the authenticity, accuracy, or correctness of any of the records and reports of the administrative proceedings that have been referred to in the FAC and appended to Defendants' RFJN; therefore, the court finds that under the doctrines of incorporation by reference and judicial notice (discussed *infra*), consideration of the entirety of the records and reports of those administrative proceedings is appropriate here. *See Apartment Ass'n of L.A. Cnty. v. City of L.A.*, 10 F.4th 905, 910 n.2 (9th Cir. 2021); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (judicial notice can be taken of the "[r]ecords and reports of administrative bodies."); *see also United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008) (courts may take judicial notice of matters of public record and the reports of

United States District Court
Northern District of California

1  31) at 70. The realtor's photographs (now part of the administrative record of CEU's case-file in

2  the case related to the Thomases' matter) revealed a number of building vents and certain

3  implements of commercial cannabis cultivation. *See* RFJN, Exh. A (dkt. 32-2) at 13-16. As

4  mentioned, in August of 2021, the CEU served a Notice of Violation and Proposed Administrative

5  Penalty, and a Notice to Abate Nuisance, alleging: an "unpermitted commercial cannabis

6  operation with approximately 2,500 square feet of cultivation"; and, a "structure facilitating

7  commercial cannabis activity and constructed contrary to the provisions of the Humboldt County

8  Code." *See id.* at 24-39. Naming Sommerville Creek LLC (the prior owner) as the responsible

9  party, the notices were sent to the address on record (which was now owned by the Thomases) and

10  notified them as to the possible penalties, while also informing them as to how they might remedy

11  what had been graded as Category-4 violations with proposed daily penalties in the order of

12  $6,000. *Id.* at 27, 35. In other words, while the notices were received by the Thomases, they

13  named Sommerville Creek LLC as the responsible party, and they gave 10 days for the correction

14  of the violations such as to avoid being subjected to a daily administrative penalty of $12,000 (the

15  combined sum for 2 violations) for up to 90 days. *See id.* at 24. The required abatement action

16  would consist of the discontinuation of cannabis cultivation and removal of all cannabis and

17  cannabis cultivation infrastructure, including power and irrigation infrastructure, and the removal

18  of all structures connected to cannabis cultivation that had been constructed in violation of local

19  building, plumbing, and / or electrical codes, including obtaining any necessary demolition

20  permits. *Id.* at 36.

21      In early September of 2021, a CEU site inspection was mutually arranged at which the

22  Thomases (and their attorney) were present, and to which they had expressly consented. *See id.* at

23  111, 112-13. The inspector found that the "workshop" was, in fact, "a three-story, seven-room

24  wooden building with metal sheathing, on a pier-and-post foundation" with a measured footprint

25  of 3,780 sq. ft., a total effective floor space of 7,956 sq. ft., and with numerous indicia of having

26  been used as an industrial-scale cannabis production facility. *Id.* at 114. In addition to containing

27  _____

28  administrative bodies and consider them without converting a Rule 12 motion into one for summary
judgment).

1    various implements associated with cannabis cultivation, the building still contained the "remnants

2    of cannabis . . . on the floor of every space within the building." *Id*. Moreover the inspector also

3    found: that none of the stairwells had proper railing or hand grips, including the one at the

4    entrance to the building; that none of the six doors in the rear of the building – three on the first

5    floor and three on the second floor – opened to landings; and, that the only safety measure keeping

6    a person from walking out of a second story door and falling was tape. *Id*. The inspector's report

7    attributed various statements to the Thomases (reportedly made during the course of that

8    inspection) ranging from stating that they might allow their children to ride their bicycles inside

9    the structure, to stating that the building had no apparent usefulness and might never be used. *Id*.

10   The inspector's report concluded that the only potential use for the building might be a barn;

11   however, the inspector found even that use to be inapplicable due to the fact that the Thomases

12   owned no livestock, had no farm equipment, and produced no agricultural products. *Id*.

13        At that time – that is, during 2021 – the County had a policy "requiring all unpermitted

14   structures associated with an unpermitted cannabis operation to be removed." *Id*. at 135. However,

15   by March of 2022, the county promulgated a policy allowing property owners and operators to

16   prepare a plan and description for the (non-cannabis) continued use of such unpermitted structures

17   if such property owners wanted to maintain, rather than remove, the structure. *See id*. at 132-33.

18   The requirements for this policy were: that the structure be identified for a use permitted by

19   applicable zoning and land use laws; that the structure be within the curtilage (*i.e.*, 2 acres) of an

20   existing residence; that the structure be such that it can be permitted (*i.e.*, a building permit); that

21   the continued existence of the structure not cause environmental harm; and, that it be understood

22   that any subsequent unpermitted cannabis cultivation therein would be subject to further penalties

23   pursuant to the Code. *Id*.

24        In any event, on September 2, 2021, notwithstanding the fact that they had never been

25   designated as "responsible parties," the Thomases requested an appeal hearing to contest the

26   CEU's determinations as to the unpermitted 3-story structure on their newly-acquired parcel of

27   land. *See id*. at 119-20. However, the following month – on November 8, 2021 – the Thomases

28   executed a Compliance Agreement (*see id*. at 122-30) to resolve the violation; under that

1    agreement, they agreed to obtain a demolition permit, and to remove the structure within six

2    months. *Id*. at 123. In exchange for the Thomases' promised corrective action, the County agreed

3    to stay enforcement for the agreed-upon period, and upon execution of the Thomases' corrective

4    action, the County would dismiss the pending code enforcement case. *Id*. at 124. However, the

5    agreement also stated that if the Thomases failed to uphold their end of the bargain, the County

6    would then name them as responsible parties, lift the stay, and reinstitute the enforcement

7    proceedings. *Id*.

8            Midway through the 6-month period of the Compliance Agreement – specifically, in

9    March of 2022 – the County promulgated the above-mentioned policy allowing (under certain

10   conditions) the repurposing of such structures. *See id*. at 132-33. That is, the new policy afforded

11   property owners an avenue to avoid demolition by providing the County with a restoration plan

12   that described a permitted use for the structure. *See id*. at 132. Following the promulgation of the

13   new policy, in April of 2022, an attorney representing the Thomases informed CEU that his clients

14   wished to keep the structure in place pursuant to the new policy (rather than to demolish it

15   pursuant to their agreement). *See id*. at 462-63. Thus, in August of 2022, the Thomases were

16   presented with a new agreement that allowed them to avoid removing their unpermitted structure

17   if, within eight weeks, they submitted a restoration plan and a permit application; however, finding

18   themselves displeased with the fees associated with the repurposing permits (reportedly triple the

19   amount of ordinary permitting fees), the Thomases chose to neither proceed down that avenue, nor

20   to demolish the structure as they had previously agreed. *See* FAC (dkt. 31) at 35-36. The

21   Thomases contend that "they remain intent on keeping the [unpermitted] three-story structure they

22   purchased with the property, but they are not willing to pay penalties for the prior owner's

23   wrongdoing." *Id*. at 36. At bottom, they complain that they "have still not received an

24   administrative hearing since filing their notice of appeal on September 2, 2021." *Id*. On the other

25   hand, as far as the Thomases' case is concerned, the only operative Notice of Violation and

26   Proposed Administrative Civil Penalty still does not name them as the "responsible party," and

27   instead names their property's previous owner, Summerville Creek LLC. *See* RFJN (dkt. 32-2) at

28   24. While the FAC complains that the Thomases have not yet received an administrative hearing –

United States District Court
Northern District of California

9

1   neither does the FAC allege that the Thomases have either been actually named in a Notice of

2   Violation, nor does the FAC allege that the Thomases have ever actually been fined. *See generally*

3   FAC (dkt. 31) at 1-70. Indeed, the County has expressly stated that "it has not named the

4   Thomases in an NOV or fined them," (*see* Defs.' Mot. (dkt. 32) at 13), a fact that Plaintiffs

5   expressly confirm. *See also* Pls.' Opp. (dkt. 36) at 14 ("That the County has not yet collected the

6   fines and fees it's assessed does not change this analysis.").

7   <u>*The Code Enforcement Matter of Blu Graham*</u>

8        In 2012, Plaintiff Blu Graham ("Graham") purchased an 80% interest in a parcel of land in

9   Whitethorn on which "he has been slowly developing a homestead [] ever since." FAC (dkt. 31) at

10  36. At some point, Graham constructed a number of greenhouses on his property for the purpose

11  of growing produce for his family's restaurant; his property "also contains a fire road and [a]

12  rainwater-catchment pond for fire control." *Id*. On May 10, 2018, CEU issued a Notice of

13  Violations and Proposed Administrative Penalty, and a Notice to Abate Nuisance, to Graham and

14  Jessica Modic (who is not a party to this action) alleging the existence of three violations on the

15  land identified by Parcel No. 108-281-002-000 in Whitethorn, California. *See* RFJN (dkt. 32-2) at

16  139-43, 145-49. The nature of the alleged violations were: grading without permits (HCC § 331-

17  14); construction of buildings in violation of building, plumbing, and / or electrical codes (HCC §

18  331-28); and, a violation of the County's commercial cannabis ordinance (HCC § 314-55.4). *See*

19  *id*. at 141, 147.

20       As set forth in the CEU's summary of the Graham code enforcement matter, the

21  investigation into his property "relied on high-resolution satellite data interpolated with relevant

22  Geographic Information Science [] data as well as permit records of the Humboldt County

23  Planning and Building Department and related government agencies in order to identify properties

24  engaged in unpermitted cannabis cultivation and to assess code violations related to unpermitted

25  development of the property." *Id*. at 164. While the FAC alleges that Graham "was not cultivating

26  cannabis on his property and [that] no infrastructure on his property supported cannabis

27  cultivation," the FAC does not state that Graham disputes the other two alleged violations. *See*

28  FAC (dkt. 31) at 36-43. Nevertheless, Graham contends that "[o]n or about May 12, 2018, the

1    County published [a notice] in a local newspaper that [Graham's] property was under an

2    abatement order relating to illegal [cannabis] cultivation," which "caused him stress and

3    embarrassment." *Id*. at 37.

4              On May 21, 2018, Graham filed an appeal request which "disputed the [CEU's]

5    determination that a violation exists but also stated that the requested corrective actions would

6    commence [] [and] satellite review of visible abatement efforts on the subject property revealed

7    that roughly within the 10-date abatement period that the unpermitted greenhouse/hoophouse

8    structures cited as violations had been removed from the property [but that] [t]wo

9    greenhouse/hoophouse structures on [the] [S]outh portion of [the] property were re-constructed in

10   2019; however, this construction was consistent with an approved building permit application

11   received for constructing two Agricultural Exempt greenhouse structures." RFJN (dkt. 32-2) at

12   164-65. The upshot was that, from CEU's perspective, "two of the three cited violations were

13   timely abated and [were] not of concern for [the] [appeal] hearing," but that "the unpermitted

14   grading violation had not been corrected or resolved." *Id*. at 165.

15             Over the next several years, the County offered Graham several opportunities to settle the

16   remaining dispute about the unpermitted grading violation. *See* FAC (dkt. 31) at 39-40. In July of

17   2018, a County official "acknowledged that [Graham's] pond may be for fire prevention," but also

18   noted that he "had evidence that [the] grading was done with the intent to support cannabis

19   infrastructure" – an assertion which Graham disputed, resulting in his rejection of a settlement

20   offer. *Id*. at 39. In September of 2018, the County proposed another settlement officer that

21   required Graham to admit he had graded the land for unpermitted cannabis cultivation – once

22   again, Graham rejected the offer. *Id*. A similar agreement was proposed in early 2019 which

23   Graham also rejected. *Id*. at 40. The aforementioned agreements all contained penalty provisions

24   that required Graham to pay a sum ranging from $10,000 to $20,000. *See id*. at 39-40. However, in

25   August of 2021, the County offered Graham a no-penalty settlement agreement that proposed the

26   re-grading and filling of the pond in question which Graham also refused to sign "because the

27   offer required him to accept responsibility for the County's [reportedly] baseless claim that he was

28   cultivating cannabis." *Id*. at 40; *see also* RFJN (dkt. 32-2) at 168-70.

After a good bit of more back-and-forth, during which Graham repeatedly expressed that he wanted to keep the pond for firefighting purposes (*see id*. at 182-83; *see also* FAC (dkt. 31) at 40-42), his case finally came on for an administrative hearing, which was scheduled for October 14, 2022. *Id*. at 41. The only remaining violation at issue for the hearing was the unpermitted grading (as set forth in the above-discussed summary of Graham's code enforcement matter, Graham's prior removal of the unpermitted structures meant that "two of the three cited violations were timely abated."). *See* RFJN (dkt. 32-2) at 164-65. The FAC appears to imply that Graham only became aware of this in the lead-up to the hearing in 2022, rather than years earlier when his own removal of the unpermitted greenhouses and their reconstruction in compliance with the permitting process had been undertaken. *See* FAC (dkt. 31) at ¶¶ 387, 388. Prior to the hearing, however, Graham contacted the County and requested a meeting with Defendant Ford (Director of the County's Planning and Building Department) ("Ford"); thereafter, Graham met with Ford and other county officials on September 26, 2022. *Id*. at ¶¶ 393, 394. During that meeting, Graham and Ford agreed to resolve Graham's remaining violation (unpermitted grading) as such: (1) Graham would, there-and-then, apply and pay for a grading permit using a hand-drawn site plan and a letter he had previously procured from an engineer finding that the site was stable; and, (2) by paying the County's administrative costs (occasioned in the course of Graham's code enforcement matter). *See* RFJN (dkt. 32-2) at 235. Graham's grading permit was accepted the same day without the need to pay any filing fee with the proviso that Graham would pay the application fee when he would later "pull the permit." *Id*. Graham confirmed his agreement via email correspondence with Ford in which he expressed his agreement and stated that he was dropping off a check for the administrative fees that day. *Id*. That day, Graham rendered payment to the County for $3,747.29 in administrative fees associated with his case. *See* FAC (dkt. 31) at 43. Pursuant to this agreement, the County then cancelled Graham's appeal hearing; the County also refunded Graham $2,951.18 of what he paid in administrative fees (*see* RFJN (dkt. 32-2) at 243); and, at the end of the day, Graham ended up paying just under $800 to resolve his code enforcement case – a sum which presumably included his permit fee. *See id*. at 242-49 (settlement packet); *see also* FAC (dkt. 31) at 43. With the consummation of this agreement, and the issuance of his grading permit,

1  dated October 3, 2022, Graham's code enforcement matter was resolved. *See* RFJN (dkt. 32-2) at

2  251.

3  <u>*The Code Enforcement Matter of Rhonda Olson*</u>

4  In September of 2020, Plaintiff Olson purchased three adjacent parcels of land near her

5  house in Orleans, California, for a combined sum of $60,000. *See* FAC (dkt. 31) at 44. One or

6  more of the parcels "came scattered with junk and needed renovations," and Olson intended to use

7  the parcels "to provide housing for her family and close friends in the properties' existing homes

8  and to build affordable housing that she could sell on the undeveloped parcel." *Id.* at ¶¶ 411, 412.

9  The properties in question were located at 1030 and 1133 Red Cap Road; and, in the recorded

10  deed (recording their purchase by Rhonda Olson from Paul Zaccardo and Kevin Penny on behalf

11  of "Lb 4 Lb Corporation") the parcels were respectively identified as APN / Parcel Id. Nos. 529-

12  171-033-000 ("Parcel-1"), 529-181-036-000 ("Parcel-2"), and 529-181-038-000 ("Parcel-3"). *See*

13  RFJN (dkt. 32-2) at 519-24. The properties in question had been – for quite some time – the

14  subject of code violation enforcement actions. *See id.* at 286-88, 290-94.

15  On April 18, 2018, as to Parcel-1, Paul Zaccardo was issued a Notice of Violation and

16  Proposed Administrative Civil Penalty and a Notice to Abate asserting two violations –

17  construction of structures in violation of building, plumbing, and / or electrical codes, and a

18  violation of the commercial cannabis cultivation ordinance. *Id.* at 276-88. Remedying the

19  violations would have involved applying for and obtaining permits to develop and implement a

20  restoration plan for the unpermitted structures; and, ceasing the commercial cultivation operations

21  and removing the supporting infrastructure while applying for and obtaining permits to develop

22  and implement a restoration plan. *Id.* at 279.

23  On August 2, 2020, weeks before Olson's purchase, police executed a search warrant on

24  Parcel-1 and two neighboring properties; the agencies onsite were the CEU, the California

25  Department of Fish and Wildlife, the California Department of Food and Agriculture, the

26  Department of Justice, the National Guard, and the Humboldt County Hazardous Materials Unit.

27  *See id.* at 290-91. During the course of this inspection, the CEU inspector found that all three

28  properties "were working in concert as one large cannabis cultivation operation." *Id.* at 291; *see*

United States District Court
Northern District of California

United States District Court
Northern District of California

*also id*. at 298 (satellite imagery of the three adjacent parcels clearly shows a combined operation). As it related to the property that would be purchased by Olson the following month, the CEU inspector noted the following condition: the presence of two unpermitted structures (greenhouses over 120 sq. ft. in size that had been erected without the necessary electrical or building permits) situated atop a 5,700 sq. ft. area of graded land (for which a grading permit had never been secured). *Id*. at 291-92, 295 (constituting violations of HCC §§ 314-55.4, 331-14. 521-4, and 321-28). One greenhouse was an 1,800 sq. ft. structure with a metal frame, wood bracing, and electrical wiring; the second was an 1,100 sq. ft. structure with a PVC frame, wood bracing, and electrical wiring. *Id*. at 295. The result of the inspection, as to Parcel-1, was the identification of six violations: (1) grading without permits (19,750 sq. ft.); (2) construction of structures in violation of building and electrical codes (16 counts); (3) violation of the commercial cannabis land use ordinance; (4) development in a Streamside Management Area without a permit (17 counts); (5) improper storage and removal of solid waste (2 counts); and, (6) use of a recreational home or mobile home as a residence (1 count). *Id*. at 297. The inspection report also noted that, "a Mark Zaccardo was located across the street and found to be associated with Lb 4 Lb LLC [and] [b]oth [he] and Paul Zaccardo have New York addresses and it is likely that the two are involved with a larger cannabis cultivation operation." *Id*.

Less than three weeks later, on September 8, 2020, on behalf of Lb 4 Lb LLC, Paul Zaccardo and Kevin Penny sold and conveyed Parcel-1, and two nearby properties (Parcel-2 and Parcel-3), to Plaintiff Olson in exchange for $60,000. *See id*. at 519-24; *see also* FAC (dkt. 31) at ¶ 410. Three days later, on September 11, 2020, a Notice of Violation and Proposed Administrative Penalty issued as to Parcel-2 naming Lb 4 Lb LLC as the responsible party, as well as another notice as to Parcel-1 (the previous notice as to Parcel-1, mentioned above, having been issued in April of 2018). *Id*. at 300-11. As to the violation details, Parcel-2 was assessed with six violations: (1) unpermitted commercial cannabis operation with approximately 2,400 sq. ft. of cultivation (Category-4 violation); (2) four structures constructed in violation of the applicable building and electrical codes (Category-4 violation); (3) grading without permits (Category-4 violation); (4) development in a mapped Streamside Management Area to facilitate commercial cannabis

14

1  cultivation activity (Category-4 violation); (5) junk and inoperable vehicles (Category-1

2  violation); and, (6) multiple piles of solid waste (Category-1 violation). *See* RFJN (dkt. 32-2) at

3  302. Regarding the violation details for the 2020 Notice for Parcel-1, CEU alleged three Category-

4  4 violations (violation of the cannabis land use ordinance; structures in violation of the building

5  and electrical code; and unpermitted grading) and a single Category-1 violation (improper storage

6  and removal of solid waste). *Id*. at 309. As reflected in all of the above-cited records – the County

7  had not issued a single notice of violation naming Olson as the responsible party for the violations

8  that already existed on Parcel-1 and Parcel-2 in the aftermath of her purchase of the three parcels

9  of land at 1030 and 1133 Red Cap Road.

10      A few weeks after her purchase of the properties in question, a consultant hired by Olson

11  performed a detailed site assessment and communicated it to CEU by way of a response to the

12  violation notices. *See id*. at 319-26. In addition to recommending (presumably to Olson) the

13  removal of the unpermitted structures, junked vehicles, and solid waste – Olson's consultant's

14  assessment inquired from CEU whether Olson would be responsible for resolving the permitting

15  issues on the subject properties. *Id*. at 325. Further, the consultant noted that Olson was attempting

16  to communicate with the prior owners "to determine if they will return to resolve these issues,"

17  including attempting to persuade the previous owners to remove the junked vehicles. *Id*. at 326. At

18  bottom, Olson's consultant requested "a year extension of time before the ten (10) day expiration

19  of the violation notices to allow adequate time for corrective actions to be implemented." *Id*.

20      A little over five months later, Olson communicated with the CEU to inquire further about

21  the violations. *See id*. at 313-17. In one email, Olson noted the existence of a tunnel of some sort

22  that had been constructed under one of the structures that also needed to be addressed and asked if

23  she could set up a meeting with CEU officials onsite "to address the issues from the previous

24  owners." *Id*. at 316. In turn, CEU officials informed her that the properties she had recently

25  purchased all had active code enforcement cases and that "[b]efore any permits for development

26  can be issued[,] the code enforcement case and associated violations must all be cleared and the

27  case closed." *Id*. at 315. That same day, Olson and a consulting firm (Trinity Valley Consulting

28  Engineers) assisting her asked CEU for the details of the violations for the three parcels. *See id*. at

313-14. The following morning, CEU responded with the details of the violations that existed on each parcel, as well as setting forth the following remedial actions required for resolution: (1) Parcel-1 required the removal of unpermitted structures (greenhouses), removal of solid waste, and contracting with an engineer to resolve unpermitted grading (which might not require a grading plan due to the seismic instability rating); (2) Parcel-2 required removal of unpermitted greenhouses, contracting with an engineer to resolve the unpermitted grading of the flats (for which a grading plan would be required), the removal of tanks located within the Streamside Management Area, the removal of solid waste, and the removal of a junked vehicle (a school bus); and, (3) Parcel-3 required the restoration of the residence back to its original use (*i.e.*, removing cannabis infrastructure), removal of all solid waste from the property, and contracting with an engineer to resolve the unpermitted tunnel underneath the rear storage shed on the property (for which a grading plan would be required). *Id*. at 313.

In April of 2022, when more than 18 months had passed from the time that Olson's consultant had asked for a 1-year extension of time and all the necessary corrective actions had not been effected, the County served a new Notice of Violation and Proposed Administrative Civil Penalty and a Notice to Abate Nuisance naming Olson as the responsible party as to the violations on Parcel-1. *See id*. at 328-37, 346-436. This notice alleged a Category-1 violation (multiple piles of solid waste), and three Category-4 violations (unpermitted cannabis operation, unpermitted grading, and structures in violation of applicable building and electrical codes). *See id*. at 331. On April 30, 2022, Olson requested an appeal hearing. *See id*. at 336-37.

In May of 2022, a third consultant representing Olson (DTN Engineering, Consulting, and Permitting) submitted a "Current Plan to Lift the Abatement." *See id*. at 339-34. This plan proposed various remedial actions for each of the three parcels including: filling the existing cultivation holes (each of which was approximately 3 ft. in diameter and 2 ft. deep) as well as compacting the soil and putting erosion control measures in place (while assuming that an engineered grading plan would not be required); using approximately 45 yards of a self-consolidating cementing material to fill the tunnel beneath the shed; demolition of the shed; preparing a soils report; and, site preparation. *Id*. at 340-44. In addition to the construction costs,

1    the proposal included budgeted sums for engineering fees, permitting fees, and an additional 25%

2    for contingencies. *Id*. at 344. Including the extra 25% allowance for contingencies, Olson's third

3    consultant estimated the total project cost (for all three parcels) as $61,125.00. *Id*. On May 18,

4    2022, CEU responded to the following effect: (1) as to Parcel-3, CEU agreed with the consultant's

5    proposed resolution plan; (2) as to Parcel-2, CEU added that the cultivation refuse and

6    infrastructure, and the water tanks that had been installed in the Streamside Management Area,

7    must be removed, that the 10,000 sq. ft. graded area in the Northeast corner of the parcel must be

8    permitted, and that the accessory building with a nexus to cannabis cultivation must either be

9    permitted or demolished; and, (3) as to Parcel-1, the unpermitted cannabis cultivation structures,

10   infrastructure, and solid waste should also be removed. *Id*. at 438-39. Defendants report that

11   "Olson agreed to comply, but the April 2022 NOV remains open [and] [t]he County remains

12   hopeful of resolution." *See* Defs.' Mot. (dkt. 32) at 16.

13          The above-cited and judicially-noticed information about the course of Olson's code

14   enforcement case has been omitted from the FAC. Instead, the FAC attempts to paint an

15   inaccurate portrait of these events by amassing the various speculative proposed penalties together

16   and stating that because Olson "faces [] a still staggering $7,470,000" in proposed administrative

17   civil penalties, she "developed shingles on her face due to the stress of the millions of dollars in

18   fines hanging over her head and she temporarily lost the use of her left eye [while] [t]o date, the

19   County has not provided her a hearing or issued her the permits she needs to develop her

20   property." *See* FAC (dkt. 31) at 48.

21          *The Code Enforcement Matter of Cyro Glad*

22          On September 1, 2018, Glad purchased a 40-acre property (identified as APN 218-041-

23   0030 and -006)) from Patrick Woods and Gayna Uransky; at the time of purchase, "there was a

24   greenhouse and several hoop houses scattered around the front parcel." *See* FAC (dkt. 31) at 49;

25   *see also* RFJN (dkt. 32-2) at 528-30 (recorded grant deed). Between May and August of 2018,

26   using satellite imagery, the County identified various code violations on the property. *See id*. at

27   532-38. On November 2, 2018, the County served Glad with a Notice of Violation (*see* FAC (dkt.

28   31) at 49) and a Notice to Abate (*see* RFJN (dkt. 32-2) at 540-45). The cited violations (and the

United States District Court
Northern District of California

necessary corrective actions) were as follows: unpermitted grading (obtain permits and implement a restoration plan); structures in violation of building, plumbing, and / or electrical codes (remove unpermitted structures by first obtaining demolition permits); unpermitted commercial cannabis cultivation (cease commercial cannabis cultivation activity and remove all supporting infrastructure, and obtain permits to develop and implement a restoration plan); impermissible development within a Streamside Management Area (remove impermanent materials from waterway and, if applicable, submit restoration plan to remediate). *Id*. at 542. The Notice was served on Glad by mail at the same P.O. Box address in Redway, California, that was listed on the recorded grant deed under which he took title to the subject property. *Id*. at 540; *see also id*. at 528.

On November 16, 2018, Glad submitted forms requesting an appeal hearing, but noted therein that "all nuisances are in [the] process of being removed, cleaned, and [brought into compliance] with county code standards." *Id*. at 565-66; *see also* FAC (dkt. 31) at ¶¶ 475, 476. Glad then hired an engineer to assess the property while "he continued his work of cleaning up the mess that the prior occupants had left." *Id*. at ¶ 477. Glad submits that, in February of 2019, he sent Defendant Ford a letter "to plead with him and seek compassion of the violations the County cited [him] for just weeks after he purchased the property," and maintains that he "never received a response." *Id*. at ¶¶ 478, 479. Glad submits that "[o]ver four years have passed since [he] requested his initial hearing, but the County has still not scheduled one for him." *Id*. at ¶ 480. However, county records indicate that CEU sent Glad a letter on May 6, 2021 (addressed to that same P.O. Box address in Redway, California) asking him whether or not the County should schedule his appeal hearing, or if he preferred to enter into a compliance agreement and settle and resolve his case. *See id*. at 569-70. The record does not indicate any further action on Glad's case by either Glad or the County.

## LEGAL STANDARDS

The currently-pending motion to dismiss (dkt. 32), filed pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), asserts a lack of subject matter jurisdiction and challenges the sufficiency of the allegations set forth in the FAC. When evaluating 12(b)(1) challenges to the court's subject-

1  matter jurisdiction, it should be noted that Plaintiffs bear the burden of proving jurisdiction at the

2  time the action is commenced. *See Tosco Corp. v. Cmtys. for Better Env't*, 236 F.3d 495, 499 (9th

3  Cir. 2001), overruled on other grounds by *Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010); *see*

4  *also Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).

5  "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing

6  independent obligation to determine whether subject-matter jurisdiction exists." *Leeson v.*

7  *Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation

8  marks and citations omitted). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe*

9  *Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack "asserts that the

10  allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction."

11  *Id.* When considering this type of challenge, courts are required to "accept as true the allegations

12  of the complaint." *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189

13  (9th Cir. 2001); *see also Miranda v. Reno*, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001). On the other

14  hand, in a factual attack, "the challenger disputes the truth of the allegations that, by themselves,

15  would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. In resolving a factual

16  attack on jurisdiction, courts need not presume the truthfulness of the plaintiff's allegations and

17  they may review evidence beyond the complaint without converting the motion to dismiss into a

18  motion for summary judgment. *See id.*; *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

19  2000). Once a factual challenge has been raised, the party opposing dismissal must present

20  "affidavits or other evidence necessary to satisfy its burden of establishing that the court, in fact,

21  possesses subject matter jurisdiction." *Safe Air*, 373 F.3d at 1039. (quoting *Savage v. Glendale*

22  *Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)); *see also Colwell v. Dep't of Health &*

23  *Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009) (quoting *St. Clair v. City of Chico*, 880 F.2d

24  199, 201 (9th Cir. 1989)).

25       In reviewing the sufficiency of a complaint in light of a request to dismiss under Rule

26  12(b)(6), before the presentation of any evidence either by affidavit or admissions, the court's task

27  is limited – the issue is not whether a plaintiff will ultimately prevail, instead the issue is whether a

28  plaintiff is even entitled to offer evidence to support the claims. *See Scheuer v. Rhodes*, 416 U.S.

United States District Court
Northern District of California

232, 236 (1974); *see also Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Dismissal is proper when an operative complaint either fails to advance "a cognizable legal theory," or fails to allege "sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *see also Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).

In evaluating such motions, courts must: (1) construe the operative complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996). However, courts are not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Courts "need not assume the truth of legal conclusions cast in the form of factual allegations," *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643, n. 2 (9th Cir. 1986), and therefore courts must not "assume that the [plaintiff] can prove facts that [he or she] has not alleged or that the defendants have violated . . . laws in ways that have not been alleged." *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

To survive dismissal under the standards associated with Rule 12(b)(6), while complaints do not necessarily need to be hyper-detailed, they do need to contain enough relevant factual allegations such as to establish the grounds of a plaintiff's entitlement to relief – and, doing so "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 557). Under these standards, courts follow a "two-prong approach" for addressing a motion to dismiss: (1) first, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions, threadbare recitals of the elements of a cause of action, or conclusory statements; and, (2) only a complaint that states a *plausible* claim for relief

survives a motion to dismiss. Plausibility is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense; however, where the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint may have alleged, but it has failed to "show," "that the pleader is entitled to relief" as required by Fed. Rule Civ. Proc. 8(a)(2). *See generally Iqbal*, 556 U.S. at 678-79.

In light of these principles, a court considering a Rule 12(b)(6) motion to dismiss can choose to begin by identifying allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id*. at 679. While legal conclusions can provide the framework of a complaint, they must be supported by well-pleaded factual allegations. *Id*. When a complaint does in fact contain well-pleaded and factual allegations, courts will assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. In short, for a complaint to survive a Rule 12(b)(6) motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must plausibly suggest a claim entitling the plaintiff to relief. *See Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009).

As to the nature of dismissals, leave to amend should be granted unless it is clear that amendment would be futile because further amendments cannot remedy the defects in the complaint. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment."); *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir. 2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile.") (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### DISCUSSION

Pleading rules mandate that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). While the rules adopt a flexible pleading policy, a complaint must give fair notice and state the elements of the claim plainly and succinctly. *See Jones v. Community Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984). Even after an amendment (*compare* dkt. 1 with dkt. 31), the FAC in this case is anything but a

1   short plain statement of the factual allegations underlying Plaintiffs' claims for relief. Spanning 70

2   pages, with more than 600 numbered paragraphs, the FAC is overwhelmingly dominated by legal

3   arguments couched as factual allegations, unreasonable inferences, unwarranted deductions,

4   conclusory assertions, unjustified labels, and hyperbole. As to the relatively small number of

5   paragraphs that do contain actual allegations of fact, the vast majority of that content is either

6   irrelevant or simply implausible.

7         By way of example, the FAC's "statement of facts" begins with the following series of

8   statements:

9              For decades, the County has attracted off-the-grid homesteaders,
               hippies, and other counterculture and anti-government types. As a
10             likely result of the County's geographic, economic, and
               political makeup, Humboldt has scarcely enforced its building code as
11             thousands of its residents built homes and accessory structures and
               graded land without first obtaining a permit from the County. The
12             County allowed this culture of unpermitted development to grow
               unabated. After Californians voted to legalize the recreational use of
13             marijuana, however, Humboldt County discovered a newfound rigor
               for enforcing the permitting requirements and nuisance laws that it
14             had overlooked or left unenforced for decades. The County amended
               its code to authorize the Planning and Building Department to police
15             cannabis cultivation in tandem with these nuisances and permitting
               requirements. Faced with the same constraints that made code
16             enforcement difficult historically in Humboldt, the Planning and
               Building Department devised a strategy to supercharge its abatement
17             regime: *ticket everyone* and force the accused to prove their
               innocence.

18         FAC (dkt. 31) at ¶¶ 34-39 (emphasis in original).

19   The above-quoted passage is emblematic of the overwhelming majority of the FAC's 600

20   numbered paragraphs. Indeed, because the FAC paints such a distorted picture of the interactions

21   between Plaintiffs and the County, Defendants have asked the court to take judicial notice of

22   approximately 600 pages of the records and reports of administrative agencies, as well as a

23   number of local laws, ordinances and regulations, law enforcement records, a court decision, and

24   other official county records and documents. *See generally* RFJN (dkt. 32-2) at 1-570; *see also*

25   SRFJN (dkt. 37-2) at 1-50. Plaintiffs have lodged an objection to the Defendants' RFJN. *See* Pls.'

26   Obj. (dkt. 36-1) at 2. However, the objection is limited to a single sentence maintaining that: "[t]he

27   Plaintiffs object to the County's request for judicial notice in support of their motion to dismiss []

28   on grounds that it impermissibly seeks to introduce facts that are [] beyond the allegations of the

United States District Court
Northern District of California

1    subject pleading and thus impermissibly converts their motion into a motion for summary

2    judgment, and [introduces facts that are] not judicially noticeable." *See id*. (citing Fed. R. Evid.

3    201). Other than this single unspecific and unsupported sentence, Plaintiffs' objection offers

4    nothing.

5                                  ***Judicial Notice***

6            In evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of the

7    complaint and material properly submitted with the complaint. *See Van Buskirk v. Cable News

8    Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner &

9    Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by reference doctrine,

10   however, the court may also consider documents "whose contents are alleged in a complaint and

11   whose authenticity no party questions, but which are not physically attached to the pleading."

12   *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds* by *Galbraith v.

13   County of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002). The court may treat such documents

14   as "part of the complaint, and thus may assume that [their] contents are true for purposes of a

15   motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

16   2003). This doctrine applies to the majority of the material from Defendants' RFJN cited herein as

17   those code enforcement matters, the local statutory framework, and agency records in question

18   have been discussed throughout the allegations in the FAC; moreover, while Plaintiffs' have

19   lodged a *pro forma* objection, they have not questioned their accuracy or their authenticity (*see*

20   dkt. 36-1).

21           Additionally, contrary to Plaintiffs' suggestion, at the motion to dismiss phase, the court

22   may take judicial notice of certain items without converting the motion to dismiss into one for

23   summary judgment. *See Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). For instance, the

24   court may take judicial notice of facts "not subject to reasonable dispute" because they are either:

25   generally known within the trial court's territorial jurisdiction; or can be accurately and readily

26   determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201;

27   *see also Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that the court may

28   take judicial notice of "undisputed matters of public record," including "documents on file in

United States District Court
Northern District of California

23

1   federal or state courts," as well as "documents not attached to a complaint . . . if no party questions

2   their authenticity and the complaint relies on those documents").

3          Because Plaintiffs do not offer any factual dispute about any of the contents of Defendants'

4   RFJN cited herein (as well as Defendants' SRFJN) – namely, the records and reports of

5   administrative agencies, as well as the local laws, ordinances and regulations, law enforcement

6   records, a court decision, and the other official county records and documents – judicial notice is

7   proper. *See Aids Healthcare Found., Inc.*, 208 F. Supp. 3d at 1098 n.2 (citing *Colony Cove Props.*,

8   *LLC*, 640 F.3d at 954-56 n.3-4) (taking judicial notice of undisputed contents of local ordinances

9   and resolutions)); *see also Apartment Ass'n of L.A. Cnty.*, 10 F.4th at 910 n.2; *see also Barron*, 13

10  F.3d at 1377 (judicial notice can be taken of the "[r]ecords and reports of administrative bodies");

11  *see also United States v. 14.02 Acres*, 547 F.3d at 955 (courts may take judicial notice of matters

12  of public record and the reports of administrative bodies and consider them without converting a

13  Rule 12 motion into one for summary judgment). Thus, Plaintiffs' unspecific and unsupported

14  objection (dkt. 36-1) is **OVERRULED** and Defendants' RFJN and SRFJN (dkts. 32-2 and 37-2)

15  are **GRANTED**.

16          ***Plaintiffs' Standing to Bring Claim-4 (Excessive Fines and Fees)***

17          Defendants contend that all of the Plaintiffs in this case lack Article III standing "for their

18  claims asserting unconstitutional fees and fines" because of a failure to allege a constitutionally

19  cognizable injury in fact. *See* Defs.' Mot. (dkt. 32) at 17-18. As to Graham, Defendants note that

20  he received his grading permit and paid only $523 permit fees; he is no longer facing any

21  proposed fines; the County resolved his case and refunded all fees (with the exception of the fees

22  associated with his grading permit); thus, Graham owes no penalties. *Id.* at 17. As to the

23  Thomases, Defendants point out that they appealed a violation notice in which they were not

24  named as responsible parties; nevertheless, they entered into a compliance agreement, as a result

25  of which the County never issued any notice in their names; it is speculative whether they will

26  ever be made to pay any fine or penalty at all because "they are seeking to resolve the violations

27  [that attached to the land they purchased] under a new policy allowing them to maintain an

28  unpermitted structure for non-cannabis uses[,] [t]hus, their case is hypothetical." *Id.* As to Olson,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants claim that, while she appealed an April 2022 notice naming her as the responsible

2    party, her third consulting engineer has since contacted the County to resolve the violations that

3    attached to the land she purchased; accordingly, Defendants submit that because she also may

4    never be made to pay any fine, her excessive fine claim is also speculative. *Id*. at 18. Lastly, as to

5    Glad's case, Defendants note that neither have any fines actually been imposed, nor have any been

6    paid; the proposed administrative penalties set forth in his notice (and those of the other Plaintiffs)

7    "are proposed but not imposed [and] Glad may resolve all violations as Graham did and pay no

8    fine or administrative fee." *Id*. at 18.

9          Plaintiffs disagree and submit that they do "have standing to challenge the process they're

10    stuck in." *See* Pls.' Opp. (Dkt. 36) at 13-14. While overlooking the distinction between proposed

11    fines (as set forth in HCC §§ 352-6(a),(b) and 352-7), and finalized fines that would be subject to

12    collections actions (as set forth in HCC §§ 352-12(c) and 352-14(a)), Plaintiffs simply declare that

13    "[t]hey have had daily fines accrue against them." Pls.' Mot. (dkt. 36)  at 13. Plaintiffs add that

14    "they have hired engineers and lawyers in response to the County's sanctions," and that "[t]hey

15    have also racked up administrative fees by contesting their cases and are now subject to treble fees

16    for retroactive permits for any structure cited with a cannabis violation." *Id*. Further, Plaintiffs

17    submit that they have "incurred reputational damage from the County's publication of its false

18    charges . . . [and that the violation notices have] made Plaintiffs ineligible for permits to develop

19    their property while their abatement cases are outstanding." *Id*. Plaintiffs also dispute that Graham

20    only paid $523 in permit fees – instead, they contend that Graham's permit "really cost $936 . . .

21    in addition to the $795.92 that [he] paid in administrative fees . . . [and] [h]is payment of these

22    fees confers standing, as does the County's unconstitutional denial of his Safe Home permit until

23    he settled his abatement case." *Id*. at 13-14. Lastly, Plaintiffs claim that even the "proposed"

24    nature of the fines set forth in the initial violation notices (which can be reduced or eliminated at

25    no fewer than three junctures in the administrative and judicial review process – that is, by the

26    hearing officer, by Director Ford, or during review in the Humboldt County Superior Court) – is

27    "enough to confer standing because they are 'certainly impending' and 'there is a substantial risk

28    that the harm will occur . . . [t]hus, a 'credible threat of enforcement' is enough for standing." *Id*.

at 14 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 161, 165 (2014)).

Article III limits federal judicial jurisdiction to "Cases" and "Controversies." *See* U.S. Const. Art. III §2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List*, 573 U.S. at 157 (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 560 (1992)). When viewed through that lens, "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. The first requirement is that a plaintiff must have suffered an "injury in fact," that is, an invasion of a legally protected interest which is both concrete and particularized, as well as being actual or imminent, as opposed to conjectural, speculative, or hypothetical. *See Lujan*, 504 U.S. at 560. Second, there must be a nexus of causation between the injury and the conduct that has been complained of; in other words, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" *Id*. at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)). The third requirement – redressability – is that it must be likely, as opposed to merely speculative, that the injury will actually be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 37, 43).

The court should also note at this point that "[t]he limitation on federal subject-matter jurisdiction to 'cases or controversies' has both a standing and a ripeness component, which are two sides of the same coin." *See Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1178 (D.N.M. 2011). A "[c]orrect analysis in terms of ripeness tells us *when* a proper party may bring an action and analysis in terms of standing tells us *who* may bring the action." *See Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) (emphasis in original). The two doctrines, of course, "'originate' from the same Article III limitation.'" *Susan B. Anthony List*, 573 U.S. at 157 n.5 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)). Sometimes, as appears to be the case here, standing and ripeness "boil down to the same question." *See Susan B. Anthony List*, 573 U.S. at 157 n.5; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).

Defendants' standing argument is addressed to Plaintiffs' "claims asserting unconstitutional fees and fines." *See* Defs.' Mot. (dkt. 32) at 18. Therefore, Plaintiffs' assertions to the effect that "they hired engineers and lawyers," or that "they have already incurred reputational damage from the County's publication of its [reportedly] false charges," or that the violation notices supposedly "made the Plaintiffs ineligible for permits to develop their property while their abatement cases are outstanding" are irrelevant and of no import when analyzing the question of whether these Plaintiffs have standing to bring a claim for excessive fines and fees under the Eight and Fourteenth Amendments (Claim-4) (*see* FAC (dkt. 31) at 64-66). The FAC focuses this claim on the County's alleged "policy, practice, and custom of levying Category 4 penalties and ordering the destruction of property for violations of the county code . . . that the County alleges have a nexus to illegal cultivation of cannabis." *Id.* at 64. In short, the FAC's excessive fines and fees claim (Count-4) is clearly directed to the Category-4 fines that appear in the "proposed" fine sections of the notices of violation involved in each of the Plaintiffs' code enforcement cases. *See id.* at ¶¶ 565, 570, 571, 573-75, 577-78. Strangely, Plaintiffs also contend that "[t]he County's policy of requiring that landowners return property to its 'pre-cannabis' state' are also punitive fines within the meaning of the Eighth Amendment." *See id.* at ¶ 576.

"The Eighth Amendment's Excessive Fines clause 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (quoting *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)) (emphasis removed). "'The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law.'" *Austin*, 509 U.S. at 610 (quoting *United States v. Halper*, 490 U.S. 435, 447-48 (1989)). Importantly, "[t]he Clause prohibits only the imposition of 'excessive' fines, and a fine that serves purely remedial purposes cannot be considered 'excessive' in any event." *Austin*, 509 U.S. at 622 n.14. Accordingly, because it cannot be reasonably contended – or considered "plausible," to put it in more fitting verbiage (*see Iqbal*, 556 U.S. at 678-79) – that "[t]he County's policy of requiring that landowners return property to its 'pre-cannabis' state'" is punitive within the meaning of the Eighth Amendment, this allegation (*see* FAC (dkt. 31) at ¶ 576) too is of no import. This is so

1    because requiring landowners to conform their property to a non-illegal use is not punitive and

2    clearly "serves purely remedial purposes which cannot be considered 'excessive' in any event."

3    *See Austin*, 509 U.S. at 622 n.14

4         As to the FAC's remaining allegations supporting Plaintiffs' excessive fines and fees claim

5    (to wit, the proposed fines), Plaintiffs' assertions as to their supposed injuries ring hollow. No

6    party has actually paid a fine. It should also not escape mention that all of these Plaintiffs (either

7    knowingly or with constructive knowledge) purchased properties with presumably obvious pre-

8    existing code violations – in other words, they all bought their way into existing code enforcement

9    matters. Having done so affects the traceability analysis under the second prong of the standing

10   analysis. *See Lujan*, 504 U.S. at 560-61. Further, Graham's case is fully resolved and it is certain

11   that he will never pay a fine associated with the code enforcement matter described in this case

12   rendering his part of this claim moot. The Thomases' violation notice did not even name them as a

13   responsible party, they have entered into a compliance agreement, and it would be highly

14   speculative to assume that they will ever pay a fine. The same is true for Olson and Glad,

15   assuming that they would ever pay a fine in any amount would also require a great deal of

16   speculation – let alone assuming that they would pay an 'excessive' fine.

17        In short, given that no Plaintiff has sustained any actual injury in the nature of excessive

18   fines and fees in violation of the Eighth and Fourteenth Amendments, and given the fact that any

19   future injury is speculative at best, Plaintiffs lacks standing to pursue a claim that they have been

20   subjected to "excessive fines and fees" as described in Claim-4. *See generally Texas v. United*

21   *States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent

22   future events that may not occur as anticipated, or indeed may not occur at all.") (internal

23   quotation marks omitted); *see also Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d

24   957, 983-84 (9th Cir. 2011) (procedural due process claims ripen only when a distinct property

25   deprivation has *already* occurred, thereby warranting federal court's consideration of whether the

26   process due was provided); *Witt v. Dep't of Air Force*, 527 F.3d 806, 812-13 (9th Cir. 2008) (due

27   process claim not ripe for adjudication where injury asserted may or may not occur); *Taylor v.*

28   *Def. Fin. & Accounting Serv.*, No. CIV. 2:12-2466 WBS DAD, 2014 U.S. Dist. LEXIS 268, 2014

United States District Court
Northern District of California

28

WL 28820, at *14 (E.D. Cal. 2014) (neither the mere existence of unpaid debt, nor the mere notification that a debt was owed, constituted a deprivation of property, and even the initiation of collection efforts did not constitute a final deprivation of property where the debt was recalled and recoupment efforts ceased); *see also Sanders v. Dickerson*, No. CV-09-299-ST, 2010 U.S. Dist. LEXIS 100132, 2010 WL 3824077, at *10 (D. Or. 2010) (pretrial detainee's claim that county's fees for booking, housing, medical services, copying, and mailing amounted to punishment before conviction fails where he was never actually charged the fees and county did not seek reimbursement), *adopted in full*, 2010 U.S. Dist. LEXIS 100151, 2010 WL 3805511 (D. Or. 2010). Accordingly, because it is clear that these defects cannot be remedied by further amendment, Claim-4 (excessive fines and fees) is **DISMISSED with prejudice**.

### *Ripeness and the County's Alleged Denial of Land-Use Permits*

Throughout the FAC, Plaintiffs repeatedly complain about the County's alleged policy and practice of denying land-use permits to landowners with outstanding abatement orders, even when such requested permits have no nexus to the abatement order. *See* FAC (dkt. 31) at ¶¶ 9, 44, 214-17, 220, 395, 508(c), 532, 549, 554. Plaintiffs have advanced this suggestion in support of Claim-1 (claiming violations of their procedural due process rights) (*see id*. at ¶ 508(c)), in support of Claim-2 (claiming violations of their substantive due process rights) (*see id*. at ¶ 532), and in support of Claim-3 (claiming violations under the unconstitutional conditions doctrine) (*see id*. at ¶¶ 549, 554). Defendants argue that Plaintiffs' land-use permit denial claims are unripe "until they apply for [such] permits and obtain a final decision on their applications." *See* Defs.' Mot. (dkt. 32) at 18. In turn, Plaintiffs respond to the effect that "no Plaintiff is challenging the substantive denial of a permit," instead, "the Plaintiffs' claim is that the blanket denial of permits is part of an unconstitutional system of coercive penalties." Pls.' Mot. (dkt. 36) at 14. In conclusory fashion, Plaintiffs assert that they "have plausibly alleged that the County has a policy of denying permits to people facing abatement orders and has applied that policy to the Plaintiffs." *Id*. at 15. Lastly, Plaintiffs contend that there should be no ripeness issue as to their contentions on account of an allegation that Olson was told by someone employed by the County – during email correspondence – that no non-remedial permits would be issued for properties with open code

enforcement matters. *Id*. (citing FAC (dkt. 31) at ¶¶ 441-42. There is also the allegation that when Graham met with some County officials, he was told that the County would not issue any non-remedial permits for a property under an abatement order. *See id*. at ¶ 395.

Initially, the court will note that ripeness – as a concept – attaches to not only claims, but also to allegations. *See e.g.*, *Steadfast Ins. Co. v. Essex Portfolio LP*, No. 21-cv-02756-JSC, 2021 U.S. Dist. LEXIS 157987, at *11 (N.D. Cal. Aug. 20, 2021) ("Because Essex's claim that Steadfast breached the insurance contract is unripe, there is no ripe allegation that such breach was in bad faith."); see also *Tahoe-Sierra Pres. Council, Inc.v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1076 (9th Cir. 2003) ("We acknowledge, however, that one set of claims, asserted by the 10% Plaintiffs, alleges harm that has not yet been done; we analyze these unripe allegations in section III.B."). Moreover, in *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir. 1987), the Ninth Circuit interpreted *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), as requiring – for ripeness purposes – a final decision by the government which inflicts an actual, concrete harm upon the plaintiff property owner. More specifically, with a narrow exception for futility that is not applicable here, the *Kinzli* court determined that a final decision, inflicting a concrete harm, is ripe for adjudication when the property owner can show a rejected application. *See Kinzli*, 818 F.2d at 1454. The same is true for due process claims – allegations of harm that is yet to be experienced (*i.e.*, by complaining of permit denials without actually applying for one) are unripe. *See Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1261 (9th Cir. 1994) (substantive due process is violated at the moment the harm occurs); *see also Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9th Cir. 1988) (equal protection and due process challenges to county actions regarding land use become ripe when the plaintiff has received a final decision which inflicts concrete harm).

Here, Plaintiffs concede that they have not actually received any such final decisions by having had any such land-use permit applications rejected. *See* Pls. Mot. (dkt. 36) at 14. Instead, Plaintiffs rely on a pair of allegations to the effect that Olson and Graham were told by someone employed by the County that such permits would not be granted. *See* FAC (dkt. 31) at ¶¶ 395, 441-42. Plaintiffs' reliance on such a contention is unavailing as it fails to satisfy the finality

United States District Court
Northern District of California

United States District Court
Northern District of California

1    standard set forth in *Kinzli* and *Williamson County*, and the other authorities mentioned above. In

2    other words, the allegation about Olson's email correspondence, and Graham's conversation, do

3    not establish the infliction of concrete harm as would be the case with an actual land-use permit

4    application that had been submitted and rejected. Instead, Plaintiffs' approach relies on

5    speculative, rather than concrete, harm. For these reasons, the court agrees with Defendants that

6    Plaintiffs allegations about the blanket denial of land use permits (asserted in support of Claims 1,

7    2, and 3) are unripe and, therefore, will not be considered.

8                    ***Some of Plaintiffs' Claims are Time-Barred & Claim-5 is Foreclosed***

9           Defendants submit that "Plaintiffs' claims that the County's procedures for [its violation

10   notices] are unconstitutional are time-barred, as all issued more than 2 years before this action was

11   filed on October 5, 2022." *See* Defs.' Mot. (dkt. 32) at 19. In this vein, Defendants submit that all

12   of Plaintiffs' as-applied due process claims pertaining to the County's procedures for handling

13   these violation notices are time-barred. *Id*. Defendants also argue that to the extent Plaintiffs have

14   presented a facial challenge to the County's statutory framework for adjudicating the violation

15   notices in question, that too would be time-barred as the "ordinances [were] adopted in 2017 – 5

16   years before this suit." *Id*. Plaintiffs respond to the effect that "the unconstitutional conditions" of

17   which Graham is complaining continued until "mere weeks before he sued," and the injuries to the

18   Thomases, Olson, and Glad "are ongoing." *See* Pls.' Opp. (dkt. 36) at 16. Plaintiffs note that "they

19   each requested a hearing and remain ensnared in the very abatement process (such that it is) that

20   they're challenging" and that "[t]he County cannot seriously contend that it has trapped the

21   Plaintiffs in this interminable system for so long that the statute of limitations bars them from

22   trying to get out." *Id*.

23          Claims brought under § 1983 must conform to the forum state's statute of limitations for

24   personal injury claims. *See Action Apartment Ass'n v. Santa Monica Rent Control Op. Bd.*, 509

25   F.3d 1020, 1026 (9th Cir. 2007) (citing *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985)). In

26   California, that limitations period is 2 years. *See* Cal. Code Civ. P. § 335.1. As to accrual, this

27   court is bound to apply the, "know or should know of an injury," accrual rule to a constitutional

28   challenge of an ordinance or a statute brought pursuant to § 1983. *See Action Apartment Ass'n*,

509 F.3d at 1026-27 ("'Generally, the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury.'") (quoting *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084, 1086-87 (9th Cir. 1991) (". . . the action of the local government giving rise to a cause of action for a taking was the government's enactment of the ordinance itself.")).

Here, a number of Plaintiffs' claims have been presented well beyond the expiration of the applicable two-year limitations period. First, as Plaintiffs see it, Claim-4 (alleging excessive fines and fees) entails facial and as-applied challenges: to the County's statutory framework as to the fine amounts (*see* FAC (dkt. 31) at ¶ 580); as to requiring landowners to bring their properties into compliance with its code (*id*. at ¶ 581); and, as to the amounts of administrative fees involved in code enforcement cases (*id*. at ¶ 582). To the extent Plaintiffs have asserted facial challenges to the Humboldt County Code, those challenges have been filed well beyond the 2-year limitations period as the ordinances were enacted upwards of 5 years before the commencement of this action. To the extent Plaintiffs asserted as-applied challenges in this regard – with the exception of the Thomases' notices, those too have been filed beyond the 2-year limitations period because: (1) this action was commenced on October 5, 2022; (2) Graham's notice was issued on May 10, 2018; (3) the Olson property notices were issued on September 11, 2020 (days after she purchased the property); and, (4) Glad's notice was issued on November 2, 2018. However, no further action is necessary in this regard because the court has already dismissed Claim-4 with prejudice because, as described above, all Plaintiffs (including the Thomases) lack standing to bring such a claim.

Further, in Claim-5 (denial of a right to a jury in administrative hearings), Plaintiffs appear to present a facial challenge to Humboldt County's statutory framework because "[t]he County imposes civil penalties through a[n] administrative-enforcement scheme to minimize the expense and delay associated with pursuing remedies through the [civil or] criminal justice system." *See id*. at ¶ 594. Plaintiffs' novel contention in this regard boils down to the suggestion that because this administrative process entails "factual determination[s] of whether a landowner violated the code in order to grow marijuana without a permit," and because such determinations can supposedly "result[] in the deprivation of property and liberty as a punishment for the offense, the accused is

entitled to have a jury of their peers decide those facts." *See id*. at ¶ 598-99. To the extent that

Claim-5 is a facial challenge to the Humboldt County code-enforcement ordinances under the

Seventh and Fourteenth Amendments, the claim is clearly time-barred as the statutory framework

was enacted well beyond the applicable 2-year limitations period. *See generally De Anza*

*Properties,* 936 F.2d at 1086-87 (facial challenge under the takings clause accrues on enactment of

the ordinance itself); *see also Action Apartment Ass'n*, 509 F.3d at 1027 (facial substantive due

process challenge accrues on enactment of ordinance). In any event, to the extent that Claim-5 is

an as-applied challenge, it is foreclosed by well-established precedent setting forth that there is no

right to a jury trial in the sort of administrative hearing at issue here – something which Plaintiffs

appear to vaguely concede. *See* Pls.' Opp. (dkt. 36) at 33 ("The Plaintiffs recognize that the

discrete issue of Seventh Amendment incorporation is foreclosed by circuit precent . . . [and] ask

this Court to confirm as much, so that they may seek relief on appeal.")

While the Seventh Amendment right attaches in cases involving legal rather than equitable

claims (*see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989)), Plaintiffs' limited

concession (limited to Seventh Amendment incorporation) appears to ignore the broader problem

with Claim-5 – namely, that it has long since been established that legislatures may delegate fact-

finding powers to administrative agencies when governments sue in their sovereign capacities in

actions to enforce public rights. *See e.g., Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 450 (1977)

("At least in cases in which 'public rights' are being litigated - *e.g.*, cases in which the

Government sues in its sovereign capacity to enforce public rights created by statutes within the

power of Congress to enact - the Seventh Amendment does not prohibit Congress from assigning

the factfinding function and initial adjudication to an administrative forum with which the jury

would be incompatible."); *see also Stern v. Marshall*, 564 U.S. 462, 490-91 (2011) ("Shortly after

[*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (plurality

opinion)], the Court rejected the limitation of the public rights exception to actions involving the

Government as a party. The Court has continued, however, to limit the exception to cases in which

the claim at issue derives from a [] regulatory scheme, or in which resolution of the claim by an

expert Government agency is deemed essential to a limited regulatory objective within the

33

agency's authority. In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action."); *see also Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1424 (9th Cir. 1994) (concluding that the Seventh Amendment is inapplicable in government proceedings implicating public rights when a legislature has "provided [] a proper administrative forum for adjudicating [the] action."); *see also Jackson Water Works, Inc. v. Pub. Utils. Com.*, 793 F.2d 1090, 1096 (9th Cir. 1986) ("First, the state is not obligated under the federal Constitution to provide either a right of appeal or a jury trial . . . [and] [s]econd, the Supreme Court has recognized that the creation of administrative remedies may properly eliminate rights that may have been available in the judicial forum . . . [and in this case] [w]e agree . . . that the legislature could have rationally concluded that the public's interest would be better served by allowing the City to select the forum.").

The undersigned finds that Humboldt County's code-enforcement regulatory framework clearly fits into this rubric, and that it expressly provides for full-fledged judicial review after the conclusion of the administrative phase of the proceedings. Much like the district court in *Jackson Water Works*, the undersigned finds that Humboldt County rationally concluded that the public's interest would be better served by allowing for the selection of an administrative forum for the *initial* phase of the overall adjudication of its code enforcement cases – that is, before those matters might proceed to state court for final judicial review. For these reasons, and because it cannot be remedied by further amendment, Claim-5 (denial of the right to a jury under the Seventh and Fourteenth Amendments) is **DISMISSED with prejudice**.

### ***Improperly Sued Individual Defendants***

Plaintiffs have sued the five individual members of the County's legislative arm – the Board of Supervisors – without alleging any actionable individual action on any of their parts other than stating that "[t]he Board of Supervisors passed the ordinances at issue in this case, and it controls, directs, and funds the County's Planning and Building Department and its subsidiary Code Enforcement Unit." *See* FAC (dkt. 31) at ¶¶ 23, 25-29. The members of the Board of Supervisors are never mentioned again in the FAC – their inclusion is, quite literally, only pegged to the fact that they sit on a board that legislated the ordinances at issue. *See generally id.* at ¶¶ 1-

618. Additionally, Plaintiffs have sued Defendant John H. Ford – Director of the Humboldt County Planning and Building Department. *See id.* at ¶ 30. As the case caption in the FAC makes clear, these individuals have all been sued only in their official capacities. *See id.* at 1.

To the extent that Plaintiffs have sued Defendants Madrone, Bohn, Wilson, Bushnell, and Arroyo (hereafter, "the Supervisors"), because they "passed the ordinances at issue in this case" (*id.* at ¶ 23) that theory is untenable as those Defendants enjoy absolute legislative immunity for such actions. *See Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998) ("Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity," and "[m]ost evidently . . . acts of voting for an ordinance were, in form, quintessentially legislative."). Plaintiffs appear to state that this is not the basis on which the Supervisors have been sued. *See* Pls.' Opp. (dkt. 36) at 16. On the other hand, to the extent that the Supervisors have been sued for their official actions because the Board "controls, directs, and funds the County's Planning and Building Department" (*see* FAC (dkt. 31) at ¶ 23), it is still improper to name them individually because liability attaches to the entity represented by official capacity defendants, and it is redundant and unnecessary to name the individual if the entity has received notice and an opportunity to respond to the action. *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) ("In at least three recent cases arising under § 1983, we have plainly implied that a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. We now make that point explicit."). This applies with equal force to Defendant Ford as well – given that he has also been sued in his official capacity, and also that he has not been alleged to be responsible for any actionable conduct beyond that which the FAC has pegged to the County itself. Plaintiffs' only response in this regard is to state that "[c]ourts routinely entertain suits against both municipal entities and their officials," while citing (without using a pinpoint citation) to one patently inapplicable case. *See* Pls.' Opp. (dkt. 36) at 17. The response is unavailing – as Defendants point out, this is a suit against the County, not against the needlessly-named officials. *See* Defs.' Mot. (dkt. 32) at 20. Indeed, as pleaded, each of the 5 causes of action is only brought "against the County," without so much as a mention of the individual defendants. *See* FAC (dkt. 31) at ¶¶ 497,

1    517, 549, 565, 587. Accordingly, Defendants Madrone, Bohn, Wilson, Bushnell, Arroyo, and Ford

2    are herewith **DISMISSED** from this action.

3                    ***Claim-1 (denial of procedural due process) Fails to State a Claim***

4            Through Claim-1, Plaintiffs submit that their procedural due process rights have been

5    violated in that the County's "policy and practices [], taken together, deprive owners facing

6    cannabis abatement orders of a meaningful opportunity to be heard." *Id*. at ¶ 497. This claim is

7    supported by ineffectual and implausible allegations – specifically, the ten supposed indicia of

8    denials of notice or a meaningful opportunity to be heard, are all either implausible, irrelevant,

9    conclusory, or are based on unreasonable inferences or unwarranted deductions. In that vein,

10   Plaintiffs claim procedural due process violations because the County supposedly issued them

11   violations "without adequate investigation or regard for probable cause"; that it refused to dismiss

12   citations when shown photographic proof that there is no cannabis on the property; that it

13   "refus[ed] to allow landowners to abate permitting violations by obtaining the permit at issue"; 

14   that it "obscured" the time landowners have to comply with an abatement order; that the County

15   conditions the issuance of abatement permits on a landowner's payment of unrelated fines and

16   fees; and, that it failed to toll the accrual of fines before an accused can receive an administrative

17   hearing. *See id*. at ¶ 504. Based on the standards set forth above, these allegations are not entitled

18   to a presumption of truth for present purposes. As to the suggestion that the County refuses to

19   issue non-remedial land-use permits during the pendency of code enforcement cases (*see id*.) – as

20   explained above – because no Plaintiff actually applied for such a permit, let alone having had

21   such an application rejected, the allegation is unripe. All that remains to support Plaintiffs'

22   procedural due process claim, therefore, are the suggestions: (1) that the violations were issued

23   "without adequate investigation or regard for probable cause"; (2) that the violations were "based

24   on satellite images that predate the passage of the cannabis-related code at issue"; (3) that the

25   County impermissibly delays the administrative hearings; and (4) that "[c]harging up to $4,500 for

26   an administrative hearing or a compliance agreement" supposedly violated their procedural due

27   process rights. *See id*. at ¶ 504(a), (b), (h), (j).

28           The Fourteenth Amendment's Due Process Clause "protects persons against deprivations

United States District Court
Northern District of California

36

of life, liberty, or property." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In provides two

distinct, but related, spheres of protection – procedural and substantive. *See Albright v. Oliver*, 510

U.S. 266, 272 (1994). "The touchstone of due process is protection of the individual against

arbitrary action of government, whether the fault lies in a denial of fundamental procedural

fairness or in the exercise of power without any reasonable justification in the service of a

legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)

(citations and internal punctuations omitted). For purposes of analyzing the viability of Claim-1,

the inquiry must begin by noting that "[a] procedural due process claim has two distinct elements:

(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of

adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149

F.3d 971, 982 (9th Cir. 1998); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59

(1999). Once the first prong is satisfied, the inquiry turns to determining "what process is due."

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The hallmark of procedural due process is that

any deprivation of life, liberty or property must "be preceded by notice and opportunity for

hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339

U.S. 306, 313 (1950). As to the hearing, it must constitute an "opportunity to be heard at a

meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Where a meaningful pre-deprivation hearing is practicable, post-deprivation remedies do not

provide due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982).

   The notice must also be sufficient to enable the plaintiff to prepare for the hearing in a

meaningful way. *See SEIU Local 1021 v. Cnty. of Mendocino*, No. 20-cv-05423-RMI, 2021 U.S.

Dist. LEXIS 5980, at *8 n.2 (N.D. Cal. Jan. 12, 2021). "Precisely what procedures the Due

Process Clause requires in any given case is a function of context." *Brewster*, 149 F.3d at 983. A

three-part balancing test is used to determine whether or not a given set of procedures satisfy due

process in a given case. *See id.* To that end, *Mathews v. Eldridge* requires courts to consider: (1)

the private interest that will be affected by the official action; (2) the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards; and, (3) the governmental interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Mathews*, 424 U.S. at 335. Lastly, it should be noted that property interests are not created by the Constitution but by existing rules or understandings that stem from independent sources such as state law. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005).

Rather than focusing its procedural due process claim on notice and a meaningful opportunity to be heard, Plaintiffs' FAC simply throws out a litany of remonstrances (*see* FAC (dkt. 31) at ¶ 504(a)-(j)) – nearly all of which do not fit into the procedural due process rubric at all. By way of example, "[c]harging up to $4,500 for an administrative hearing or a compliance agreement" (*see id*. at ¶ 504(j)) is not relevant to effective notice or a meaningful opportunity to be heard; and, even if it were, no Plaintiff in this case has been made to pay such a sum. Likewise, the suggestion that the County refuses to dismiss citations when shown "photographic proof that there is no cannabis on the property" (*see id*. at ¶ 504(c)) is also irrelevant to an alleged deprivation of notice or a meaningful opportunity to be heard; and, even if relevant, the assertion constitutes an unwarranted deduction in that such a photograph would not be conclusive as to the absence of cannabis on the property and would not be in any way relevant to the grading or building code violations at issue here. Plaintiffs' assertions that these investigations were inadequate, or without regard for probable cause, or based on old satellite images, (*see id*. at ¶ 504(a),(b)) are conclusory and contradicted by the record as set forth herein, as is the case with the majority of Plaintiffs' assertions offered in support of this claim (*see also id*. at ¶ 504(d), (f), (g)). Plaintiffs' assertion to the effect that the County's failure "to toll the accrual of fines before an accused can receive an administrative hearing" (*see id*. at ¶ 504(i)) is premised on Plaintiffs' stubborn refusal to acknowledge the reality that the "penalties" set forth in the notices are merely *proposed* penalties (*see* n.2 *supra*) which can be reduced or eliminated at several junctures in the administrative process – as was done in the course of Graham's code enforcement matter. When stripped of this content, all that remains is Plaintiffs' grievance about the timeliness of administrative hearings (*see id*. at ¶ 504(h)). Lastly, and in conclusory fashion, Plaintiffs submit that "[t]he County's procedurally deficient system creates an unreasonable risk of erroneous deprivation of property."

38

United States District Court
Northern District of California

1  *Id*. at ¶ 505. However, the FAC does not allege that any Plaintiff has actually been deprived of

2  liberty or any property. No party has paid any fines; no party has otherwise been deprived of any

3  other property; the unripe suggestion that non-remedial land use permits have been denied has

4  never been tested by an actual application for one (let alone an actual denial); Graham has

5  voluntarily resolved his case and paid only a few hundred dollars for a permit (or for other fees,

6  but it matters not because he *voluntarily* paid that sum); and the other Plaintiffs have repeatedly

7  delayed their own hearings by expressing interest in resolving their cases. Thus, Plaintiffs

8  themselves have occasioned most of the delay of which they now complain.

9      As set forth above, the County is still waiting for the Thomases' actions to either submit a

10  remedial plan or to obtain a permit to demolish the unpermitted (and potentially unsafe) structure

11  on their property – subject to two agreements into which they entered voluntarily. The Thomases'

12  first compliance agreement stayed all enforcement for a six-month period, following which, their

13  attorney informed the County the Thomases wanted to keep their unpermitted structure pursuant to

14  a new County policy (rather than to demolish it pursuant to their agreement). Then, in August of

15  2022, when the Thomases were presented with a new agreement that allowed them to avoid

16  removing their unpermitted structure if, within eight weeks, they submitted a restoration plan and

17  a permit application, they then chose to neither proceed with a restoration plan, nor to demolish

18  the structure as they had previously agreed. Instead, while now insisting on keeping their

19  unpermitted three-story structure, the Thomases maintain that they are not willing to pay increased

20  permit fees due to a prior owner's wrongdoing. Thus, most (if not all) of the delay in the

21  Thomases' case has clearly been occasioned by their own hand. Then there is the fact that the

22  operative violation notice as to their property does not even name them as the responsible party –

23  calling into some question their right to a hearing on that notice in the first place. Nor does the

24  FAC allege that the Thomases have ever been fined, or that their unpermitted (and reportedly

25  unsafe) three-story structure has been in any way harmed by the County. Much like the Thomases,

26  Olson also repeatedly led the County to believe that she preferred to informally resolve her case;

27  through three sets of consultants, Olson started and stopped her applications for approval of

28  remediation plans multiple times. Accordingly, it cannot be plausibly suggested that the Thomases

1    and Olson have suffered any deprivation of a constitutionally-protected liberty or property interest

2    – let alone a denial of adequate procedural protections. *See Brewster*, 149 F.3d at 982.

3           The other two Plaintiffs fare no better in this regard. Graham's voluntary settlement of his

4    case effectively forfeits his right to complain about any delay attending an administrative hearing;

5    and, even if that were not the case, much of the delay leading up to his settlement was attributable

6    to Graham himself. Following Graham's filing of his initial appeal request in May of 2018, he

7    demolished and properly reconstructed the two unpermitted greenhouse structures on his property

8    pursuant to valid agricultural permits[4] – meaning that his only active violation in his matter was an

9    unpermitted grading violation that existed on his property. As set forth above, between May of

10   2018 and Graham's ultimate settlement of his case in the Fall of 2022, Graham and the County

11   were engaged in back-and-forth settlement negotiations. Once it appeared that those negotiations

12   would not bear any fruit, and Graham's grading violation was actually scheduled for an

13   administrative hearing in October of 2022, Graham then chose to voluntarily settle his case.

14          Glad's case is riddled with equivocation. He requested his hearing in November of 2018

15   but noted that all nuisances were in the process of being removed, cleaned, and brought into

16   compliance with county code standards (which, of course, would obviate the need for any

17   hearing). He then hired an engineer to assess the property, while he continued his work of cleaning

18   up the mess that the prior occupants had left. In February of 2019, he sent Director Ford a letter

19   "to plead with him and seek compassion of the violations the County cited [him] for just weeks

20   after he purchased the property," and claims that he "never received a response." *See* FAC (dkt.

21   31) at ¶¶ 478, 479. As mentioned above, county records indicate that CEU sent Glad a letter on

22   May 6, 2021, asking him whether or not the County should schedule his appeal hearing, or if he

23   preferred to enter into a compliance agreement and settle and resolve his case; and the record does

24   not indicate any further action on Glad's case by either Glad or the County. It is therefore

25

26   ─────────────────

27   [4] As set forth in detail *supra*, Graham applied for and received these building permits, allowing him to abate two of the three violations on his property voluntarily (which resulted in the dismissal of those violations). This, of course, thoroughly contradicts the FAC's conclusory assertion that the County

28   "refus[es] to allow landowners to abate permitting violations by obtaining the permit at issue." *See* FAC (dkt. 31) at ¶ 504(d).

United States District Court
Northern District of California

1    implausible for Glad to suggest that the delay in his matter being scheduled for a hearing is only

2    attributable to the County, as Glad repeatedly led the County to believe that he preferred an

3    informal resolution. It should also not go without mention that no Plaintiff has advanced any

4    plausible non-conclusory assertion of any prejudice attributable to the County stemming from any

5    delay in the scheduling of any administrative hearings. As to the suggestion that a hearing might

6    have been required prior to the issuance of the notices in question – such a suggestion would have

7    no basis in the law. *See e.g.*, *Walnut Hill Estate Enters. v. City of Oroville*, No. 2:09-cv-00500-

8    GEB-GGH, 2010 U.S. Dist. LEXIS 74084, at *16-17 (E.D. Cal. July 21, 2010) ("Plaintiffs have

9    not pointed to any California law requiring a hearing prior to the issuance of a 'Notice of Repair or

10   Demolish.'"). In the end, because no Plaintiff has been subjected to any deprivation of any

11   constitutionally-protected liberty or property interest, or any denial of adequate procedural

12   protections, it cannot be plausibly contended that any of them have suffered any procedural due

13   process violations; nor does it appear that these defects could be remedied by further amendment.

14   For these reasons, as well as those argued by Defendants (*see* Defs.' Mot. (dkt. 32) at 21-25; *see*

15   *also* Defs.' Reply (dkt. 37) at 10-13), Claim-1 (denial of procedural due process) is **DISMISSED**

16   **with prejudice**.

17                    ___Claim-2 (denial of substantive due process) Fails to State a Claim___

18           Claim-2 argues that Plaintiffs have suffered a denial of substantive due process "based on

19   [the County's] policy, practice, and custom of issuing citations and imposing penalties for code

20   violations allegedly related to cannabis cultivation (a) without regard for probable cause that the

21   accused has cultivated cannabis illegally and (b) unsupported by a valid governmental interest."

22   *See* FAC (dkt. 31) at ¶ 517. This claim, too, is entirely supported by baseless assertions,

23   conclusory statements, unreasonable inferences, unwarranted deductions, and outright contortions

24   of reality. As set forth above, CEU relied on County records to determine whether or not certain

25   structures that existed on Plaintiffs' properties were permitted or unpermitted – and in the case of

26   the unpermitted tunnel, the unpermitted three-story building, the unpermitted greenhouses, sheds,

27   and other structures, the unpermitted structures within Streamside Management Areas, the solid

28   waste piles, the vehicles improperly being used as residences, and the junked school bus – the

                                                        41

1    County used various investigative methods (including a criminal search warrant) to determine that

2    these unpermitted structures were erected in violation of applicable building, plumbing, and / or

3    electrical codes. In other words, a great many of the code violations at issue in this case were

4    unrelated to any notion as to whether or not these Plaintiffs (or even their predecessors in interest)

5    were or were not actively cultivating cannabis on their properties. Nevertheless, the FAC advances

6    heedless allegations in support of Claim-2 as such: "[r]elying on aerial images alone, the County

7    charges Category 4 violations for activity unrelated to cannabis like having a greenhouse or a

8    rainwater-catchment unit [while] [t]he presence of an unpermitted greenhouse or rainwater-

9    catchment unit is not probable cause that a landowner is cultivating cannabis without a permit."

10   *See id.* at ¶ 525-26. The FAC then proceeds to reassert the litany of conclusory assertions about

11   the accrual of astronomical daily proposed fines (though no Plaintiff has paid any fine); the

12   supposed deprivation of landowners' right to develop their property while they wait indefinitely

13   for administrative hearings (though no Plaintiff has ever applied for such a permit); that the

14   "policy and practice of charging Category 4 violations without probable cause imposes a

15   significant financial, reputational, and psychological cost on the named Plaintiffs' and the Class as

16   soon as their receive [a violation notice]" (notwithstanding the fact that each of these Plaintiffs

17   knew or had constructive knowledge that they were purchasing properties with existing code

18   violation matters); and, that the County charges up to $4,500 in administrative fees to hold

19   hearings or settle these code enforcement matters (though Graham ultimately paid no such

20   administrative fees to settle his case, and neither has any other Plaintiff paid any such fee). *Id.* at ¶

21   531-34. Beyond this, Plaintiffs FAC renders a series of legal conclusions masquerading as factual

22   allegations. By way of just a few examples, Plaintiffs' FAC argues: that "[t]he County has no

23   legitimate governmental interest in charging cannabis-related Category 4 violations without regard

24   for probable cause" (*id.* at ¶ 535); that "[n]o process the government can provide could justify its

25   deprivation of life, liberty, or property when there is no governmental interest in the deprivation"

26   (*id.* at ¶ 538); that "[t]he County has no interest in punishing conduct that does not harm the

27   public" (*id.* at 539); and, that "[n]o process could justify the government's deprivation of an

28   innocent person's life, liberty, or property based on someone else's conduct." *Id.* at ¶ 541.

United States District Court
Northern District of California

Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoted sources and internal quotation marks omitted); *see also Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009). "To state a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty, or property interest." *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). It should be noted, "[h]owever, [that] [t]he Supreme Court has 'long-eschewed . . . heightened [means-ends] scrutiny when addressing substantive due process challenges to government regulation' that does not impinge on fundamental rights." *Id.* (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005)).

For that reason, "the 'irreducible minimum' of a substantive due process claim challenging land use action is failure to advance any legitimate governmental purpose.'" *Shanks*, 540 F.3d at 1087 (quoting *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008)); *see also Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1156 (9th Cir. 2008) ("[S]tate action which neither utilizes a suspect classification nor draws distinctions among individuals that implicate fundamental rights will violate substantive due process only if the action is not rationally related to a legitimate governmental purpose.") (internal quotations omitted). A plaintiff bears an "exceedingly high burden" in demonstrating that a municipality behaved in a constitutionally arbitrary fashion. *See Matsuda*, 512 F.3d at 1156.

When executive action is at issue, "only egregious official conduct can be said to be arbitrary in the constitutional sense: it must amount to an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective." *Shanks*, 540 F.3d at 1088 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *see also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 198 (2003) (rejecting substantive due process claim because city engineer's refusal to issue building permits "in no sense constituted egregious or arbitrary government conduct"). Even decisions based upon erroneous legal interpretations, or those rendered with a lack of due care, are not necessarily constitutionally arbitrary. *Id.*; *see also Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (rejecting claims "that the Due

43

1  Process Clause should be interpreted to impose federal duties that are analogous to those

2  traditionally imposed by state tort law"); *Brittain v. Hansen*, 451 F.3d 982, 996 (9th Cir. 2006)

3  ("[S]ubstantive due process secures individuals from 'arbitrary' government action that rises to the

4  level of 'egregious conduct,' not from reasonable, though possibly erroneous, legal

5  interpretation."). The court's task in evaluating such claims "is not to balance 'the public interest

6  supporting the government action against the severity of the private deprivation.'" *Id.* (quoting

7  *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1237-38 (9th Cir. 1994)). Instead, a plaintiff's

8  substantive due process claim must fail if "[i]t is at least fairly debatable" that a municipality

9  rationally furthered its legitimate interest through its challenged action. *Id.*

10         In promulgating the chapter of its Code setting forth its administrative penalty framework

11  of which Plaintiffs complain, the Board of Supervisors found that "enforcement of the Humboldt

12  County Code, [the] other ordinances adopted by the County of Humboldt and conditions on

13  entitlement set forth in permits and / or agreements that have been issued or approved by the

14  County are matters of local concern and serve important public purposes." *See* HCC § 352-2(b).

15  The Board further found that it was furthering the following goals: (1) protecting the public's

16  health, safety, and welfare; (2) providing an administrative process that employs objective criteria

17  for the imposition of penalties and provides for a process to appeal the imposition of penalties; (3)

18  providing a means of properly penalizing persons who fail or refuse to comply with the County's

19  code and its other ordinances; and (4) minimizing the expense and delay associated with pursuing

20  alternative remedies through the civil and criminal justice system. *See* HCC § 352-2(b)(1)-(4).

21         First, as discussed above in the context of Claim-1 (procedural due process), none of these

22  Plaintiffs have plausibly alleged any cognizable deprivation of life, liberty, or property. Second,

23  when stripped from its conclusory and implausible content, the FAC also fails to allege any lack of

24  governmental interest in either the statutory framework or the executive enforcement actions taken

25  thereunder. Third, the FAC contains no competent allegations which establish that any action

26  taken by the County that shocks the conscience, that was arbitrary or discriminatory, or that

27  interfered with rights implicit in the concept of ordered liberty. In other words, Plaintiffs have not

28  even approached "show[ing] as a threshold matter that a state actor deprived [them] of a

44

1   constitutionally protected life, liberty, or property interest," or that the land use actions involved in

2   this case failed to advance legitimate governmental purposes. *See Shanks*, 540 F.3d at 1087.

3   Because this case does not involve any plausible allegation that state action either utilized a

4   suspect classification, or drew distinctions among individuals that implicate fundamental rights, or

5   that was arbitrary in the constitutional sense, and because it is clear that all of the complained of

6   land use actions were all eminently related to the legitimate governmental purposes set forth in

7   HCC § 352-2(b)(1)-(4), Plaintiffs have not stated – and will not be able to state – a substantive due

8   process claim. *See Matsuda*, 512 F.3d at 1156.

9          Plaintiffs' arguments to the contrary are all unpersuasive because they simply rehash the

10   FAC's conclusory statements and its implausible allegations. *See* Pls. Mot. (dkt. 36) at 22-25.

11   Plaintiffs argue that "the abatement program violates due process because the County enforces it

12   with systematic indifference to innocence . . . [and] disregards probable cause and fails to

13   investigate before it administers penalties . . . [and] knowingly penalizes innocent purchasers for

14   the conduct of others." *Id*. at 22. However, as is clear from the factual background set forth above,

15   these are gross mischaracterizations. First, each of these Plaintiffs (with either actual or

16   constructive knowledge) purchased properties with existing code violations, such as unpermitted

17   (and potentially unsafe) structures and buildings, a tunnel of some sort, illegal installations in

18   Streamside Management Areas, and unpermitted grading – it is, therefore, unreasonable to suggest

19   that they should be permanently immunized (as a matter of constitutional law) from code

20   enforcement as to the unpermitted and violative conditions on their land. Second, it is highly

21   disingenuous to contend that the County enforces the abatement program with "systematic

22   indifference to innocence," or that the County "disregards probable cause and fails to investigate"

23   when each of these Plaintiffs (in one way or another) has expressly acknowledged the existence of

24   unpermitted or otherwise violative conditions on their land. Plaintiffs also argue that "due process

25   prohibits punishing innocent purchases," by contending that the "the NOV's don't just order the

26   abatement of existing nuisances – they impose penalties for past illegal *conduct*." *Id*. at 24. This

27   too is a mischaracterization. As stated herein repeatedly, the penalties, about which Plaintiffs have

28   made much ado, are merely "proposed penalties," none of the Plaintiffs in this case have paid a

single cent of penalties. The proposition of penalty in the initial notices is clearly meant to be coercive in order to induce speedy compliance with the abatement orders. As is clear from Graham's code enforcement matter, the County has no interest whatsoever in lining its pockets with penalty money – instead, its only interest is in securing compliance with its abatement orders and bringing non-compliant properties into compliance with its land use code. In short, Plaintiffs have failed to state a claim for any substantive due process violations – and, it is clear that this defect cannot be cured by further amendment. Accordingly, for these reasons, as well as those argued by Defendants (*see* Defs.' Mot. (dkt. 32) at 26-28; *see also* Defs.' Reply (dkt. 37) at 13-14), Claim-2 (denial of substantive due process) is **DISMISSED with prejudice**.

### *Claim-3 (violation of the unconstitutional conditions doctrine) Fails to State a Claim*

Plaintiffs state that they "bring this Count based on the County's policy and practice of denying permits to landowners who face cannabis-related Category 4 violations brought without regard for probable cause unless the landowner will agree to (a) pay a sum of money the County has proposed in an unrelated settlement agreement; (b) waive their due-process right to a hearing at which they can contest unrelated code violations; (c) consent to warrantless searches of their property; and (d) waive their right to sell or otherwise transfer their property." *See* FAC (dkt. 31) at ¶ 549. The FAC goes on to proclaim that "[t]he unconstitutional conditions doctrine vindicates constitutional rights by prohibiting the government from coercing people into giving them up in exchange for a discretionary benefit such as a building or grading permit[,] [however] [t]he government cannot coercively withhold a land-use permit from someone for exercising their constitutional right." *Id*. at ¶ 550-51.

Once again, this claim is built on a foundation of mischaracterizations, conclusory statements, unwarranted deductions, unreasonable inferences, and implausible assertions. As stated above, no Plaintiff in this case has even applied for such a non-remedial land-use permit – let alone having such application rejected for this reason. Second, contrary to Plaintiffs' suggestion, an insistence on flouting valid land use ordinances (building codes, plumbing codes, electrical codes, permitting requirements, etc.) is not a constitutional right. Third, as described above, all of the County's regulations at issue here serve legitimate governmental interests and all

United States District Court
Northern District of California

1    have been enforced in an even-handed, proportionate, non-discriminatory, and non-arbitrary

2    manner. While Plaintiffs contend that the "sum that the County proposes in settlement offers,

3    including fines and / fees, is not roughly proportionate to the social costs associated with the

4    landowner's permit application," (*see id*. at ¶ 557) Plaintiffs gloss over the fact that none of them

5    have actually unsuccessfully applied for any non-remedial permits during the pendency of their

6    code enforcement cases. This assertion is particularly disingenuous because the only remedial

7    permit application to have been submitted by any plaintiff in this case, Graham, was accepted and

8    *granted* on the spot. When he was negotiating a resolution of what remained of his code

9    enforcement matter (a single grading violation) with Director Ford on the eve of his administrative

10   hearing, Graham applied for a grading permit there-and-then using a hand-drawn site plan;

11   Graham's permit application was accepted and granted that very day. So too, therefore, is it

12   disingenuous for Plaintiffs to suggest that "[t]his monetary exaction in exchange for a permit is an

13   unconstitutional condition," (*see id*. at 558) when the only one of them to have applied for a

14   permit of any sort had the permit granted without any such "monetary exaction" other than an

15   ordinary permit fee. Plaintiffs also contend that "[t]he demand that landowners give up their

16   constitutionally guaranteed right to a hearing on the County's unrelated claims against them in

17   exchange for a permit is also an unconstitutional condition." *Id*. at ¶ 559. Lastly, Plaintiffs suggest

18   that Graham "is entitled to a declaration that the County's exaction" of $795.92 in fees for a

19   grading permit for his rainwater-catchment pond violated the doctrine against unconstitutional

20   conditions. *Id*. at ¶ 562. However, in so contending, Plaintiffs overlook the fact that Graham

21   actually had an administrative hearing scheduled, and days before the hearing was to take place,

22   Graham *voluntarily* decided to cancel his own hearing and to pay the sum in question to resolve

23   the matter informally.

24         The unconstitutional conditions doctrine is rooted in the proposition, established through a

25   long line of cases likely beginning with *Lafayette Ins. Co. v. French*, 59 U.S. (18 How.) 404, 407

26   (1856), and *Barron v. Burnside*, 121 U.S. 186 (1887)[5], that the government may not deny a

27

28   _____

     [5] "In both of the cases referred to, the foreign corporation had made the agreement not to remove into the
     Federal court suits to be brought against it in the state court. In the present case, no such agreement has

                                               47

United States District Court
Northern District of California

1    discretionary benefit to a person simply by virtue of that person's exercise of a constitutional right.

2    *See e.g., Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983); *Rumsfeld v.*

3    *Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59-60 (2006); *Rutan v.*

4    *Republican Party of Ill.*, 497 U.S. 62, 78 (1990); *see also Perry v. Sindermann*, 408 U.S. 593, 602-

5    03 (1972) (public college would violate a professor's freedom of speech if it declined to renew his

6    contract because he was an outspoken critic of the college's administrators); *see also Memorial*

7    *Hospital v. Maricopa County*, 415 U. S. 250, 269-70 (1974) (county impermissibly burdened the

8    right to travel by extending healthcare benefits only to those indigent sick who had been residents

9    of the county for at least one year). "Those cases reflect an overarching principle, known as the

10   unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by

11   preventing the government from coercing people into giving them up." *Koontz v. St. Johns River*

12   *Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

13          Certain types of land use cases "'involve a special application' of this doctrine that protects

14   the Fifth Amendment right to just compensation for property the government takes when owners

15   apply for land-use permits," and in such cases, the Supreme Court has explained that past

16   decisions "reflect two realities of the permitting process[:] [] that land-use permit applicants are

17   especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits

18   because the government often has broad discretion to deny a permit that is worth far more than

19   property it would like to take . . . [and] that many proposed land uses threaten to impose costs on

20   the public that dedications of property can offset [such as] [w]here a building proposal would

21   substantially increase traffic congestion, for example, officials might condition permit approval on

22   the owner's agreement to deed over the land needed to widen a public road." *Id.* at 604-05. Thus,

23   in *Koontz*, the Court explained that its precedent in this area has sought to "accommodate both

24   realities by allowing the government to condition approval of a permit on the dedication of

25   _____

26   been made, but the locomotive engineer is arrested for acting as such in the employment of the corporation,
     because it has refused to stipulate that it will not remove into the Federal court suits brought against it in
27   the state court, as a condition of obtaining a permit, and consequently has not obtained such permit . . . In
     all the cases in which this court has considered the subject of the granting by a state to a foreign corporation
28   of its consent to the transaction of business in the state, it has uniformly asserted that no conditions can be
     imposed by the state which are repugnant to the Constitution and laws of the United States." *Id.* at 199-200.

property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Id*. at 605-06.

For example, a litigation waiver included in a settlement agreement does not amount to an unconstitutional condition because there is "'a close nexus – a tight fit – between the specific interest the government seeks to advance in the dispute . . . and the specific right waived.'" *Emmert Indus. Corp. v. City of Milwaukee*, 307 F. App'x 65, 67 (9th Cir. 2009) (quoting *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991)). Thus, while "the government may not impose a choice between the government benefit and the exercise of a constitutionally guaranteed right," (*see Parks v. Watson*, 716 F.2d 646, 650 (9th Cir. 1983), the doctrine "does not strip state and federal governments of [the] indispensable and long acknowledged power [to conclude commercial bargains]." *Honolulu Rapid Transit Co. v. Dolim*, 459 F.2d 551, 553 (9th Cir.), cert. denied, 409 U.S. 875 (1972). Lastly, "[b]ecause the doctrine of unconstitutional conditions only applies where surrender of a constitutional right is at stake, a plaintiff's initial burden is to demonstrate that a constitutional right is implicated, and to specify which one." *La. Pac. Corp. v. Beazer Materials & Servs.*, 842 F. Supp. 1243, 1251 (E.D. Cal. 1994).

Here, Plaintiffs' FAC identifies four allegedly unconstitutional conditions attending the County's alleged "practice of denying permits" unless Plaintiffs agree to (a) pay a sum of money the County has proposed in an unrelated settlement agreement; (b) waive their due-process right to a hearing at which they can contest unrelated code violations; (c) consent to warrantless searches of their property; and (d) waive their right to sell or otherwise transfer their property." *See* FAC (dkt. 31) at ¶ 549. However, as was the case above – Plaintiffs' contention is built on a faulty foundation. First, the court will note – once again – that no Party has applied for and been denied such a non-remedial permit. Second, the FAC makes only mention of Plaintiffs' "right to sell or transfer their property" (*see id*. at ¶¶ 325, 547, 556) in cursory and conclusory fashion in three isolated snippets; perhaps because no Plaintiff other than Graham has entered into a settlement agreement with the County. Third, Graham – the only Party to apply for a permit had his permit

1    granted that same day without being subjected to any onerous set of conditions. To the extent

2    Plaintiffs contend that Graham waived his hearing "in exchange for" his permit – that

3    characterization would be disagreeable because Graham agreed to cancel his hearing because his

4    case had been resolved and there was nothing left to contest at a hearing. To the extent that

5    Plaintiffs contend that Graham's resolution of his case (or that of any of the other Plaintiffs') was

6    (or would be) conditioned upon CEU being permitted to inspect the property to determine

7    compliance with the agreement – that condition clearly bears "'a close nexus – a tight fit –

8    between the specific interest the government seeks to advance in the dispute . . . and the specific

9    right waived.'" *Emmert Indus. Corp.* 307 F. App'x at 67 (quoting *Davies*, 930 F.2d at 1399).

10   Lastly, the only Plaintiff to pay any sum of money in this case was Graham – who voluntarily paid

11   a few hundred dollars in fees to secure his grading permit and resolve his case.

12          In short, perhaps with the exception of the right to privacy, implicated by a potential

13   agreement to let CEU inspect a reportedly remedied code violation, and the proposals to delay

14   alienation or sale of the land in question during the agreed-upon period for abating nuisances (as

15   set forth in the proposed, but rejected, settlement agreements), Plaintiffs have failed "to

16   demonstrate that a constitutional right is implicated, and to specify which one." *Beazer Materials

17   & Servs.*, 842 F. Supp. at 1251. Plaintiffs have not shown – and, in the court's opinion will not be

18   able to show – that the County has ever sought to impose a choice between a government benefit

19   and the exercise of a constitutionally guaranteed right. The court sees nothing wrong with

20   Graham's agreement with the County. And, in other respects, it is clear (as Defendants argue) that

21   "the [other proposed] compliance agreements here impose conditions closely tailored to the

22   County's goal to enforce its laws, such as inspections to confirm compliance, corrective actions

23   including obtaining permits, limiting transfer of property until compliance is achieved, and

24   imposing fines [if] compliance does not follow . . . [in exchange for which] the County agrees to

25   dismiss citations, not take enforcement action unless the property [owner] fails to comply, and

26   issues a release of the enforcement action, all to the benefit of the property owner." *See* Defs.'

27   Mot. (dkt. 32) at 32. In any event, with the exception of Graham – whose case is resolved – no

28   other Plaintiff has executed any compliance agreement or been made to forfeit any constitutional

United States District Court
Northern District of California

50

1    right in exchange for any discretionary benefit, at least not in the absence of a close nexus between

2    the specific interest the County has sought to advance and the specific right for which a waiver

3    was solicited.

4            As to the limited waiver of a privacy right (necessary for the County to inspect a property

5    owner's report of abatement pursuant to such a settlement agreement), the court finds that such a

6    limited waiver bears the requisite "close nexus" to bring it outside of the scope of the

7    unconstitutional conditions doctrine. Likewise, as to the requested agreement to not alienate or sell

8    a subject parcel during the operative period of a settlement agreement's period allowing for the

9    abatement of a nuisance, that too bears the requisite close nexus to place it beyond the doctrine's

10   ambit. Indeed, had such a restraint on alienation or sale been incumbent on the Zaccardo brothers

11   and Kevin Penny, the owners of "Lb 4 Lb LLC" of New York, perhaps Olson would not have

12   been bought her way into the code enforcement cases which she claims caused her profound

13   distress and illness – the same can be said for the Thomases and Glad, all of whom also appear to

14   have bought their way into existing code enforcement cases. In light of the above, the court finds

15   that Plaintiffs have not stated a claim under the unconstitutional conditions doctrine and that it

16   appears that further opportunities for amendment would be futile. Accordingly, for these reasons,

17   as well as those put forth by Defendants (*see* Defs.' Mot. (dkt. 32) at 30-32; *see also* Defs.' Reply

18   (dkt. 37) at 8-9), Claim-3 (alleging violations of the unconstitutional conditions doctrine) is

19   **DISMISSED with prejudice**.

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

United States District Court
Northern District of California

## CONCLUSION

For the reasons explained herein, as well as on the basis of the remainder of Defendants' arguments not expressly mentioned or discussed herein, Plaintiffs' First Amended Class Action Complaint (dkt. 31) is **DISMISSED with prejudice** in its entirety. The court will issue a separate judgment as required by Rule 58(a).

**IT IS SO ORDERED.**

Dated: May 12, 2023

ROBERT M. ILLMAN
United States Magistrate Judge